**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

SHAWN COREY CARTER,

      Plaintiff,

          v.

ANTHONY BUZBEE, DAVID
FORTNEY, ANTHONY G. BUZBEE LP
(d/b/a THE BUZBEE LAW FIRM),
ANTIGONE CURIS, CURIS LAW, PLLC
and JANE DOE,

      Defendants.

Case No. 1:25-CV-00086-TFM-MU

---

**PLAINTIFF SHAWN COREY CARTER'S AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**William G. Somerville
W. Patton Hahn
Jade E. Sipes
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
1901 Sixth Avenue North, Ste. 2600
Birmingham, Alabama 35226
wsomerville@bakerdonelson.com
phahn@bakerdonelson.com
jsipes@bakerdonelson.com**

*Attorneys For Plaintiff Shawn Carter*

## Introduction

1.   A. False;

   B. Malicious;

   C. Strategically and tactically calculated and timed to inflict maximum pain, and economic and reputational damage; and

   D. Executed in concert with co-conspirator attorneys, including Defendants Anthony Buzbee, David Fortney, and Antigone Curis who — like Jane Doe — were soullessly motivated by greed, in their scheme to extort and defraud an innocent man and his family, with abject disregard of the truth and the most fundamental precepts of human decency.

2. These are the truthful, accurate, and irrefutable descriptions of Jane Doe's and her lawyers' reprehensible conduct. The malevolent and willful acts they undertook in furtherance of their vile conspiracy to extort, defraud, and assassinate the impeccable and lifetime-earned reputation and character of Shawn Corey Carter are incomprehensible to people of decency.

3. Mr. Carter is professionally known as Jay-Z, but more importantly is known to those he loves and who love him as dad, husband, son, friend, and partner. He is a human being who did nothing to deserve or elicit the false, wanton, and depraved attack that Jane Doe and her lawyers launched to make a quick eight-figure amount through extortion.

4. Mr. Carter's living nightmare began in the Fall of 2024 when, in furtherance of their conspiracy to defraud and extort Mr. Carter, Doe and her co-conspirator attorneys — Anthony Buzbee ("Buzbee"), David Fortney ("Fortney"), and Anthony G. Buzbee LP (d/b/a The Buzbee Law Firm) (the "Buzbee Law Firm") (collectively, the "Buzbee Defendants"), and Antigone Curis ("Curis") and Curis Law PLLC ("Curis Law" and, together with Curis, the "Curis Defendants") — publicly filed an explosive, false, and malicious complaint against "Celebrity A," the

impossibility, and indeed absurdity, of which is surpassed only by its vile malevolence. Then, in furtherance of the conspiracy to defraud, they sent Mr. Carter an extortionate and menacing "private" "demand letter" in a wanton attempt to leverage and coerce Mr. Carter into making a substantial payoff which these malicious co-conspirators presented as the only path for Mr. Carter to avoid the public unmasking of Mr. Carter as the previously unnamed "Celebrity A" with the public litigation of a horrific and potentially career ending albeit false claim of sexual assault of a minor. (*See* Exs. 1 and 2, Nov. 5, 2024 Demand Letters on behalf of Jane Doe and John Doe, respectively.)

5. When their extortionate demand letter failed to yield the financial windfall they sought, and ***after*** Doe told Buzbee – with whom she had never spoken before he filed Doe's original complaint or sent the demand letter – that Mr. Carter "did not sexually assault [her]," Buzbee "pushed [her] towards going forward with the false story against Mr. Carter . . . to make the case better and get them [the lawyer's and her] more money. . . ." Specifically: "Buzbee brought Jay-Z into it."

6. Buzbee jettisoned his legal and ethical responsibilities and urged Doe to go forward with naming Mr. Carter, with full knowledge, as imparted to him by Doe, that Mr. Carter had never assaulted Doe, and Doe's entire story as it related to Mr. Carter was completely fabricated.

7. Doe has now voluntarily confessed directly to investigators, in her own words as captured on a recording, that the story she and her co-conspirator attorneys brought before the world in court and on global television was just that: a false, malicious lie. (*See* Ex. 3, Declaration of James Butler, dated March 4, 2025, at ¶8; Ex. 4, Declaration of Charlotte Henderson, dated March 4, 2025, at ¶8.) Doe has admitted that Mr. Carter did not assault her and that indeed it was Buzbee himself – whom she met to discuss her allegations for the first time at a coffee shop in

Houston on the day of her maliciously false NBC News interview (which is discussed in detail below) – who pushed her to propagate the false narrative of the sexual assault by Mr. Carter in order to leverage a maximum payday. *Id*. In fact, when asked directly if Mr. Carter assaulted her, she responded "no." *Id.* And she admitted to the conspiracy, orchestrated by Buzbee, when she told the investigators that "Buzbee brought Jay-Z into it." *Id*. Doe was crystal clear when she admitted that Buzbee was the one who "pushed" her to go[] forward" with the false accusations against Mr. Carter. *Id*.

8.     Doe has fraudulently attempted to backtrack and recant her statements. In a declaration she submitted in California federal court, Doe tries – but fails – to claim the investigators misrepresented her statements. As discovery in this case will demonstrate, however, there is indisputable proof in the form of an audio recording of Doe's admission that the false claims against Mr. Carter were part of a conspiracy. And this recording will be presented to the jury to demonstrate not only that Doe's statements in her complaint and on global television were willfully defamatory, but also to prove the conspiracy by ringleader Buzbee to maliciously name Mr. Carter in a lawsuit, without even a shred of evidence to support the grotesque and false allegations brought against him. At a minimum, it will show the Buzbee Defendants' conduct clearly violated Alabama Rules of Professional Conduct 3.3, 3.4(b) and 4.1 given that Buzbee and the Buzbee Law Firm pursued these harmful allegations knowing they were false and repeatedly reasserted them in court filings (*e.g.*, their Motion to Dismiss in the Southern District of Alabama), to the news media, and in demand letters.

9.     Defendants took no action to mitigate the damages they caused by the filing and global broadcasting of false allegations against Mr. Carter. Instead, they compounded this egregious harm when Buzbee's and Fortney's co-counsel – a prominent New York attorney in the

now dismissed false action against Mr. Carter – doubled-down and threatened to publicize yet another false public statement by Doe in Mr. Carter's California lawsuit against Buzbee if Mr. Carter revealed that Doe had fully publicly retracted her false allegations and admitted that she was encouraged to lie by her co-conspirators Buzbee and Fortney.

10.     Fortunately, and clearly unexpectedly from their perspective, Defendants were met with nothing but righteous resolve at every turn by Mr. Carter. He stood steadfast; publicly decried the lies being put forth against him; and against all odds beat back the evil conspiracy spearheaded by Doe and her malevolent, soulless lawyers, driving them back into the shadows from which they came. Indeed, Mr. Carter's courage, which came at great personal and professional cost, forced their hand, leaving the Defendants with no choice but to voluntary dismiss the false and malicious complaint on February 14, 2025, with prejudice and without settlement. Contrary to their belated claims, the only reason Defendants dismissed the complaint is because they understood with complete certainty that their conspiracy had failed. They knew they could never prove the allegations made by Doe were true because they were not; and, ultimately, they would be unable to extort the big payout.

11.     Mr. Carter does not commence this action lightly. Following Doe's admissions that she fabricated her claims against Mr. Carter, she and her lawyers have continued to perpetuate their lies, including through further extortionate threats and demands by Buzbee as recently as February 28, 2025.

12.     Even after all that he had endured, Mr. Carter chooses not to expose the identity of Jane Doe, his malicious and wrongful accuser, in this Complaint. But this courtesy must not be mistaken for weakness.

13.    Mr. Carter brings this lawsuit to hold Doe and her co-conspirators accountable for knowingly and willfully peddling false and malicious allegations against Mr. Carter. Their actions have caused severe personal and professional harm to Mr. Carter, from which he may never recover. Indeed, the effects of their scheme continue to reverberate, inflicting specific and quantifiable reputational and financial damage on Mr. Carter in this District and globally.

**PARTIES**

14.    Plaintiff Shawn Corey Carter (p/k/a Jay-Z) is a citizen of the State of California residing in the State of California and is the victim of the conspired extortion scheme by the Defendants.

15.    Defendant Doe is, and at all relevant times was, a citizen of the State of Alabama residing in this District. Upon information and belief, and unless specifically alleged otherwise, Doe was physically present in this District at all relevant times. As more fully set forth below, Doe conspired with her attorneys to extort Mr. Carter, from Alabama, and all of Doe's and her attorney's actions in furtherance of that conspiracy are therefore linked to and venued in Alabama. As part of their extortion scheme, Doe sued Mr. Carter in the United States District Court for the Southern District of New York ("SDNY") under a "Jane Doe" pseudonym. She later further published and amplified her malicious lies to a global audience on NBC News. In furtherance of the conspiracy, Doe met with her attorneys in Alabama, communicated with them about the matters at issue from Alabama, kept in contact with them while she was in Alabama, and conspired with them to extort Mr. Carter in and from Alabama.

16.    Defendant Buzbee is an attorney and resident of the State of Texas. He is a principal of the Buzbee Law Firm. Buzbee is no stranger to Alabama, having availed himself of the jurisdiction of its courts for decades. Since as early as 1999, Buzbee has appeared as counsel of

record for Alabama residents in more than a dozen lawsuits he filed in Alabama courts, including in this District.[1] Upon information and belief, Buzbee has derived significant revenue from Alabama for himself, personally, and the Buzbee Law Firm. And as it relates to the claims at issue in this lawsuit, attorneys employed by the Buzbee Law Firm and/or their agents solicited Doe in Alabama, communicated with Doe while she was in Alabama, and traveled to Alabama on multiple occasions in furtherance of their conspiracy – a conspiracy that was born in Alabama through direct and repeated contacts between Buzbee, his employees, and/or agents, and Doe, who at all times resided in Alabama. Moreover, multiple acts taken in furtherance of the conspiracy occurred and continued to occur in Alabama. Further, upon information and belief, and as Doe confessed to investigators, the Buzbee Law Firm arranged and/or coordinated and/or financed Doe's travel to and from this District for all purposes alleged herein, including Doe's travel to Houston, Texas, where Doe, at the Buzbee Defendants' direction, peddled her malicious lies about Mr. Carter on national television.

17.     Defendant Fortney is an attorney affiliated with the Buzbee Law Firm, and is a resident of the State of Texas. Upon information and belief, Fortney has derived significant revenue from Alabama for himself, personally, and the Buzbee Law Firm. Additionally, Fortney

---

[1] *See, e.g., Ainsworth v. Jones, et al.,* Case No. 10-cv-23-900039 (Butler Cty. Cir. Ct. Ala. Apr. 13, 2023); *In the Matter of GraeStone Logistics, LLC*, Case No. 1:19-cv-00031-TFM-MU (S.D. Ala. Jan. 24, 2019); *Ricks v. State Farm Fire and Cas. Co.*, Case No. 5:12-cv-03694 (N. D. Ala. Oct 24, 2012); *Parker v. QBE Ins. Corp*, Case No. 5:12-cv-03640 (N.D. Ala. Oct 18, 2012); *Stewart v. Allstate Indemnity Co.,* Case No. 5:12-cv-03644 (N.D. Ala. Oct 18, 2012); *Vera v. West Point Trawlers, Inc.,* Case No. 1:04-cv-00498-WS-B (S.D. Ala. July 30, 2004); *Maersk Line, Ltd. v. Juzang,* Case No. 1:99-cv-00689-CB-S (S.D. Ala. July 26, 1999); *Maersk Line, Ltd. v. Laffitte,* Case No. 1:99-cv-00560-P-S (S.D. Ala. June 16, 1999); *NATCO Ltd. v. Franklin,* Case No. 1:99-cv-00428-RV-M (S.D. Ala. Apr. 30, 1999); *NATCO Ltd. v. Kinsey,* Case No. 1:99-cv-00861-RV-M (S.D. Ala. Sept. 10, 1999); *Maersk Line, Ltd v. Dansley,* et al., Dkt No. 1:99-cv-00766-RV-D (S.D. Ala. Aug. 20, 1999); *Miracle Deliverance Apostalic Church v. Hartford Cas. Ins. Co.,* Case No. CV-12-63 (Lawrence Cty. Cir. Ct. Ala. Aug. 27, 2012); *Ashford v. Johnson & Johnson, et al.,* Case No. CV-12-62 (Lawrence Cty. Cir. Ct. Ala. Aug. 27, 2012); *Simmons v. Alfa Ins. Corp.,* Case No. CV-12-59 (Lawrence Cty. Cir. Ct. Ala. Aug. 8, 2012).

traveled to Alabama on at least two occasions for "purpose[s] related to the facts alleged in th[is] Complaint" and "[o]n both occasions [he] met with [his] client, Ms. Doe" in furtherance of their conspiracy to extort Mr. Carter. (Affidavit of David Fortney, dated April 4, 2025, ECF No. 21-1 (the "Fortney Aff.") at ¶¶ 8-9.)

18.    Defendant the Buzbee Law Firm is a law firm that is organized under the laws of the State of Texas and operates its principal place of business from Harris County, Texas. Doe, Buzbee, his employees, and/or agents used the Buzbee Firm to orchestrate the conspiracy against Mr. Carter. As described in this Complaint, the Buzbee Law Firm has availed itself of Alabama courts, including in this District, more than a dozen times, thus deriving significant revenue from Alabama.

19.    Defendant Antigone Curis is an attorney and resident of the State of New York. She is the principal of Defendant Curis Law. As described in this Complaint, Curis conspired with the Buzbee Defendants to extort Mr. Carter by, among other things, allowing the Buzbee Defendants, who were not authorized to practice law in the SDNY, to use her electronic filing credentials to file Doe's complaint against Mr. Carter. Upon information and belief, Curis did not vet Doe's allegations before she filed her false complaints against Mr. Carter.

20.    Defendant Curis Law is a law firm organized under the laws of the State of New York and operates its principal place of business from New York, New York. No members of Defendant Curis Law's limited partnership reside in the State of California. Curis's conduct described in this Complaint were taken on behalf of herself, individually, and on behalf of Defendant Curis Law. Upon information and belief, Curis Law did not vet Doe's allegations before it filed a false complaint against Mr. Carter.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

22.     Mr. Carter is a citizen of the State of California. The Buzbee Defendants are citizens of the State of Texas, Doe is a citizen of the State of Alabama, and the Curis Defendants are citizens of the State of New York.

23.     This Court has personal jurisdiction over the Defendants under Alabama's long-arm statute, which allows for the exercise of personal jurisdiction to the fullest extent constitutionally permissible. Personal jurisdiction is also consistent with Due Process under the U.S. Constitution.

24.     Doe is subject to jurisdiction in Alabama because she is a citizen and resident of Alabama. Doe was physically present in Alabama at all relevant times, unless alleged otherwise, and all acts attributable to Doe therefore occurred in Alabama.

25.     The Buzbee Defendants are subject to jurisdiction in Alabama pursuant to conspiracy jurisdiction, because they conspired with an Alabama resident, Doe (who was in Alabama when they hatched their conspiracy), and took multiple overt acts in furtherance of the conspiracy in Alabama. Buzbee, Fortney, and the Buzbee Law Firm purposefully availed themselves of the rights and privileges of doing business in Alabama on numerous occasions, including this one, and Mr. Carter's claims against them arise directly out of their contacts with Alabama.

26.     Fortney is subject to jurisdiction in Alabama because, as set forth more fully below, he traveled to Alabama on, at least, two occasions to meet with his co-conspirator, Doe. These

meetings were not for purposes of simply maintaining a good faith, ethical, and typical attorney/client relationship, but in furtherance of the conspiracy against Mr. Carter. Fortney also contacted Doe in Alabama on multiple occasions in furtherance of their conspiracy to extort Mr. Carter. Fortney helped facilitate Doe's removal from this District to participate in the NBC News interview, arranged that interview with the specific intent that the resulting broadcast reach the largest possible audience, including viewers in and residents of Alabama, and then stood by Doe's side as she lied about Mr. Carter to a global television audience – all in violation of Rule 3.4(b) and 4.1 of the Alabama Rules of Professional Conduct. Fortney then helped facilitate Doe's return to this District following the NBC News interview.

27.    The Buzbee Defendants and the Curis Defendants are subject to jurisdiction in Alabama because Mr. Carter's claims against them arise out of and relate to their contacts with and in Alabama, as well as pursuant to conspiracy jurisdiction. Indeed, they directly, or by and through their agents, advertised and solicited clients in this District for the specific purpose of the conspiracy alleged herein; Doe responded in and from this District to their advertising and/or solicitations; and, together, they hatched and pursued a malicious conspiracy to extort Mr. Carter from this District. The Buzbee Defendants have continuous, systematic, and substantial contacts with the jurisdiction and have derived substantial revenue in Alabama and from Alabama residents, including Doe[2]. Curis is subject to the jurisdiction in Alabama by virtue of her active participation in the conspiracy to extort Mr. Carter and as the individual responsible for the filing of the false, extortionate allegations against Mr. Carter, which were born in Alabama, and all relate back to Alabama.

---

[2] *See* n.1, *supra*.

28.     Venue in this district is appropriate under 28 U.S.C. § 1391 because Doe resides in this judicial district, and Buzbee and Fortney provided legal services to her, and spoke and met with her, within this District. Because Doe resides in this judicial district, and because a substantial part of the events or omissions giving rise to this lawsuit occurred in Alabama, as the unlawful and unethical conspiracy at the root of this lawsuit was born in Alabama, and acts in furtherance of the conspiracy by and among the Defendants all occurred, and continued to occur and cause damage to Mr. Carter, in this District, venue is proper in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

I.    **In September 2024, The Buzbee Defendants Launch An Aggressive Campaign To Solicit Plaintiffs In Alabama And Across The United States To Sue Combs**

29.     On September 17, 2024, Sean "Diddy" Combs was arrested and charged in a three count Indictment with racketeering conspiracy, sex trafficking, and transportation to engage in prostitution.

30.     While most people saw the charges against Combs as an abhorrent tragedy, Buzbee saw dollar signs. Upon information and belief, about a week after charges against Combs were announced publicly, Buzbee reached out to Andrew Van Arsdale, an attorney and principal of his eponymous firm, AVA Law Group ("AVA Law"), in order to solicit civil claims against Combs.[3]

31.     Van Arsdale's primary business is Reciprocity Industries, LLC ("Reciprocity"), a legal marketing firm. Reciprocity generates client leads by soliciting them through targeted advertisements on television and social media. Reciprocity's advertisements direct potential clients to Reciprocity's call center, which it operates from a "low-slung building in Montana," for

---

[3] Jacobs, *Inside the Sean Combs Hotline: The Makings of a Mass Tort*, N.Y. Times (March 9, 2025), https://www.nytimes.com/2025/03/09/arts/music/sean-combs-diddy-hotline-tony-buzbee-lawsuits.html (the "March 2025 NYT Article") ("About a week later, Mr. Van Arsdale said, Mr. Buzbee reached out. Years earlier, he said, Reciprocity had helped Mr. Buzbee with advertising on another mass-tort case").

intake and, allegedly, vetting. According to Van Arsdale, Reciprocity has about 70 employees to answer phones around the clock, and other employees to "develop" cases.

32.     As part of their strategy to locate plaintiffs to sue Sean Combs and anyone who attended the same party as Combs, in September 2024, Reciprocity, AVA Law, and the Buzbee Defendants entered into an agreement whereby Reciprocity agreed, after intaking a potential plaintiff, to forward the leads to both AVA Law and the Buzbee Defendants.

33.     Reciprocity is a controversial player within an already controversial industry. In 2021, a former Reciprocity employee blew the whistle on Reciprocity's aggressive tactics in the *Boy Scouts* sexual abuse case.[4] The whistleblower submitted an affidavit revealing that:

- She only rejected approximately ten out of the 6,000 claimants that she spoke to. Reciprocity paid her $11 or $12 an hour, and a $200 weekly bonus if she signed up twenty claimants, and an additional $100 bonus for every ten claimants she signed up after the initial twenty. Reciprocity would "keep track of numbers," using "white boards everywhere in the office on which numbers of claims were written." (Stenulson Decl. ¶¶ 7-8, 10.)

- The contract the claimants signed authorized Reciprocity to keep 40% of any amount awarded. (*Id*. at ¶7-8.)

- Reciprocity told employees that they could "push through Proofs of Claim without the claimants' signatures." In those cases, claimant signatures "were electronically affixed to Proofs of claims by copying their signatures from their contracts and pasting them onto their Proofs of Claims." (*Id*. at ¶16.)

- When claimants changed their mind about pursuing a claim or were told they did not qualify, employees were instructed "to leave the claim on file, but to inform the client that their claim had been canceled," even though they had not. (*Id*. at ¶12.)

- At times, employees "were told to change the details of a caller's story in order to make their claims seem more viable." (*Id*. at ¶17.)

---

[4] Declaration of Veronica Stenulson, dated April 14, 2021, *In re: Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (Bankr. D. Del.), ECF No. 3857-2 (the "Stenulson Decl.").

34.     Although Van Arsdale claims that, after the *Boy Scout* cases, Reciprocity stopped using "incentives," he also claims that "[t]he same kind of rigorous vetting process that we have and exists today existed then." (*See* March 2025 NYT Article.)

**A.  The Buzbee Defendants Hire Reciprocity To Solicit Alabama Residents To Bring Claims Against Diddy**

35.     Upon information and belief, on September 25, 2024, the Buzbee Defendants hired Reciprocity to solicit potential plaintiffs to bring claims against Combs.[5]

36.     Reciprocity, acting on the express instructions it received from the Buzbee Defendants, solicited potential plaintiffs in Alabama (and elsewhere) with targeted advertisements on Instagram and Facebook.[6]

37.     For instance, Reciprocity, at the Buzbee Defendants' instruction, used Facebook and Instagram to disseminate an advertisement proclaiming that "If you've been silenced, now is the time to find your voice." Another Facebook and Instagram advertisement asks, "were you affected?" and contains a link to "check if you qualify." Each advertisement contains an A.I. generated image of Combs, two of which show Combs in a jail cell:

---

[5] *See* March 2025 NYT Article (stating that Buzbee and Van Arsdale agreed to work together "six days" before they held a press conference on October 1, 2025, "in front of the sign featuring Reciprocity's 1-800 number.").

[6] Facebook and Instagram display ads to users based on the criteria selected by the advertiser, including, among others, the user's location.

  

38.    The Buzbee Defendants, through Reciprocity, targeted Alabama residents with these and other advertisements on Facebook and Instagram.

39.    Moreover, the Buzbee Defendants paid for and generated a 1-800 "sexual abuse" hotline that Alabama residents (and others) were encouraged to call if they thought they had a claim against Combs and anyone who attended the same party as Combs. Upon information and belief, the Buzbee Defendants set up this "free to the caller" 1-800 number, as opposed to utilizing their local phone numbers, in order to attract callers from outside of their home states, including callers from Alabama.

40.    Online and telephone responses to the Buzbee Defendants' ads would flow to Van Arsdale's boiler-room call center where an employee would walk the caller through a questionnaire titled "Buzbee AVA Sean Combs Abuse:"



**B. Four Days After Hiring Reciprocity, Buzbee Holds A Press Conference Claiming That He Already Found, "Corroborated" And "Vetted" 120 Plaintiffs To Sue Combs And "Many Other Individuals and Entities"**

41.      On September 26, 2024, on the social media platform Instagram, Buzbee shared a post that informed readers that the Buzbee Law Firm "has been associated by the Ava Law Group to act as Lead Counsel to pursue claims on behalf of more than fifty individuals" and, although Buzbee had only allegedly begun pursuing claims against Combs one day earlier, ominously warning that "many other individuals will be implicated."[7]

42.      Then on September 29, 2024, the Buzbee Defendants issued a press release stating that the Buzbee Defendants would be filing lawsuits on behalf of "well over 100 alleged victims" and would be holding a press conference on October 1, 2024.

43.      In the September 29, 2024 press release, the Buzbee Defendants stated that, at an upcoming press conference, they would discuss "the various state laws that apply" and publish

---

[7] https://www.instagram.com/p/DAZpMyrJNAy/?hl=en.

**"the Sexual Assault Hotline, 1-800-200-7474** and explain the process to witnesses or victims when they called that number."[8] The Buzbee Defendants also proclaimed that "information w[ould] be made available for the first time to the public regarding claims made by victims against Sean 'Diddy' Combs and other alleged perpetrators where rape, sexual assault, and sexual exploitation are alleged." To maximize media attention, the press release teased that, "[d]etails provided at the conference will include information regarding other potential defendants."

44.    On October 1, 2024, "[s]ix days after Mr. Buzbee and Mr. Van Arsdale agreed to work together, they held a joint news conference at which Mr. Buzbee, speaking in front of the sign featuring Reciprocity's 1-800 number,"[9] announced they were representing 120 "corroborated, vetted" clients who intended to sue the Combs. (March 2025 NYT Article; *see also* Ex. 5, Transcript of Video-Recorded Press Conference: "Diddy Lawsuits. Lawyer for more than 100 alleged victim speaks" (Oct. 1, 2024).) The Buzbee Law Firm advertised the "1-800 number" (as opposed to their local Houston number) with the specific intent of attracting callers who were not local to Houston, but in numerous states, including those in Alabama, like Jane Doe.

45.    Buzbee spent much of October 2024 on a media tour to generate more claims. To that end, between October 1, 2024, and October 14, 2024, Buzbee sat for no less than 10 interviews with national media, including:

- **October 1, 2024:** Buzbee sat for an interview with Chris Cuomo.

- **October 2, 2024:** Buzbee was interviewed by Elizabeth Wagmeister on CNN.

---

[8] *The Buzbee Law Firm and AVA Law Group to Release Information Regarding Pending Lawsuits Against Sean*
*"Diddy" Combs* (Sept. 30, 2024, 07:00 AM), https://www.prnewswire.com/news-releases/the-buzbee-law-firm-and-ava-law-group-to-release-information-regarding-pending-lawsuits-against-sean-diddy-combs-302261930.html. AVA Law has been using the same 1-800 number for years.
*See, e.g.,* https://x.com/AVALawGroup/status/1511833631014240256 (Apr. 6, 2022, 6:30 PM).
[9] March 2025 NYT Article.

- **October 2, 2024:** Buzbee was interviewed by Jesse Watters on Fox News.

- **October 2, 2024:** Buzbee was interviewed by Sierra Gillespie on Law & Crime Network.

- **October 3, 2024:** Buzbee was interviewed by Chris Hansen on the TruBlue Streaming Network.

- **October 3, 2024:** Buzbee was interviewed by Stephen A. Smith on the Stephen A. Smith Show.

- **October 7, 2024:** Buzbee was interviewed by Shaun Atwood on Atwood Unleashed.

- **October 7, 2024:** Buzbee was interviewed by Harvey Levin on TMZ.

- **October 8, 2024:** Buzbee was interviewed by Piers Morgan on Piers Morgan Uncensored.

- **October 14, 2024:** Buzbee was interviewed by Chloe Melas on NBC News.

46.     Upon information and belief, Defendant Buzbee was referring to Reciprocity's team of nearly 100 employees assigned to vet the veracity of alleged victims' claims when he made numerous media appearances describing his and the Buzbee Law Firm's supposed vetting processes. (*See, e.g*., Ex. 5 at 5:20-6:12 (describing alleged vetting process)).

**C.  The Curis Defendants Join the Conspiracy**

47.     Although Buzbee is admitted to practice in the State of New York, Buzbee was ***never*** admitted to practice in the SDNY, which encompasses Manhattan. Moreover, Fortney is not admitted to practice in New York State or the SDNY.

48.     Nevertheless, and as discussed below, in their desire to file suit in the waning days of the extended statute of limitations provided for in the New York City Victims of Gender-Motivated Violence Protection Law, the Defendants conspired to make use of Curis's admission, and consequent electronic filing access to the SDNY, to file the fraudulent and baseless claims against Mr. Carter in federal court, in a public filing available to anybody with a PACER account. In doing so, Curis furthered the aims of the conspiracy by becoming a direct participant in her co-

defendants' scheme against Mr. Carter and aiding and abetting their actions to Mr. Carter's significant financial and personal detriment.

49.      Indeed, Judges in the SDNY have opined that the Buzbee Defendants used Curis to hide from the courts that they are not admitted to practice in the SDNY.

50.      Notably, this was not the only time Buzbee utilized this tactic. For example, the Buzbee Defendants and AVA Law shadow litigated another lawsuit against Combs and his entities using Curis's electronic filing credentials. *McCrary v. Combs et al.,* Case No. 1:24-cv-08054 (SDNY). In the *McCrary* case, District Judge Vyskocil issued an Order denying Buzbee's 11th hour motion to appear in the case *pro hac vice* and motion to withdraw his representation. (*Id*., ECF No. 76.) In her Order, Judge Vyskocil found that:

- "Buzbee had previously improperly filed numerous actions in this Court and scores of submissions in this case and other cases, using the ECF credentials of another attorney, without having even applied for regular or pro hac vice admission to the United States District Court for the Southern District of New York."

- Curis's "complicity" in Buzbee's "improper conduct may be grounds for sanctions."

- Buzbee's application for admission to the SDNY was "belated" and denied because "he had appeared in cases without seeking admission."

- Curis filed an undated declaration attesting that Buzbee told her that he was never "denied admission" by any Court, despite the Grievance Committee's Order, which was annexed to Buzbee' Affidavit in support of his PHV motion, doing just that.

- "Mr. Buzbee improperly filed and litigated this case using the ECF credentials of local counsel, whose apparent complicity in his improper conduct *may be grounds for sanctions*."

- "Plaintiff's counsel is on notice that further failure to comply with the procedural rules that govern [the SDNY] and her ethical responsibilities *will have grave consequences*."

51.      Attempting to justify her misconduct, Curis filed a letter to Judge Vyskocil stating that her assertion that Buzbee improperly filed and litigated the case using Curis's ECF credentials

is "simply not true." Curis represented that "*I reviewed all documents in this case and filed them under my ECF because I approved them*." (*Id*., ECF No. 77 (emphasis added).)

52. On March 28, 2025, Judge Vyskocil, acutely aware of the games Buzbee and Curis were playing, issued an Order to Show Cause requiring Buzbee's "local" counsel, Curis, to explain "why she should not be sanctioned for making false or misleading representations to the Court." (*Id*., ECF No. 79.) In her Order to Show Cause, Judge Vyskocil stated that "Ms. Curis, who represents in her Letter that she 'reviewed' and 'approved' 'all documents' before filing them on ECF, filed a document that directly contradicted her own affidavit. (*Id*. at 1-2.) At the ensuing hearing, Judge Vyskocil stated:

> [Buzbee] then moved to withdraw his admission even though he never had been admitted. And I issued an order in which I simply reminded you, counsel, of your obligations to be careful about what you are filing. And I did call to your attention the displeasure about things being filed that had been signed only by Mr. Buzbee but that were filed under your ECF credentials. And rather than just taking to heart my calling to your attention potential issues, which may be happening in other cases as well, you chose to double down. And you filed a letter with the Court saying, "I review everything, and I approve it for accuracy."
>
> I don't know how you could have reviewed the *pro hac vice* application and confirmed its accuracy when right on top of your affidavit, which is undated, and simply /s/ signed. There was an affidavit from Mr. Buzbee saying that he had been denied admission to the Southern District, which is directly at odds with what he reportedly told you.

53. In sum, it is clear that Curis joined the conspiracy to extort Mr. Carter, which was hatched in Alabama, and quickly became an integral part of the scheme by using her admission to the SDNY, weaponizing the civil justice system. In other words, Curis knowingly and intentionally filed a complaint against Mr. Carter which contained false allegations for the purpose of leveraging a settlement for a conspiracy that was hatched in Alabama.

## II.    On Or Around October 14, Doe, An Alabama Resident, Responds To The Buzbee Defendants And The AVA Defendants' Solicitations

54.    Upon information and belief, on or around October 14, 2024, Doe — a resident of the Southern District of Alabama — retained Van Arsdale's law firm, AVA Law, to pursue claims against Combs.[10]

55.    One version of Doe's initial contact with Defendants is that she was connected to AVA Law when she contacted "Reciprocity last fall after responding to a Facebook ad, according to Mr. Van Arsdale." (March 2025 NYT Article.) The geographical reach of this Facebook ad – and the many others like it – was not limited to Houston or any one particular state. To the contrary, the relevant ads were intended to be – and, in fact, were – delivered to and received by users in numerous states, including Alabama.

56.    Doe's father, however, tells a different story. According to Doe's father, Fortney initially solicited Doe as a client while she was in Alabama and that Doe "did nothing to start this."

57.    Either way, Van Arsdale testified that that AVA Law "vetted" Doe's story. Van Arsdale claims Doe was interviewed and evaluated by an intake specialist as well as at least one attorney." (Van Arsdale Aff., ¶ 6.)

58.    Upon information and belief, Doe was within the Southern District of Alabama while being interviewed and while her claims were being evaluated, and no evidence has been proffered that would call this fact into doubt. In other words, the Buzbee Defendants, through their employees and agents, directly communicated with Doe in the Southern District of Alabama,

---

[10] Affidavit of Andrew Van Arsdale In the Matter of Jane Doe Claim (the "Van Arsdale Aff."), ¶ 4 ("the plaintiff identified as 'Jane Doe' . . . signed and retained AVA Law Group on October 14, 2024.").

where she was residing, for purposes of supposed vetting, and she responded to that communication while in the Southern District of Alabama.

59.    The conspiracy against Mr. Carter was, therefore, hatched within the Southern District of Alabama as it arose out of activities directly related to and arising from contacts with Doe in the Southern District of Alabama. Indeed, Doe only traveled to Texas once and all of her other communications with her co-Defendants occurred while she was in the Southern District of Alabama.

60.    Upon information and belief, within days — if not hours — of Doe retaining AVA Law, a draft of Doe's complaint was sent to the Buzbee Defendants.[11]

61.    Buzbee has since testified that, after received the draft complaint from AVA Law, the Buzbee Law Firm "also engaged in further rigorous due diligence to investigate the veracity and legal viability of [Doe]'s claim" which included "[a]t least two attorneys [who] interviewed the plaintiff and fact-checked various aspects of her account." (Jan. 2025 Buzbee Decl., at ¶7.) Upon information and belief, Doe was in the Southern District of Alabama when the Buzbee Defendants allegedly interviewed Doe. The Buzbee Law Firm "also engaged a retired police detective to gather facts about elements of Jane Doe's claims" (Declaration of Anthony Buzbee, dated March 11, 2025 (the "Mar. 2025 Buzbee Decl."), at ¶11) which, assuming truthful, would have had to include contacting individuals in and/or the investigator travelling to the Southern District of Alabama.

62.    Mr. Carter will prove at trial, however, that either (i) this "vetting" never occurred at all; or (ii) the "vetting" uncovered the falsity of Doe's allegations. In either case, the false

---

[11] Buzbee has testified that AVA Law referred Doe's case to him in "early October." (*See* Declaration of Anthony G. Buzbee, dated Jan. 22, 2025, at ¶ 5, *Doe v. Combs*, 24-cv-7975, ECF No. 76 (SDNY Jan. 22, 2025) (the "Jan. 2025 Buzbee Decl."). Buzbee's testimony is contradicted by Van Arsdale's testimony that he only referred Doe's case to Buzbee after October 14, 2025.

allegations were manufactured in the Southern District of Alabama and the Defendants peddled them as part of the conspiracy to extort Mr. Carter knowing they were false.

### III.  Defendants Falsely Accuse Mr. Carter Of Sexual Assault In Written Correspondence, Court Filings, And On Global Television, Motivated Entirely By Greed

63.  In October 2024, Doe was suffering with personal and financial hardships. At that time, she had already lost custody of her children, and her parents, who, on information and belief, supported Doe, had recently suffered their own financial hardships and filed for bankruptcy protection. Open-source information also revealed that Doe has a long history of mental health and substance abuse issues.

64.  Desperate to obtain a payday, Doe hired Defendants — including the Buzbee Law Firm, which has a long history of whipping up a media frenzy with vague and sensational claims against public figures — and together they hatched a scheme to extort a large payout from Mr. Carter under the threat of devastating harm to his reputation and to his life.

65.  As discussed herein, as part of the scheme to defraud, and conspiracy to extort Mr. Carter, Doe and her lawyers first filed an "anonymous" lawsuit claiming she was sexually assaulted by "Celebrity A," and then Buzbee quickly sent an extortionate demand letter to an attorney for Mr. Carter alleging that "Celebrity A" was Mr. Carter and intimating they expected a large settlement to keep Mr. Carter's name out of the suit. When Mr. Carter refused to capitulate to Doe's baseless and obviously extortionate demands, Doe and her co-conspirator attorneys doubled down, weaponizing the civil justice system in an attempt to leverage Mr. Carter by formally naming him in the complaint which contained utterly false, fabricated, and horrific allegations. And when that also failed, Doe and her co-conspirators resorted to defaming Mr. Carter on global television.

66.  A simple Google search or other public record search by any of the Defendants of Jane Doe (using her real name) would have immediately cast doubt on her credibility by revealing

that, among other things: (a) 90 days before filing her lawsuit against Mr. Carter, Doe had been in Mental Health Court; (b) about 10 months before filing her lawsuit against Mr. Carter, Doe was charged with assault in the second degree; (c) Doe, according to the public testimony of her psychiatrist, suffers from several mental health disorders, takes multiple prescription medications and has a history of hallucinations; and (d) on three previous occasions, Doe has made unrelated false sexual assault allegations against others which were either dropped by her or dismissed by courts. Hardly the history of a credible complainant.

### A. After, At Most, 6-Days Of "Vetting," Doe Sues Sean Combs, Combs' Entities, And "Does 1-10" Alleging That She Was Sexually Assaulted At An Afterparty Following The 2000 MTV Video Music Awards

67.    The Defendants' solicitations in the Southern District of Alabama and elsewhere were successful. According to Reciprocity, it received about 26,000 contacts because of their advertisements, including Jane Doe's.

68.    As discussed *supra*, Doe allegedly retained AVA Law on October 14, 2024. Just six-days later, on October 20, 2024, Defendants sued Sean "Diddy" Combs and his business entities, as well as "Does 1-10."[12] *See Doe v. Combs*, No. 24-cv-7975 (SDNY), ECF No. 29 (the "SDNY Complaint"). Notably, the Defendants were able to file this fraudulent lawsuit with the assistance of co-conspirator Curis Defendants' electronic filing credentials to mask the fact that the Buzbee Defendants were not authorized to practice in the SDNY. And they did so for an improper purpose.

---

[12] During this six-day period, the Buzbee Defendants and the Curis Defendants "vetted" and filed ***thirteen*** other lawsuits against Combs and his entities. See Case Nos. 1:24-cv-07774, 1:24-cv-07777, 1:24-cv-07769, 1:24-cv-07778, 1:24-cv-07776, 1:24-cv-07772, 1:24-mc-00478, 1:24-cv-07974, 1:24-cv-07976, 1:24-cv-07973, 1:24-cv-07977 filed in the SDNY; and Index Nos. 159915/2024 and 159914/2024 filed in the Supreme Court of New York.

69.     As part of Defendants' conspiracy to defraud and extort Mr. Carter, Doe's lawsuit initially implicated unnamed "Celebrity A" and "Celebrity B," refraining from identifying Mr. Carter as a party. *Id*., at ¶¶ 48-52. Instead, Doe only sued "Does 1-10" as defendants. In doing so, and as would become evident by his subsequent demand letter, Buzbee's first complaint was designed for a collateral advantage: causing Mr. Carter to fear that he must either pay Defendants off or risk being formally named in the complaint and having his life, reputation, and businesses ruined.

70.     In other words, the complaint was the opening salvo to Defendants' extortion scheme, a mere tool to gain leverage over Mr. Carter. Indeed, Van Arsdale has since admitted that although Mr. Carter was not named in the lawsuit, Mr. Carter was "Celebrity A" and was one of the "Does 1-10."

71.     In her original pleading, Doe alleges that when she was 13 years old, a friend dropped her off at Radio City Music Hall in New York City so she could try to attend the Video Music Awards ("VMAs") on September 7, 2000. *Id*., at ¶ 34. Although she was unable to talk her way into the VMAs, a limousine driver purporting to work for Combs invited her to an "afterparty." *Id*., at ¶¶ 36-37. Later that evening, the limousine driver took her to a large white house with a gated U-shaped driveway about 20 minutes away. *Id*., at ¶¶ 39-40.

72.     After accepting a drink, Doe claims that she felt woozy and lightheaded and found what she believed to be an empty room. *Id*., at ¶¶ 45-47. Doe alleges that Combs and "Celebrity A" sexually assaulted her while "Celebrity B" watched. *Id.*, at ¶¶ 48-52.

73.     The evidence adduced to date proves that Doe and her co-conspirator lawyers, the Defendants, did not initiate this lawsuit for a legitimate purpose; rather the lawsuit was a vehicle by which to extort Mr. Carter and leverage a large payout. Proof of this uncomplicated yet

devastating scheme is the simple fact that Defendants failed to conduct any meaningful inquiry before filing the lawsuit after, at most, six days of supposed "vetting" and, upon information and belief, the Curis Defendants filed the lawsuit without doing *any* vetting whatsoever.

**B. Doe Sends Mr. Carter An Extortionate Letter Falsely Accusing Him Of Sexual Assault**

74.     A few weeks after filing her complaint, Doe and the Buzbee Defendants sent Mr. Carter an extortionate letter dated November 5, 2024, containing false allegations of vile conduct by Mr. Carter.[13] The Buzbee Defendants claim that Fortney and an associate at the Buzbee Law Firm received Doe's permission to send the demand letter on a phone call, which upon information and belief, occurred while Doe was in the Southern District of Alabama on or around November 4, 2024.

75.     Many of the allegations in Doe's letter were from the public complaint Doe filed against Combs and "Does 1-10" (which contained inconsistencies that were later changed when the complaint was amended), with the obvious implication that Doe would amend her complaint to add Mr. Carter if he refused to pay.

76.     The Defendants utilized the already-filed complaint as leverage to extort Mr. Carter into paying them off. Indeed, Doe and her lawyers threatened to "take a different course" if Mr. Carter did not commit to a "confidential mediation" to "resolve this delicate and important matter" by the deadline of November 19, 2024, giving Mr. Carter only a two-week window before Doe threatened to go public with her false allegations. To avoid both public and criminal exposure, the Buzbee Defendants stated that Doe "want[s] something of substance" by way of a settlement.

77.     However, as discussed *supra*, Doe and her lawyers had ***already*** sued Mr. Carter, albeit as one of the "Does 1-10." Defendants' plan was thus clear. They demanded Mr. Carter

---

[13] Doe did not reveal her name in the demand letter.

either: (a) pay "something of substance" to stop Doe from making public the wildly false allegations of sexual assault that would subject Mr. Carter to public humiliation and irreparably harm his reputation, family, career, and livelihood, or (2) endure catastrophic financial and personal ruin. The Buzbee Defendants' statements and correspondence made clear the immediate and real threat of public exposure if Mr. Carter failed to pay.

### C. Doe Amends Her Lawsuit Revealing That Mr. Carter Was "Celebrity A"

78.     Unwilling to capitulate to Defendants' extortion, on November 18, 2024, Mr. Carter filed a lawsuit against Buzbee for Extortion and Intentional Infliction of Emotional Distress.[14] *See Shawn Carter v. The Buzbee Law Firm et al.*, No. 24SMCV05637 (Sup. Ct. L.A. Cnty. 2024). Mr. Carter explained that Buzbee was "shamelessly attempting to extort exorbitant sums from him or else publicly file wildly horrific allegations against him."

79.     On December 8, 2024, Doe, humiliated and exposed by Mr. Carter's lawsuit, at Buzbee and Fortney's direction, filed an amended complaint, revealing what Mr. Carter understood all along — that one of the anonymous "Does" Defendants was a placeholder for Mr. Carter being utilized as a sword of Damocles to hold over Mr. Carter's head as a threat of what would happen if he did not succumb to the extortion scheme. *See Doe v. Combs*, No. 24-cv-7975 (SDNY Dec. 8, 2024), ECF No. 29 (the "SDNY Am. Complaint").

80.     Doe's amended complaint makes wild, horrific, but utterly false allegations against Mr. Carter, identifying him by name as the previously described "Celebrity A" from the original complaint.

81.     Defendants' intent was clear: to cause maximum harm to a wildly successful businessman and at the very top of the music industry and the business world, and who is unrivaled

---

[14] On the same day, Doe allegedly executed an affidavit in Alabama reiterating the allegations in her complaint. Mar. 2025 Buzbee Decl., at ¶7, Ex. A.

in fame and influence, all in an effort to place Mr. Carter in such fear for his reputation that he would capitulate to their unlawful monetary demands.

### D.  Doe Goes On Global Television Falsely Accusing Mr. Carter Of Sexual Assault

82.    In the second week of December 2024, the Buzbee Defendants paid for Doe to travel from her home in the Southern District of Alabama to the Buzbee Defendants' offices in Houston, Texas to sit for an interview with NBC News. Buzbee met Doe *for the first time* during that trip. It was also *the first time* that Buzbee himself discussed Doe's allegations with her.

83.    Critically, Buzbee and Doe first met to discuss any aspect of the case: (a) *after* Buzbee went on a public media crusade threatening anyone and everyone that attended a party that Combs also attended; (b) *after* Defendants sued Mr. Carter as a "Doe" and Buzbee sent an extortionate demand letter to Mr. Carter; (c) *after* Defendants filed a public lawsuit against Mr. Carter; and (d) *after* Buzbee told TMZ that he had not ruled out filing a criminal complaint and that "[w]hat happens next is up to my client." Defendant Buzbee's conduct was violative of Alabama Rule 3.10 and Texas Disciplinary Rule of Professional Conduct 4.04(b) prohibiting a lawyer from presenting or threatening to present "criminal or disciplinary charges solely to gain an advantage in a civil matter."

84.    On December 13, 2024, NBC News broadcasted portions of an exclusive television interview of Doe, which was conducted with Fortney by her side. As part of that interview, NBC News honored Doe's request to conceal her identity. Additionally, NBC News published a story excerpting interviews it held with Doe.[15]

---

[15] *See* Chloe Melas, et al., *Jay-Z rape accuser comes forward to NBC News, acknowledges inconsistencies in her allegations*, NBC News (Dec. 13, 2024, 7:27 PM), https://www.nbcnews.com/news/us-news/jay-z-rape-accuser-comes-forward-nbc-newsacknowledges-inconsistencies-rcna183435 (the "December 2024 NBC News Article").

85.    During the NBC television interview—which was set up by Buzbee, which Doe attended on a voluntary basis, and which occurred in the presence of Fortney—Doe lied about Mr. Carter to a ***global television audience***. Indeed, the NBC News television interview was, upon information and belief, set up by Buzbee with the specific intent that the resulting broadcast reach the largest possible audience, including viewers who reside in the United States, including Alabama, and an international and worldwide audience.

86.    Doe, in addition to attempting to explain the impossible—how she, as a 13-year-old from upstate New York, wound up in Manhattan at a private VMAs afterparty with countless celebrities—told NBC News that she spoke with musicians Benji Madden and his brother at the afterparty. Doe said she recalled talking to Benji Madden "about his tattoo, . . . [of] 'The Last Supper,'" because she has a "religious background so it was something to talk about." (*See* December 2024 NBC News Article.) Notably, these allegations were not included in Doe's complaint and were made for the first time to NBC News.

87.    Indeed, far from simply repeating the allegations in her complaint, Doe unleashed entirely new allegations against Mr. Carter during the interview – allegations that go well beyond those contained her complaint. Doe stated, for the first time, that she had been ***"fighting trying to get away from [Mr. Carter] and he put his hand over my mouth."*** Doe also stated, for the first time, that Mr. Carter ***"told me to stop it -- you know, stop it, cut the BEEP."*** She also provided other, previously undisclosed, details about herself and her alleged "encounter," including that she:

    a.    Is "A 38-year-old mother from Alabama."

    b.    Allegedly went to the VMAs "to catch a glimpse of her favorite celebrities."

    c.    Was not scared to be alone in New York because "with having autism, is -- like feeling you live your life in a shatter-proof, juggle ball. The worlds on fire, the fire is inside the ball with you, but there's no way for you to get out."

d.      "[S]uffered a head injury."

e.      "The night of the 2000s VMAs . . . a friend drove her from Rochester, New York to Manhattan."

f.      Believed Mr. Combs' limo driver attempted to convey that she "was just pretty."

g.      Had to "seek medical treatment due to the stress."

88.     During the NBC News interview, Doe falsely stated that, while at the afterparty, she had a drink "that made her feel woozy," after which "Combs and Mr. Carter took turns raping her" while an unidentified female celebrity watched. (*Id.*, at 4:7-15.) Doe also told NBC News that following the alleged sexual assault, she found her way to a gas station where she called her father who picked her up and drove her home.

89.     Doe attempted to explain, for the first time, why she could produce no witnesses to this alleged assault. First, Buzbee, through a statement issued to NBC News on Doe's behalf, alleged that the "friend" who allegedly drove Doe from Rochester to New York City the night of the alleged assault "has since died." Second, Doe stated, for the first time, that after her father picked her up from the afterparty, they "[r]ode home in silence" and that her father "didn't ask me what happened, he didn't ask me what I did or where I was."

90.     In fact, even after NBC News questioned the new, false allegations made during her interview, Doe stated: "[I] stand by [my] statements [to NBC News]" and that "what is the clearest is what happened to me."

91.     After the disastrous interview, and in furtherance of their conspiracy, Fortney admittedly traveled to Alabama to meet with Doe. (Fortney Aff., ¶ 12.)

- 29 -

**IV.    A Simple Google Search Or Other Basic Investigation Would Have Revealed That All Of Doe's Allegations Against Mr. Carter Were Demonstrably False**

92.    The allegations made by Doe against Mr. Carter are false, defamatory, and easily refutable. Even a simple Google search or basic investigation of the allegations would have proven that Doe's claims were demonstrably false. This begs the question: did Defendants, blinded by greed, file this case without the appropriate vetting, or did the Defendants' vetting reveal that Doe's allegations were false and, fueled by greed, they filed the lawsuit anyway? Either way, these questions lay bare the motive in filing the suit: to extort and defame Mr. Carter. Indeed, the Defendants knew full well this was not a triable case, but they filed it anyway because they never had any intention of litigating this matter, further evidenced by the fact that once the extortion scheme was laid bare, they rushed to dismiss the lawsuit with prejudice. In sum, Defendants' claims against Mr. Carter were made in bad faith, with malicious intent, and without probable cause that the claims would succeed.

93.    *First*, although Doe stated that the assault occurred at a residence, public records show that Mr. Carter was at no such residence. Indeed, NBC News easily located photos of Mr. Carter from that evening showing him at a party at a commercial location — the now-closed Lotus nightclub in New York City. (*See* December 2024 NBC News Article.) Of course, a private nightclub cannot be mistaken for "a large white residence with a gated U-shaped driveway" that included "a large living room or foyer," and containing "a hallway containing several rooms off of it," and a bedroom. Even Buzbee was forced to admit to NBC News that Doe does not claim the assault occurred at Lotus nightclub. *Id*.

94.    *Second*, Doe told NBC News that she spent "20 minutes in the limo" before arriving at the residence. However, when pressed about these details in a follow-up interview with NBC News, Doe admitted she did not know where she was going or even how long the drive took. *Id*.

Worse, she conceded to NBC News that she "guessed about the length of time the trip had taken [as set forth] in the lawsuit." *Id.*

95.    ***Third***, during her interview with NBC News, Doe described an alleged conversation she had with the singer Benji Madden at the afterparty for the 2000 VMA's, the night she claims to have been assaulted. However, Benji Madden's tour schedule, which is publicly available online, proves that Madden and his brother were not even in New York that night but, rather, they were touring in Chicago.[16]

96.    Further, a representative for Madden confirmed to NBC News that neither he nor his brother Joel attended the 2000 VMAs and that they (and their band Good Charlotte) were on tour in the Midwest at that time. When confronted with this evidence during the interview, Doe conceded she "made a mistake in identifying" them and that not all the faces at the after-party were clear. *Id*.

97.    ***Fourth***, when questioned about the alleged pre-dawn pick-up and drive home with Doe after the alleged assault, Doe's father told NBC News that he does not recall picking up Doe, which (unsurprisingly) he said would have been "something that would definitely stick in my mind." Doe's father also said that he first learned of the alleged assault when Doe was interviewed by NBC News in December and that he did then recall picking Doe up in the middle of the night on one occasion, but it "was a local drive." Based on "their [then] address [in Rochester, New York]," Doe's father would have driven at least 5 hours and 47 minutes to pick her up. It strains credulity that Defendants would not have learned that Doe's father had no recollection of a key aspect of Doe's story during their "vetting" process. In fact, public court records show that Doe previously admitted to fabricating allegations of sexual assault.

---

[16] *https://www.concertarchives.org/bands/goodcharlotte?page=4&year=2000#concert-table*

98.    Notably, there are countless other falsehoods in Doe's allegations. Despite alleging that it took 20 minutes to get from Radio City Music Hall to the afterparty (SDNY Am. Complaint, at ¶ 44), public records show there are no houses matching Doe's description within 20 minutes of Radio City Music Hall. And, although Doe implies that Combs hosted the afterparty, public records show that none of the properties owned by Combs match Doe's description of the location of the afterparty.

99.    Furthermore, Doe alleges that after the VMAs began, "much of the crowd moved inside, but [Doe], without a ticket, remained outside with others and watched the VMAs on a jumbotron." SDNY Am. Complaint, at ¶ 40. This description of events, like many others, is easily refutable. Indeed, the broadcast of the 2000 VMAs—which is publicly available on YouTube—conclusively shows that there was no jumbotron on site. Indeed, the producers of the 2000 VMAs and the NYPD confirmed that there was no jumbotron set up that night as the producers had applied for a permit to set up a jumbotron for that evening, but the application was denied.

100.    Even assuming Doe was outside the VMAs that evening, it was impossible for her to have approached celebrity limousines as she claims, because publicly available video of the VMAs show that the limousines were only outside of Radio City Music Hall briefly for celebrity pick up and drop off. In any event, after drop-off, the celebrity limousines were moved to an area that was separated from fans by police barricades, as publicly available video of the event clearly shows, thus were not even accessible.

101.    NBC News did not air Doe's entire interview, but, upon information and belief, the full interview contained additional damaging information about Doe's claims and credibility.

102.    In a follow-up interview of Doe by NBC News, Doe was confronted with the mountain of evidence contradicting her story, which NBC News uncovered in less than a week

after conducting the initial interview. In response to irrefutable proof of her lies, Doe admitted she "made some mistakes." She then shockingly disavowed the allegations in her complaint about the location of the alleged incident and admitted she was just guessing.

103.    Even after being confronted with her lies, Doe did not drop her baseless complaint. Instead, she and her co-conspirators insisted on moving forward, committing to submit to a polygraph. Defendants have unsurprisingly not revealed whether Doe passed her polygraph test.

104.    It is clear that Defendants knew Doe was, and is, a deeply unreliable and untruthful person. Indeed, publicly available records prove two things: (1) significant aspects of Doe's allegations can be disproven, casting significant doubt on her entire story; and (2) Doe has made multiple false allegations of sexual misconduct in the past. Nonetheless, Defendants chose to use Doe as a prop to extort a payout just six days after she hired them. At bottom, there was never any intention to litigate the matter, Defendants weaponized the Federal Civil Court system as a tool to extort Mr. Carter.

105.    They failed.

## V.    Doe Waited Months Before Dismissing Her False Complaint, And Did So After Being Lied To By Her Attorneys For Their Own Benefit

106.    Beginning in November 2024, Mr. Carter made several court filings in which he vehemently denied Doe's claims, pointing out the huge inconsistencies in her story and the utter baselessness of various allegations.

107.    At each of these junctures, Doe was confronted with the false nature of her claim, as well as the harm it was causing Mr. Carter. At any of these points, Doe could have withdrawn her lawsuit. Undeterred, Doe continued to pursue her claim without regard to the harm it was causing or could cause Mr. Carter.

108.    Having already (1) sent the November 2024 false and defamatory demand letters; (2) filed the false and defamatory complaint and amended complaint; and (3) conspired with Doe up to give the false and defamatory interview to NBC News, the Defendants were intent on perpetuating Doe's lies, as the co-conspirators firmly believed that the public pressure of the story would force Mr. Carter's hand, leading to a payout.

109.    Indeed, on December 10, 2024, Buzbee, already fully aware of the falsity of Doe's allegations, told TMZ that Doe was "not ruling out filing rape charges" against Mr. Carter, and that "[w]hat happens next is up to my client. It's her case and what she decides to do you will find out in due course."[17]  Buzbee made these statements before he had even met with Doe.

110.    While Defendants' conspiracy ran into some roadblocks, Buzbee remained undeterred. Buzbee signed both complaints and other filings in the action against Mr. Carter without being admitted to the SDNY Bar, as required. When the District Judge presiding over the case was advised of this fact, she Ordered Buzbee to "file proof of admission [to the SDNY] on the docket" by February 14, 2025. *See Doe v. Combs*, No. 24-cv-7975 (SDNY Jan. 28, 2025).

111.    The very next day, January 29, 2025, Buzbee applied for such admission.

112.    On February 13, 2025 – one day before his deadline to file proof of admission in the SDNY – Buzbee got the news that, because he had already filed pleadings in the SDNY without being admitted to the Bar of that Court – in the case at issue here and in more than 20 others – his application for admission had been denied. *See Matter of Buzbee*, No. 24-cv-8054 (SDNY), ECF No. 49-6 (the "Denial Order"). Buzbee was also instructed to attach a copy of the Denial Order to any subsequent application for admission in a particular case in the SDNY. *Id.*

---

[17]*JAY-Z ACCUSER DOESN'T RULE OUT CRIMINAL COMPLAINT AGAINST MOGUL Attorney Tony Buzbee Says* (Dec. 10, 2024, 1:48 PM), https://www.tmz.com/2024/12/10/tony-buzbee-responds-jayz-sexual-assault-criminal-complaint/.

113.     Faced with his inability to comply with the Judge's order in the case against Mr. Carter, and facing the threat of punishment by the court, Buzbee dispatched Fortney to Alabama to meet with Doe that same day, namely February 13, 2025. (*See* Fortney Aff.)

114.     Fortney returned to Alabama on February 13, 2025. (*Id.*) Upon information and belief, he did so at Buzbee's direction, for the express purpose of trying to cover up their conspiracy by deceiving Doe about the real reason for seeking dismissal of the SDNY case. This was not a normal and ethical meeting between an attorney and his client in furtherance of Doe's representation. To the contrary, Fortney traveled to Alabama in furtherance of the conspiracy at issue in this lawsuit.

115.     Upon information and belief, during that meeting, Fortney falsely, maliciously, and manipulatively told Doe that the case against Mr. Carter needed to be dismissed because Mr. Carter had made threats against Doe's life, and it was too dangerous to continue with the case. Of course, no such threats had ever been made.

116.     Rather, the Buzbee Defendants and Curis Defendants were desperate to withdraw their fraudulent case to avoid being punished in court for filing a false pleading without Buzbee even being admitted in the SDNY – jeopardizing their ability to continue with the more than 20 other cases they had pending in the SDNY.

117.     Thus, on the evening of Friday, February 14, 2025, Doe quietly filed her voluntary dismissal with prejudice. *See Doe v. Combs*, No. 24-cv-7975 (SDNY), ECF No. 91.

118.     Then, on February 21, 2025, during an interview in Alabama, Doe admitted to investigators that she made up the whole story about Mr. Carter and further admitted that she conspired with the Defendants to pursue the false claims.  (*See* Exs. 3-4.)

119.    In short order, the Defendants were made aware of Doe's confession, but shamefully, their threats and extortion aimed at Mr. Carter did not end.

120.    Rather, on Friday, February 28, 2025, after Doe admitted to fabricating her claim against Mr. Carter, and after Buzbee, Fortney, and Curis became aware of those admissions, a prominent New York attorney serving as the Buzbee Defendants' co-counsel, called an attorney for Mr. Carter. During that call, the Buzbee Defendants' New York co-counsel threatened that if Mr. Carter's attorneys filed anything in Mr. Carter's pending extortion and defamation case in California against Buzbee related to the statements made by Doe fully exculpating Mr. Carter and inculpating her and Buzbee in an extortion conspiracy, that Buzbee would issue a public statement by Doe that: (1) she was being threatened by Mr. Carter's "people" since she dropped the lawsuit; and (2) she dropped the lawsuit only because she was afraid for her life and that the allegations against she made against Mr. Carter in the lawsuit were all true.[18]

121.    Fortney traveled to Alabama to convince Doe to drop her lawsuit. He did this by falsely telling Doe that she could "get in a lot of trouble," and indeed that Mr. Carter was going to kill her. Of course, all allegations about Doe's life being threatened by Mr. Carter's "people" and her newly claimed reasons for dropping the lawsuit, are, and always were, false. When Buzbee, Fortney and their New York co-counsel said them, they knew that these statements were false and ultimately Doe knew that each of these statements was false as well.

122.    The Buzbee Defendants then pivoted to a new explanation for the dismissal and now claim that Doe only dropped her lawsuit against Mr. Carter in furtherance of a "negotiated dismissal" agreed to on February 4, 2025. However, this is also untrue. Indeed, The Buzbee

---

[18] Mr. Carter first became aware of Doe's identity on or around February 21, 2025; and has never met or interacted in any way with Doe.

Defendants' counsel acknowledged in writing that there was no settlement. (*See* Ex. 6, Declaration of Alex Spiro, dated March 14, 2025.)

123.    The real reasons for the dismissal are clear. The Buzbee Defendants knew their conspiracy to extort Mr. Carter had failed. And they were now fearful that they were going to be sanctioned for litigating Doe's lawsuit without being admitted to the SDNY, so they fabricated a story and strong-armed Doe into dismissing her suit. In truth, had Doe agreed to dismiss her lawsuit on or about the purported February 4, 2025 "negotiated dismissal," Fortney would not have needed to travel to the Southern District of Alabama on February 13, 2025 to convince Doe to drop her lawsuit.

124.    Further, Mr. Carter's counsel made clear to the Buzbee Defendants that Mr. Carter would never settle Doe's lawsuit or pay any money to resolve it. Mr. Carter's counsel also made clear that he would not dismiss Mr. Carter's lawsuit against Buzbee in California.

125.    Thus, the threats of extortion and further defamation continue to this day, necessitating that Mr. Carter take action to prevent unscrupulous actors from further preying on him.

## VI.    Mr. Carter Was Severely Injured By Defendants' Misconduct

126.    Doe's malicious lawsuit, and its demonstrably false allegations that Mr. Carter sexually assaulted her, caused Mr. Carter to suffer actual and special damages, including, but not limited to, harm to his personal and professional reputation and harm to his business entity, Roc Nation—which resulted in his business suffering $20 million in losses, representing a minimum fee guarantee, while the full fee would have been many millions of dollars higher had the contract been performed—in addition to out-of-pocket loss, and emotional harm, humiliation, and harassment. Mr. Carter, individually, is inextricably tied to his business Roc Nation, which he co-founded. He is the control person of a 50% owner of Roc Nation. Mr. Carter is Roc Nation.

Damages to one constitute damages to the other. In an industry dominated by personalities and relationships, Doe's false allegations had the potential to cause – and in fact did cause – significant damages to Mr. Carter and his business interests.

127.    Furthermore, it was incredibly painful for Mr. Carter and his wife to sit down and talk to their children, one of whom is at an age where her friends would surely see the press and ask questions about these claims, to discuss the allegations made by Doe.

128.    Indeed, Mr. Carter mourns his children's loss of innocence, robbed from them by these false allegations. In particular, Mr. Carter's oldest child is near to the age that Doe claims to have been when she alleges these heinous acts occurred, making these false allegations even more painful. Simply put, Mr. Carter is heartbroken that his children must now think about their father in this way, especially at their young age.

129.    Defendants' actions also undermined Mr. Carter's relationships, and his company Roc Nation's relationships, with their businesses in the sports and entertainment industry. For example, in violation of Wikipedia's rules, Buzbee directed his employees to edit Wikipedia pages to enhance Buzbee's image and damage Mr. Carter's and Roc Nation's reputations. Users with an IP address directly linked to the Buzbee Firm made over 100 positive edits to Buzbee's Wikipedia page.  It is undisputed that Roc Nation and Mr. Carter have significant and extensive agreements to produce entertainment programs for certain sporting events. After Defendants filed Doe's lawsuit, the media reported that other businesses could end their deals with Roc Nation and would likely force these business partners to speak out and address how the allegations would affect or even end their business relationship. This is exactly the result Defendants intended, banking on the fact that Mr. Carter would fear the reputational assassination, cave and pay.

130.    As predicted, immediately after Buzbee and his co-conspirators went public with Doe's false accusations, Roc Nation and Mr. Carter lost other contracts in the sports and entertainment space that would have generated revenues of, at least, $20 million, representing a minimum fee guarantee, while the full fee would have been many millions of dollars higher had the contract been performed. This is because Roc Nation is essentially an extension of – and inseparable from – Mr. Carter's personal brand and image. Indeed, at trial, Plaintiff will present evidence demonstrating how the extortionate scheme, and the false complaint filed in New York, resulted in the loss of business opportunities to Mr. Carter, personally; and have served to preclude him from new business opportunities across different industries.

131.    Moreover, as a result of Defendants' filing of the false lawsuit and other false public statements against Mr. Carter, Mr. Carter was denied a $55 million personal credit line.

132.    Also as a result of Defendants' filing of the false lawsuit and other false public statements against Mr. Carter, Mr. Carter's 50% owned consumer brand business, with which Mr. Carter is publicly closely associated, was also denied a $115 million loan.

133.    And as it concerns the loss of proceeds to Roc Nation, Mr. Carter will demonstrate how those losses have directly impacted him financially – opportunities that existed before are now foreclosed. These quantifiable losses were directly caused by, and connected to, the false filing in New York federal court.

134.    Finally, social media commentary online responding to Buzbee's public statements about Mr. Carter and accusations against Mr. Carter have caused him harm. For example, people have said "I can't wait until you join [Combs] in prison. Then later in hell," "He needs to be in jail . . . ," "Jay-z needs to be locked up," "Jay Z about to go down," "ALL OF YOU at Roc Nation, Jay Z…ALL OF YOU ARE GOING DOWN, just wait and see," and "Lock Jay Z up!" Other

comments have accused Mr. Carter of being a "satanist" a "trafficker," a "terrorist" and a "monster," called Mr. Cater the n-word and threatened violence against Mr. Carter and his wife, including to "kill" or "execute" them.

135.    Recent social media data shows that Defendants' case and the allegations against Mr. Carter have generated 1.3 million mentions and had the potential to be viewed nearly 15 billion times based on associated user data.[19] The Net Sentiment Score — a metric used to capture whether sentiment about a person, entity or story is positive, negative or neutral — for that content regarding Mr. Carter is 94% negative. And although Mr. Carter's Net Sentiment Score was only 40%-41% negative in 2022 and 2023, his Net Sentiment Score fell to 79% negative since Doe made her false allegations against Mr. Carter.

136.    Buzbee, Doe, and their co-conspirators must answer for all of this.

### First Cause of Action
**(Malicious Prosecution Against All Defendants)**

137.    On October 20, 2024, Defendants sued Combs and his business entities, as well as "Does 1-10" alleging that they committed heinous crimes. Defendants did not initiate that lawsuit with a legitimate purpose. Instead, the lawsuit was filed with the intent to extort Mr. Carter.

138.    On November 5, 2024, Doe, through her attorney Buzbee, sent Mr. Carter an extortionate letter threatening to publicly assert wild, horrific, but utterly false allegations that Mr. Carter sexually assaulted a minor after the 2000 VMAs. According to Doe and Buzbee, if Mr. Carter wished to avoid the financial and personal devastation that such public allegations would inflict, he would need to work out a deal to pay her off. But Doe had already sued Mr. Carter, albeit as one of the "Does 1-10." Defendants thus filed the lawsuit to force Mr. Carter into either:

---

[19] In fact, one X post published by Pop Base, *NBC News reports that Jay-Z has been accused of raping a 13-year-old girl with Diddy in 2000,* was reposted 45,000 times and "liked" 225,000 times.

(a) paying "something of substance" to stop her from making public the wildly false allegations of sexual assault that would subject Mr. Carter to opprobrium and irreparably harm his reputation, family, career, and livelihood; or (b) endure that financial and personal ruin.

139.    After Mr. Carter refused to capitulate to these extortionate demands, Defendants made good on their threat and, on December 8, 2024, formally named Mr. Carter a defendant in the pending lawsuit they filed weeks earlier.

140.    Defendants either knew that the statements against Mr. Carter were false, and/or acted with reckless disregard for the truth when initiating proceedings against Mr. Carter.

141.    Doe used NBC News and other media platforms to publish and further disseminate her false statements to millions of readers and viewers to falsely accuse Mr. Carter of sexual assault and inflict maximum reputational harm on him to induce Mr. Carter to give her money to which she was not entitled.

142.    Doe's lawsuit was meritless and lacked probable cause, as demonstrated by how quickly and easily NBC News discovered evidence that both disproved Doe's allegations and directly contradicted her claims. No person of ordinary care and prudence would believe that Mr. Carter sexually assaulted Doe at an afterparty for the 2000 VMAs just because she said so with zero corroboration. Moreover, a simple Google search would have revealed that Doe's allegations were false and thus the lawsuit had no chance of success.

143.    For example, NBC News found the following inconsistencies in Doe's allegations:

a.    Doe alleged that the VMA after party occurred at "a large white residence with a gated U-shaped driveway" that was "approximately twenty minutes" from the VMAs by car, but photographs show that Mr. Carter attended a party at Lotus, a night club in New York City;

b.    Doe alleged that her father drove to pick her up after the alleged assault: a ten-hour round trip to retrieve his 13-year-old daughter from a random gas station. When asked, her father had no recollection of doing so;

      c.      Doe alleged that she spoke to certain celebrities at the alleged party. When pressed for the name of the celebrities, Doe could only name one person, but that individual was in Chicago that evening performing a concert;

      d.      Doe alleged that she watched the VMAs on a jumbotron, despite the fact that photographs from the evening show no jumbotrons and that New York City denied MTV the permit to display one that evening; and

      e.      Doe alleges that she "approached limousine drivers" at the VMAs, despite video proof that the limousine area was cordoned off by police and inaccessible to fans.

144.    Doe also admitted to NBC News that her statements contained mistakes and that key details in her allegations were inaccurate and based on nothing more than her "guess[es]." Doe thus, facilitated by her lawyers, knowingly and intentionally filed a complaint that contained false allegations.

145.    Yet, even after NBC News exposed the falsity and improbability of her statements, Defendants nevertheless continued to pursue Doe's frivolous and meritless lawsuit in an improper attempt to extort a settlement from Mr. Carter under the threat that they would continue to prosecute Doe's fabricated sexual assault allegations in a court of law and the court of public opinion.

146.    Defendants acted with malice in pursuing and initiating the meritless lawsuit against Mr. Carter. Defendants devised and executed their plan to accuse Mr. Carter of sexual assault and used national news and media outlets to disseminate their false, fabricated accusations to millions. Defendants' actions were willful and purposefully designed to maximize the reputational harm to Mr. Carter and induce Mr. Carter to pay them. At a minimum, they initiated the lawsuit with a reckless disregard for the falsity of the allegations.

147.    Doe's frivolous lawsuit, filed by Defendants, and its demonstrably false allegations that Mr. Carter sexually assaulted her when she was a minor caused Mr. Carter to suffer actual and

special damages, including, but not limited to, harm to his personal and professional reputation, harm to his business entity, Roc Nation—which resulted in his business suffering $20 million in losses, representing a minimum fee guarantee, which would have been many of dollars higher had the contract been performed—out-of-pocket loss, and emotional harm, humiliation, and harassment. Moreover, as a result of Defendants' filing of the false lawsuit and other false public statements against Mr. Carter, Mr. Carter was denied a $55 million personal credit line. Also as a result of Defendants' filing of the false lawsuit and other false public statements against Mr. Carter. Also as a result of Defendants' filing of the false lawsuit and other false public statements against Mr. Carter, Mr. Carter's 50% owned consumer brand business, with which Mr. Carter is publicly closely associated, was also denied a $115 million loan.

148.    Defendants' initiation and continued prosecution of the frivolous lawsuit was willful and malicious and was intended to oppress and cause injury to Mr. Carter. Accordingly, Mr. Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

<u>**Second Cause of Action**</u>
**(Abuse of Process Against All Defendants)**

149.    On October 20, 2024, Doe, through Defendants, sued Combs and his business entities, as well as "Does 1-10" alleging that they committed heinous crimes. Defendants did not initiate that lawsuit with a legitimate purpose or to redress any alleged wrong. Instead, the filing was the opening salvo to their extortion scheme and used as a tool to seek collateral advantage and to gain leverage over Mr. Carter. The filing was just one part of the elaborate scheme to extort Mr. Carter, which began before the filing and continued well after the filing.

150.    On November 5, 2024, Doe, through her attorney Buzbee, sent Mr. Carter an extortionate letter threatening to publicly assert wild, horrific, but utterly false allegations that Mr.

Carter sexually assaulted a minor after the Video Music Awards in 2000. According to Doe and Buzbee, if Mr. Carter wished to avoid the financial and personal devastation that such public allegations would inflict, he would need to work out a deal to silence her. But Doe had already sued Mr. Carter, albeit as one of the "Does 1-10." Defendants thus filed the lawsuit to force Mr. Carter into either: (a) paying "something of substance" to stop her from making public the wildly false allegations of sexual assault that would subject Mr. Carter to opprobrium and irreparably harm his reputation, family, career, and livelihood; or (b) endure that financial and personal ruin.

151.    After Mr. Carter refused to capitulate to Doe's extortionate demands, Defendants made good on their threat and formally named Mr. Carter as a defendant in the lawsuit they filed weeks earlier.

152.    Defendants either knew that the statements against Mr. Carter were false, and/or acted with reckless disregard for the truth when initiating proceedings against Mr. Carter.

153.    Defendants used NBC News and other media platforms to publish and further disseminate Doe's false statements to millions of readers and viewers to falsely accuse Mr. Carter of sexual assault and inflict maximum reputational harm on him to induce Mr. Carter to give her money to which she was not entitled.

154.    Defendants lacked any probable cause to believe Doe's lawsuit had legal merit, as demonstrated by how easy it was for NBC News to disprove Doe's allegations after mere days of investigation that revealed evidence directly contradicting her version of events. No person of ordinary care and prudence would believe that Mr. Carter sexually assaulted Doe at an afterparty for the 2000 VMAs and a simple Google search would have revealed that Doe's allegations were false and had no chance of success. Yet, Defendants were undeterred, and continued advancing

Doe's false allegations in an effort to damage Mr. Carter's reputation in the hope it would convince him to give in to their attempts at extortion.

155.    For example, NBC News found the following inconsistencies in Doe's allegations:

    a.    Doe alleged that the VMA after party occurred at "a large white residence with a gated U-shaped driveway" that was "approximately twenty minutes" from the VMAs by car, but photographs show that Mr. Carter attended a party at Lotus, a night club in New York;

    b.    Doe alleged that her father drove to pick her up after the alleged assault: a ten-hour round trip to retrieve his 13-year-old daughter from a random gas station. When asked, her father had no recollection of doing so;

    c.    Doe alleged that she spoke to certain celebrities at the alleged party. When pressed for the name of the celebrities, Doe could only name one person, but that individual was in Chicago that evening performing a concert;

    d.    Doe alleged that she watched the VMAs on a jumbotron, despite the fact that photographs from the evening show no jumbotrons and that New York City denied MTV the permit; and

    e.    Doe alleges that she "approached limousine drivers" at the VMAs, despite video proof that the limousine area was cordoned off by police and inaccessible to fans.

156.    Doe also admitted to NBC News that her statements contained mistakes and admitted that key details in her allegations were inaccurate and based on her "guess[es]." Doe thus knowingly and intentionally filed a complaint that contained false allegations.

157.    Yet, even after NBC News exposed the falsity and inconsistency of her statements, Defendants nevertheless continued to pursue Doe's frivolous and meritless lawsuit without justification and for the improper purpose of attempting to harm Mr. Carter and extort a settlement from Mr. Carter based on her fabricated sexual assault allegations.

158.    Defendants acted with malice in pursuing and initiating the meritless lawsuit against Mr. Carter. Defendants devised and executed their plan to accuse Mr. Carter of sexual assault and used national news and media outlets to disseminate the fabricated accusations to

millions despite the falsity of the accusation. Defendants' actions were willful and purposeful in order to maximize the reputational harm to Mr. Carter and induce Mr. Carter to pay them. At a minimum, they initiated and continued to pursue the lawsuit with a reckless disregard for the falsity of the allegations.

159.    Doe's frivolous lawsuit and its demonstrably false allegations that Mr. Carter sexually assaulted her when she was a minor caused Mr. Carter to suffer actual and special damages, including, but not limited to, harm to his personal and professional reputation, harm to his business entity, Roc Nation—which resulted in his business suffering substantial losses in excess of $20 million—out-of-pocket loss, and emotional harm, humiliation, and harassment.

160.    After finally realizing that their plan would not succeed, Defendants quietly moved to voluntarily dismiss the lawsuit with prejudice. Accordingly, the lawsuit was resolved in Mr. Carter's favor, without settlement or compromise.

161.    Defendants' initiation and continued prosecution of the frivolous lawsuit was willful and malicious and was intended to oppress and cause injury to Mr. Carter. Accordingly, Mr. Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

## Third Cause of Action
### (Civil Conspiracy Against All Defendants)

162.    Defendants agreed and worked together and planned, and knowingly and willfully conspired, to maliciously prosecute and abuse the legal process against Mr. Carter. Defendants agreed to initiate and continue the false and malicious lawsuit in the shared objective of extorting Mr. Carter through false and damaging accusations, thereby causing harm to his reputation and financial wellbeing.

163.    In doing so, Defendants intended to harm Mr. Carter. One or more of the Defendants took an overt act or acts in furtherance of their malicious prosecution of Mr. Carter and to abuse the process of the courts against Mr. Carter:

a.    Defendant Buzbee, as Doe's attorney, filed the initial lawsuit against Mr. Carter and other entities, knowing the claims were fabricated or recklessly disregarding the truth that the claims were fabricated;

b.    Defendant Fortney, as an attorney representing Doe, assisted in pursuing the lawsuit and was complicit in the unlawful purpose of extorting Mr. Carter;

c.    Defendant Buzbee and Defendant Fortney continued to prosecute the meritless lawsuit even after each were confronted with further evidence of its falsity, demonstrating their collective intent to harm Mr. Carter; and

d.    Defendant Doe actively participated in the formulation of and prosecution of false claims against Mr. Carter.

164.    The conduct of these Defendants caused Mr. Carter's harm. Defendants' collective conduct, including their malicious prosecution and abuse of process, was intentional and calculated to cause Mr. Carter's injury. Their conspiracy was executed to extort money from Mr. Carter and to damage his personal, professional, and business reputation.

165.    As a direct result of Defendants' conspiracy, Mr. Carter suffered substantial harm. Mr. Carter also suffered out-of-pocket expenses and emotional distress. Accordingly, Mr. Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

**Fourth Cause of Action**
**(Defamation Against Doe)**

166.    Doe has made (and continues to make) false and defamatory statements to and through third parties, including, but not limited to, major media outlets, through her attorneys, on social media platforms, and during public interviews, accusing Mr. Carter of raping her. Doe's false and defamatory statements went far beyond the four corners of her complaint, and were

widely disseminated to the general public through national media outlets, social media platforms, and during public interviews. Doe did not retract the libelous statements made against Mr. Carter within 10 days of their publication, or at any time thereafter.

167.    Notwithstanding the falsity of her allegations, Doe relied on NBC News and other sources to republish and further disseminate – indeed, to amplify – her defamatory statements about Mr. Carter to the public, despite knowing that providing such statements to media outlets would disseminate her false statements about Mr. Carter throughout the country and world to millions of viewers and readers, which is what they did on December 13, 2024.

168.    Doe's accusations were neither speculative nor innocuous, but asserted by Doe as matter of fact to lead a reader or viewer to conclude that Mr. Carter committed the heinous criminal acts she alleged. Indeed, her pending legal action is barely mentioned during the broadcast.

169.    Far from regurgitating her complaint, Doe leveled new allegations against Mr. Carter during the interview. For instance, Doe stated, for the first time, that she had been ***"fighting trying to get away from [Mr. Carter] and he put his hand over my mouth and told me to stop it -- you know, stop it, cut the BEEP."*** These defamatory allegations were new and not made in Doe's complaint against Mr. Carter. She also provided other, previously undisclosed details about her and her "encounter," including that she:

  a.    Is "A 38-year-old mother from Alabama."

  b.    Allegedly went to the VMAs "to catch a glimpse of her favorite celebrities."

  c.    Was not scared to be alone in New York because "with having autism, is – like feeling you live your life in a shatter-proof, juggle ball. The world's on fire, the fire is inside the ball with you, but there's no way for you to get out."

  d.    "[S]uffered a head injury."

  e.    "The night of the 2000 VMAs . . . a friend drove her from Rochester, New York to Manhattan."

    f.     Believed Mr. Combs's limo driver attempted to convey that she "was just pretty".

    g.     Talked "to Benji Madden about his tattoo because you know, I have a – he has about his tattoo that's the Last Supper, because I have a religious background, so it was just something to talk about.

    h.     Had to "seek medical treatment due to the stress."

170.    Doe also attempted to explain, for the first time, why she has no witnesses. First, she, through a statement by Buzbee to NBC News, stated that the "friend" that allegedly drove her from Rochester to New York City "has since died." Second, Doe stated, for the first time, that after her father picked her up, they "Rode home in silence" and that her father "didn't ask me what happened, he didn't ask me what I did or where I was." In fact, even after NBC News exposed her new, false allegations during her interview, Doe stated that "she stands by her statements" and that "what is the clearest is what happened to me."

171.    Doe knowingly made her false statements and, at a minimum, made them with a reckless disregard as to their falsity as demonstrated by NBC News's ability to quickly uncover inconsistencies in Doe's allegations and contradictory evidence. Worse, when pressed about the inconsistencies, she admitted her statements contained numerous inaccuracies and, in some instances, were random guesses as to the key details. Doe thus acted with actual malice when she knowingly and intentionally published false allegations accusing Mr. Carter of sexual assault.

172.    Doe's false statements, and the plan she concocted with her attorneys to use national news media networks, such as NBC News, to disseminate those false statements to millions, were a part of Defendants' calculated plan to falsely accuse Mr. Carter of sexual assault and inflict maximum reputational harm on him to induce payment.

173. Doe's false statements are defamatory per se as her inflammatory statements and false accusation that Mr. Carter committed crimes of moral turpitude subjected Mr. Carter to disgrace, ridicule, public hatred, and contempt.

174. Mr. Carter was directly injured by Doe's false statements, including, but not limited to, the deterioration of his public image, reputation, and professional relationships, and the loss of business opportunities, due to the public contempt and hatred caused by Doe's false statements.

175. Doe's false statements also constitute defamation *per quod*:

   a. Doe's false statements were made as matter-of-fact statements that were reasonably understood to have been made about Mr. Carter;

   b. Doe's false statements to social media networks, including her NBC News interview, implicated Mr. Carter in allegations of criminal sexual misconduct; and

   c. The statements made by Doe were known to millions of readers and viewers of Doe's statements which injured Mr. Carter in his occupation as a performer and businessperson. For example, Doe's false statements and actions undermined Mr. Carter's ability to maintain professional relationships, secure business opportunities, and preserve his reputation by exposing Mr. Carter to disgrace, ridicule, public hatred, and contempt.

176. Mr. Carter has suffered assumed and actual damages, including, but not limited to, loss and injury to his business, harm to his name and reputation, out-of-pocket loss, emotional harm, humiliation, and embarrassment.

177. Doe's false statements were a substantial factor in causing Mr. Carter's harm.

178. Doe acted with constitutional malice. Doe either knew that her statements against Mr. Carter were false or acted with reckless disregard for the truth.

179. Even upon having sufficient grounds to withdraw her false statements against Mr. Carter, with the release of the NBC News Article, Doe continued to threaten, through her attorney, Buzbee, criminal prosecution against Mr. Carter and maintain the lawsuit against Mr. Carter.

180.     And Doe still has not stopped. As recently as April 11, 2025, Doe made a post on TikTok with a lip-synched audio track stating that: "you couldn't pay me a million dollars to get an apology video out of me, I stand on what I said, fuck you."[20] By refusing to apologize, and continuing to "stand on what [she] said," despite all the evidence and, indeed, her own admissions to the contrary, Doe continues to display a shocking and reckless disregard for the truth that is both intentional and malicious.

181.     Doe never had any reasonable grounds to support any truth in her statements and acted with reckless disregard for the truth. In other words, she lied. Tellingly, even after recanting portions of her complaint in the NBC News interview, when pressed to come forward with the truth, she refused. Instead, Doe responded: "what's in it for me?"

182.     Accordingly, Mr. Carter is entitled to an award of all damages available under the law, including compensatory damages, special damages, and punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Shawn Corey Carter respectfully prays for judgment and relief against Jane Doe (as to all Causes of Action) and Anthony Buzbee, David Forney, Anthony G. Buzbee L.P. (d/b/a The Buzbee Law Firm), Antigone Curis, and Curis Law, PLLC (as to the First, Second and Third Causes of Action) as follows:

1.     An award of assumed and actual damages, in an amount to be determined by the finder of fact;

2.     An award of punitive damages;

3.     Reasonable costs and legal fees pursuant to applicable law;

4.     Pre- and post- judgment interest as applicable; and

---

[20] Mr. Carter is not including a citation to Doe's TikTok page because the hyperlink includes identifying information.

5.      Any other relief the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Mr. Carter demands a trial by jury of all issues so triable.

Dated: May 5, 2025

/s/ William G. Somerville
WILLIAM G. SOMERVILLE
W. PATTON HAHN
JADE E. SIPES
BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
1901 Sixth Avenue, Ste. 2600
Birmingham, Alabama 35226
(205) 328-0480
wsomerville@bakerdonelson.com
phahn@bakerdonelson.com
jsipes@bakerdonelson.com

*Attorneys for Plaintiff Shawn Carter*