# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

SHAWN COREY CARTER,

     Plaintiff,

        v.

ANTHONY BUZBEE, DAVID
FORTNEY, ANTHONY G. BUZBEE LP
(d/b/a THE BUZBEE LAW FIRM),
ANTIGONE CURIS, CURIS LAW, PLLC
and JANE DOE,

     Defendants.

Case No. 1:25-CV-00086-TFM-MU

---

## PLAINTIFF SHAWN COREY CARTER'S MEMORANDUM OF LAW IN OPPOSITION TO THE BUZBEE DEFENDANTS' MOTION TO DISMISS

---

**William G. Somerville**
**W. Patton Hahn**
**Jade E. Sipes**
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
**1901 Sixth Avenue North, Ste. 2600**
**Birmingham, Alabama 35226**
wsomerville@bakerdonelson.com
phahn@bakerdonelson.com
jsipes@bakerdonelson.com

*Attorneys For Plaintiff Shawn Carter*

# Table of Contents

                                                                                           **Page**

**Table of Contents** ............................................................................................ i

**Table of Authorities** ...................................................................................... iii

**Preliminary Statement** .................................................................................. 1

**Background** ..................................................................................................... 4

**Argument** ........................................................................................................ 9

**I.**     **This Court Has Personal Jurisdiction Over The Buzbee Defendants** .......................... 9

      A.    Conspiracy Jurisdiction ................................................................... 10

      B.    Specific Contacts ............................................................................ 14

            1.    First Contact: The Buzbee Defendants Solicited Doe As A Client .......... 19

            2.    Second And Third Contacts: The Buzbee Defendants Discussed Their Conspiracy Against Mr. Carter With Doe In Alabama ................... 23

            3.    Fourth and Fifth Contacts: The Buzbee Defendants Traveled to Alabama Three Times To Meet With Doe About Their Conspiracy ........ 25

            4.    Sixth Contact: The Buzbee Defendants Paid For And Facilitated Doe's Participation In The Defamatory Interview By Arranging Her Travel From The Southern District Of Alabama ...................................... 25

      C.    Fair Play and Substantial Justice ................................................... 27

**II.**    **Venue Is Appropriate In This Judicial District** ........................................ 29

      A.    A Substantial Part Of The Events Giving Rise To Plaintiff's Claim Occurred In This District ................................................................. 29

      B.    Venue Is Proper As To Each Claim Based On Common Core Allegations Bearing On Mr. Carter's Claims ................................... 32

      C.    The *Press* Case Does Not Control This Case ................................. 34

      D.    The Court Does Not Need To Find That Venue Is Proper As To Each Claim .................................................................................... 36

**III.**   **Mr. Carter States A Claim For Malicious Prosecution** .......................... 36

      A.    Mr. Carter Alleges That The Buzbee Defendants Lacked Probable Cause .......... 37

            1.    Mr. Carter Pleads That The Buzbee Defendants Knew The SDNY Action Was Meritless Before They Filed It ................................. 37

            2.    The Buzbee Defendants' Factual Arguments Are Premature And, In Any Event, Are False ................................................................ 40

            3.    The SDNY Court Never Addressed The Merits Of The SDNY Action ..... 41

B.     Mr. Carter Alleges Malice ................................................................ 43

     1.    Mr. Carter's Allegations That The Buzbee Defendants Lacked Probable Cause Also Provide Sufficient Allegations Of Malice ............. 43

     2.    Mr. Carter Alleges The Buzbee Defendants Acted For An Improper Purpose ................................................................................ 44

C.     Mr. Carter Alleges A Special Injury ................................................ 46

     1.    Mr. Carter Pleads Concrete Lost Business Opportunities ...................... 47

     2.    Mr. Carter Pleads Concrete Emotional And Reputational Harm............. 50

D.     Mr. Carter Alleges That The SDNY Action Was Terminated In His Favor ........ 52

**IV.     Mr. Carter States A Claim For Abuse of Process ........................................ 57**

**V.     The Complaint States A Claim For Civil Conspiracy ................................ 61**

A.     Mr. Carter Pleads Cognizable Tort Claims............................................ 62

B.     Lawyers Are Not Absolutely Immune From Liability For Conspiring With Their Clients.......................................................................... 62

C.     New York Recognizes "Intracorporate" Civil Conspiracies ................................ 63

**VI.     The Recent Decision of The California Superior Court In Carter v. Buzbee Is Irrelevant .................................................................................... 65**

**Conclusion .................................................................................................... 67**

## Table of Authorities

**Page(s)**

**Cases**

*ADA v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ....................................................46

*Am. Needle, Inc. v. NFL*,
560 U.S. 183 (2010)....................................................64

*Aquilina v. O'Connor*,
59 A.D.2d 454 (3rd Dep't 1977)....................................................53

*Astro–Med, Inc. v. Nihon Kohden America, Inc.*,
591 F.3d 1 (1st Cir. 2009)....................................................30

*Bates v. C & S Adjusters, Inc.*,
980 F.2d 865 (2d Cir. 1992)....................................................32

*Bd. of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assoc., Inc.*,
38 N.Y.2d 397 (N.Y. 1975) ....................................................57, 58

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................67

*Boose v. Rochester*,
71 A.D.2d 59 (4th Dep't 1979)....................................................44, 45

*Bowling v. Founders Title Co.*,
773 F.2d 1175 (11th Cir. 1985) ....................................................23

*Bowman v. Hodge Mgmt. Grp., LLC*,
No. 15-cv-01318, 2016 U.S. Dist. LEXIS 82950 (N.D. Ala. June 27, 2016)....................................................24

*Brown v. Brown*,
343 F. Supp. 2d 195 (E.D.N.Y. 2004) ....................................................51

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................................................25

*Burger v. Brookhaven Medical Arts Bldg.*,
131 A.D.2d 622 (2d Dep't 1987)....................................................63

*by Sparrow Fund Mgmt. LP v. Mimedx Grp., Inc.*,
2020 U.S. Dist. LEXIS 49813 (S.D.N.Y. Mar. 22, 2020) ....................................................48

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
  902 F.2d 829 (11th Cir. 1990) ...................................................................9

*Campion Funeral Home v. State*,
  569 N.Y.S.2d 518 (3d Dept. 1991) ...........................................................51

*Cantalino v. Danner*,
  96 N.Y.2d 391 (2001) ...............................................................................52

*Cardy v. Maxwell*,
  169 N.Y.S.2d 547 (Sup. Ct. 1957)......................................................58, 61

*Chisolm-Mitchell v. Ahmed*,
  No. 20-cv-3434, 2021 U.S. Dist. LEXIS 26083 (E.D.N.Y. Feb. 11, 2021) .....................51, 52

*In re: Cmty. Health Sys., Inc.*,
  No. 15-cv-222, 2016 U.S. Dist. LEXIS 123030 (N.D. Ala. Sept. 12, 2016)...........................9

*CoachComm, LLC v. Westcom Wireless, Inc.*,
  No. 21-cv-743, 2023 U.S. Dist. LEXIS 76151 (M.D. Ala. May 2, 2023) ...............................19

*Cohen v. Williams*,
  294 Ala. 417, 318 So. 2d 279 (1975) .........................................................48

*Commc'n Equip. & Contracting Co. v. Municipality of Anchorage, Alaska*,
  498 F. Supp. 632 (M.D. Ala. 1980) ...........................................................15

*Ex parte Companies, Inc.*,
  936 So.2d 1049 (Ala. 2006)........................................................................11

*Cook v. Sheldon*,
  41 F.3d 73 (2d Cir. 1994)...........................................................................58

*Cox v. Sullivan*,
  2014 WL 4352088 (N.D. Okla. Sept. 2, 2014) ..........................................30

*CSX Transp., Inc. v. Preussag Intern. Steel Corp.*,
  201 F.Supp.2d 1228 (M.D. Ala. 2002) ......................................................27

*Curiano v. Suozzi*,
  63 N.Y.2d 113, 480 N.Y.S.2d 466 (1984) .................................................59

*Dallas v. Fassnacht*,
  42 N.Y.S.2d 415 (Sup. Ct. 1943)...............................................................63

*Del Valle v. Trivago GMBH*,
  56 F.4th 1265 (11th Cir. 2022) ..................................................................20

*Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*,
    593 F.3d 1249 (11th Cir. 2010) ......................................................15

*Doherty v. Am. Motors Corp.*,
    728 F.2d 334 (6th Cir. 1984) ........................................................64

*Douglas v. Bayview Loan Servicing, LLC*,
    2012 U.S. Dist. LEXIS 11943 (S.D. Ala. Jan. 13, 2012)......................................67

*Dudick v. Gulyas*,
    277 A.D.2d 686 (3d Dep't 2000) ..............................................46, 47, 51

*In re Eerie World Entm't, L.L.C.*,
    2006 Bankr. LEXIS 770 (Bankr. S.D.N.Y. Apr. 28, 2006)..............................48, 51

*Emanuel v. Griffin*,
    No. 13-cv-1806, 2013 U.S. Dist. LEXIS 142723 (S.D.N.Y. Oct. 2, 2013)......................41, 44

*Endurance Assurance Corp. v. Zoghbi*,
    403 F.Supp.3d 1301 (S.D. Fla. Sept. 13, 2019) ........................................27

*Engel v. CBS, Inc.*,
    182 F.3d 124 (2d Cir. 1999)...........................................................51

*FFR SE, LLC v. Sanborn*,
    No. 14-cv-5439, 2015 U.S. Dist. LEXIS 84467 (E.D. Pa. June 30, 2015)............................27

*First Fin. Bank v. CS Assets, LLC*,
    No. CIV.A. 08-0731WSM, 2009 WL 1211360 (S.D. Ala. May 4, 2009) ..................... *passim*

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021)............................................................9, 10, 28

*Goldthrip v. Johnson and Johnson*,
    No. 15-cv-00651, 2016 U.S. Dist. LEXIS 170801 (S.D. Ala. Dec. 8, 2016) ........................21

*Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*,
    956 F. Supp. 2d 1323 (M.D. Ala. 2012) .........................................31, 33

*Guidry v. U.S. Tobacco Co.*,
    188 F.3d 619 (5th Cir. 1999) ........................................................10

*Hahn v Wylie*,
    54 A.D.2d 629 (1st Dep't 1976) ......................................................63

*Hauser v. Bartow*,
    273 N.Y. 370 (1937) ................................................................59

*Heilbut v. Cassava Scies., Inc.*,
   No. 24-cv-05948, 2025 U.S. Dist. LEXIS 56283 (S.D.N.Y. Mar. 26, 2025) ................. *passim*

*Honzawa v. Honzawa*,
   268 A.D.2d 327 (1st Dep't 2000) .................................................................................... *passim*

*I.G. Second Generation Partners, L.P. v. Reade*,
   17 A.D.3d 206, 793 N.Y.S.2d 379 (1st Dep't 2005) ....................................................... *passim*

*Irish v. Ferguson*,
   970 F. Supp. 2d 317 (M.D. Pa. 2013) .................................................................................48

*J & M Assocs., Inc. v. Romero*,
   488 Fed. App'x, 373 (11th Cir. 2012) .................................................................10, 11, 23

*K.A. v. Boy Scouts of Am.*,
   No. 17-cv-0021 KBM/KK, 2017 U.S. Dist. LEXIS 79046 (D.N.M. May 23,
   2017) .......................................................................................................................................27

*Kennedy Lewis Inv. Mgmt., LLC v. StimQ Med. LLC*,
   2024 N.Y. Misc. LEXIS 4046 (Sup. Ct. June 24, 2024) ......................................................38

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*,
   1997 U.S. Dist. LEXIS 12976 (S.D.N.Y. Aug. 27, 1997) .....................................................51

*Kline v. Schaum*,
   173 Misc. 2d 108 (2d Dept. 1997) .......................................................................................63

*Kokomo Opalescent Glass Co. v. Arthur W. Schmidt Int'l, Inc.*,
   371 F.2d 208 (7th Cir. 1966) ...............................................................................................22

*Kozel v. Kozel*,
   2016 U.S. Dist. LEXIS 197439 (W.D. Penn. May 23, 2016)...................................34, 35, 36

*Lawrence v. DAP Prods.*,
   Case No. ADC-22-2651, 2022 U.S. Dist. LEXIS 112387 (D. Md. June 23,
   2022) .......................................................................................................................................48

*Legal Additions LLC v. Kowalski*,
   2009 U.S. Dist. LEXIS 41835 (N.D. Cal. Apr. 30, 2009) ....................................................36

*Lenaar v. Lubavitch*,
   2019 N.Y. Misc. LEXIS 4873 (Civ. Ct. Sept. 6, 2019) .......................................................46

*Levine v Graphic Scanning Corp.*,
   87 A.D.2d 755 (1st Dep't 1982) ...........................................................................................63

*Levine v. Sherman*,
    1976 N.Y. Misc. LEXIS 2560 (Sup. Ct. June 9, 1976) ........................................................61

*Levine v. Sherman*,
    384 N.Y.S.2d 685 (Sup. Ct. 1976) ........................................................................................58

*Levitin v. Miller*,
    92-cv-0520, 1994 U.S. Dist. LEXIS 9701 (S.D.N.Y. July 14, 1994)....................................43

*Levy's Store, Inc. v. Endicott-Johnson Corp.*,
    272 N.Y. 155 (1936) ............................................................................................................53

*Liberty Synergistics, Inc. v. Microflo Ltd.*,
    50 F. Supp. 3d 267 (E.D.N.Y. 2014) ....................................................................................53

*Little v. City of New York*,
    487 F. Supp. 2d 426 (S.D.N.Y. 2007) ..................................................................................64

*Loftus v. Arthur*,
    847 N.Y.S.2d 902 (Sup. Ct. 2007) ........................................................................................51

*Louvad Realty Corp. v. Anfang*,
    267 A.D. 567 (1st Dep't 1944) ..............................................................................................56

*Lowth v. Town of Cheektowaga*,
    82 F.3d 563 (2d Cir. 1996)....................................................................................................43

*Mansell & Assocs., LLC v. Ritchey Metals Co., Inc.*,
    No. 22-cv-01169, 2023 U.S. Dist. LEXIS 10080 (N.D. Ala. Jan. 20, 2023)........................24

*Marival, Inc. v. Planes, Inc.*,
    302 F. Supp. 201 (N.D. Ga. 1969) ........................................................................................21

*Martensen v. Koch*,
    942 F. Supp. 2d 983 (N.D. Cal. 2013) ..................................................................................36

*Martin v. City of Albany*,
    42 N.Y.2d 13 (1977) ..............................................................................................................44

*Martin v. Santorini Capital, LLC*,
    236 A.3d 386 (D.C. 2020) ....................................................................................................48

*Matthews v. Brookstone Stores, Inc.*,
    469 F. Supp. 2d 1056 (S.D. Ala. 2007)................................................................................9, 11

*McCaul v. Ardsley Union Free School District*,
    514 Fed. App'x, 1 (2d Cir. 2013)..........................................................................................51

*McDowell Bey v. Vega*,
    588 Fed. App'x, 923 (11th Cir. 2014) .................................................................27

*Ex parte McInnis*,
    820 So.2d 795 (Ala. 2001) ...................................................................10, 11

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
    863 F. Supp. 2d 928 (N.D. Cal. 2012) .................................................................36

*Med. Props. Tr., Inc. v. Viceroy Rsch.*,
    Case No. 23-cv-00408, 2023 U.S. Dist. LEXIS 112393 (N.D. Ala. June 30,
    2023) ..............................................................................................12

*Mobile Training & Educ., Inc. v. Aviation Ground Sch. of Am.*,
    2010 N.Y. Misc. LEXIS 3990 (Sup. Ct. June 23, 2010) .......................................54

*Molex Co., LLC v. Andress*,
    887 F. Supp. 2d 1189 (N.D. Ala. 2012) ................................................................16

*Molinoff v. Sassower*,
    471 N.Y.S.2d 312 (2d Dep't 1984) .....................................................................51

*Morgan v. North MS Medical Center, Inc.*,
    403 F. Supp. 2d 1115 (S.D. Ala. Dec. 2, 2005) ....................................................22

*N. Am. Commc'ns, Inc. v. Eclipse Acqui, Inc.*,
    Civ. A. No. 3:17-167, 2018 U.S. Dist. LEXIS 15518 (W.D. Pa. Jan. 31, 2018)....................32

*N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*,
    124 F.4th 1322 (11th Cir. 2025) ........................................................................10

*Newsome v. Gallacher*,
    722 F.3d 1257 (10th Cir. 2013) ...................................................................18, 19

*O'Brien v. Alexander*,
    101 F.3d 1479 (2d Cir. 1996)...........................................................................51

*Pagliarulo v. Pagliarulo*,
    30 A.D.2d 840 (2nd Dep't 1968) ...............................................................53, 58, 59

*Parkin v. Cornell Univ., Inc.*,
    78 N.Y.2d 523 (1991) ......................................................................................38

*Pasqualini v. MortgageIT, Inc.*,
    498 F. Supp. 2d 659 (S.D.N.Y. 2007)..................................................................62

*Pasulka v. Sykes*,
    131 F. Supp. 2d 988 (N.D. Ill. 2001) ..................................................................32

*Pesaplastic, C.A. v. Cincinnati Milacron Co.*,
   750 F.2d 1516 (11th Cir. 1985) ...............................................................................22

*Pro. Locate v. Prime, Inc*.,
   2007 U.S. Dist. LEXIS 40979 (S.D. Ala. June 4, 2007).........................................12

*Putnam v. Otsego Mut. Fire Ins. Co.*,
   41 A.D.2d 981 (3rd Dep't 1973)...............................................................................54

*Reich v. Lopez*,
   38 F. Supp. 3d 436 (S.D.N.Y. 2014)...................................................................64, 65

*Rivers v. Noom, Inc.*,
   No. 21-cv-1226, 2023 U.S. Dist. LEXIS 11041 (N.D. Ala. Jan. 23, 2023).............20

*Rowe v. Gary, Williams, Parteni, Watson & Gary PLLC*,
   723 Fed. App'x, 871 (11th Cir. 2018) .............................................16, 17, 24, 26

*Rubin v. Lutfy*,
   2009 N.Y. Misc. LEXIS 3398 (N.Y. Sup. Ct. Nov. 23, 2009) ...................43, 51, 53

*Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*,
   207 F.3d 1351 (11th Cir. 2000) ...............................................................................9

*Sacody Techs. v. Avant, Inc.*,
   862 F. Supp. 1152 (S.D.N.Y. 1994)..........................................................................32

*Sankin v. Abeshouse*,
   545 F. Supp. 2d 324 (S.D.N.Y. 2008).......................................................................51

*Santoro v. Town of Smithtown*,
   40 A.D.3d 736 (2nd Dep't 2007)...............................................................................45

*Sapienza v. Notaro*,
   172 A.D.3d 1418 (2d Dep't 2019) ......................................................................41, 45

*Schierloh v. Kelly*,
   253 A.D. 373 (2d Dep't 1938) ..................................................................................63

*Schoen v. Underwood*,
   No. W-11-CA-00016, 2012 U.S. Dist. LEXIS 200869 (W.D. Tex. May 15,
   2012) ........................................................................................................................48

*SE Prop. Holdings, LLC v. Center*,
   No. CIV.A. 15-0033-W, 2015 U.S. Dist. LEXIS 95168 (S.D. Ala. July 21,
   2015) ........................................................................................................................30

*Silvestri-Edwards v. Cappello*,
   2025 N.Y. Misc. LEXIS 3365 (Sup. Ct. March 20, 2025) ...............................................49, 50

*Sisler v. Gannett Co.*,
   516 A.2d 1083 (N.J. 1986)...........................................................................................49

*Smith-Hunter v. Harvey*,
   95 N.Y.2d 191 (2000) ..................................................................................................53

*SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*,
   939 So. 2d 885 (Ala. Civ. App. 2005) .......................................................................22

*Sparrow Fund Mgmt., LP v. MiMedx Grp., Inc.*,
   No. 18-cv-04921, 2019 U.S. Dist. LEXIS 195042 (S.D.N.Y. Nov. 7, 2019).............37, 38, 40

*Storey v. James Hardie Building Industries, PLC*,
   No. 22-cv-625, 2023 U.S. Dist. LEXIS 173961 (M.D. Ala. Sept. 28, 2023) .........................21

*Strumpf v. Asdourian*,
   2006 N.Y. Misc. LEXIS 3976 (Sup. Ct. Dec. 12, 2006) ..........................................48

*Sweetwater Union High School Dist. v. Gilbane Building Co.*,
   6 Cal. 5th 931 (2019) ...................................................................................................66

*Thomas v. Brown*,
   504 Fed. App'x, 845 (11th Cir. 2013) .............................................................16, 18

*Thomas v. G2 FMV, LLC*,
   147 A.D.3d 700 (1st Dep't. 2017) .............................................................................45

*Thomas v. G2 FMV, LLC*,
   2016 N.Y. Misc. LEXIS 272 (Sup. Ct. Jan. 27, 2016), *aff'd* 147 A.D.3d 700
   (1st Dep't 2017) .....................................................................................38, 47, 51

*Thryoff v. Nationwide Mut. Ins. Co.*,
   No. 05-CV-6607T, 2006 U.S. Dist. LEXIS 71706 (W.D.N.Y. Sep. 29, 2006).....................47

*Tommy Hilfiger Licensing Inc. v. Bradlees, Inc.*,
   99-cv-4677, 2002 U.S. Dist. LEXIS 7191 (S.D.N.Y. Apr. 25, 2002) .......................43, 44, 53

*Transamerican Equip. Co., LLC v. Indus. Assets Corp.*,
   No. 7:17-CV-00481-LSC, 2018 WL 831014 (N.D. Ala. Feb. 12, 2018) ..............................10

*Tray Wrap, Inc. v. Pac. Tomato Growers, Ltd.*,
   2008 NYLJ LEXIS 763 (N.Y. Sup. Ct. Jan. 25, 2008)....................................................43, 59

*U.S. S.E.C. v. Carrillo*,
   115 F.3d 1540 (11th Cir. 1997) .................................................................................20

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) .................................................................................11

*Vascular Ventures, LLC v. Am. Vascular Access, LLC*,
    No. 16-cv-00481, 2016 U.S. Dist. LEXIS 170030 (S.D. Ala. Dec. 7, 2016) .........................25

*Vernes v. Phillips*,
    266 N.Y. 298 (1935) ....................................................................................................63

*Wood Auto., Inc. v. Morrow Aviation*,
    No. 24-cv-372, 2025 U.S. Dist. LEXIS 28397 (N.D. Ala. Feb. 18, 2025) ..........................20

*World Wrestling Fed'n Entm't v. Bozell*,
    142 F. Supp.2d 514 (S.D.N.Y. 2001) ...........................................................................62

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ....................................................................................................28

*Yard Milkshake Bar Props., LLC v. BBH Creations, LLC*,
    No. 1:20-cv-498-TFM-MU, 2021 U.S. Dist. LEXIS 273825 (S.D. Ala. Aug.
    20, 2021) ......................................................................................................................9

**Rules**

Ala. R. Civ. P. 4.2(b) .........................................................................................................9, 21

Fed. R. Civ. P. 4(k)(1) .........................................................................................................21

Fed. R. Civ. P. 9(b) ............................................................................................................43

Fed R. Civ. P. 12(f) ............................................................................................................42

**Other Authorities**

Naomi Price and Jason Jarvis, *Conspiracy Jurisdiction*, 76 Stan. L. Rev. 403
    (2024) ...........................................................................................................................11

Price & Jarvis, 76 Stan. L. Rev. (2024) ...............................................................................21

Restatement (Second) of Torts 676, cmt. c .....................................................................45, 46

**Preliminary Statement**

The moment that Defendants Anthony Buzbee, David Fortney and Anthony G. Buzbee LP (collectively, "**Buzbee Defendants**") solicited representation of, and began their scheme with, their client and Alabama resident Jane Doe (along with their co-counsel, Antigone Curis and Curis Law, PLLC (collectively, "**Curis Defendants**") – which scheme resulted in the filing of a knowingly false lawsuit in the Southern District of New York ("**SDNY Action**") against Shawn Carter, falsely and maliciously alleging he raped a 13-year-old minor – they not only subjected themselves to the liability that appropriately should follow on such a despicable act masquerading as lawyering, but also to the jurisdiction of this Court. For the Buzbee Defendants to claim that they do not have to answer in Alabama for falsely conjuring up and filing that malicious lawsuit on behalf of a resident of this State – both through in person meetings in Alabama, and through electronic means directed into the State – is wrong both as a matter of fact and law.

The Buzbee Defendants rushed to file the SDNY Action mere days after Doe retained them, without conducting even the most rudimentary investigation or, as they freely admit, without even meeting with their client in person – a seemingly critical step in assessing credibility when bringing such a heinous allegation. And the complaint was riddled with obvious and demonstrable falsehoods.

Public records and media coverage placed Mr. Carter elsewhere at the relevant time; the alleged location of the assault did not even exist; and key witnesses were either not where Doe claimed they were, are deceased or had no recollection of the events. Even a cursory review of publicly available information would have exposed the SDNY Action as a sham. Nonetheless, the Buzbee Defendants, soullessly motivated by greed, filed the SDNY Action to extort a substantial financial settlement from Mr. Carter.

Moreover, Doe has since admitted that her accusations against Mr. Carter were fabricated and that she was pressured by Buzbee to include him in the SDNY Action for the purpose of increasing the case's value and extracting a larger settlement. The Buzbee Defendants were not motivated by any desire for justice or client needs or desires, but by their own greed and a calculated intent to threaten, then inflict maximum reputational and economic harm on Mr. Carter.

As their lies began to unravel – although before Jane Doe recanted her Buzbee-induced fabrications – the Buzbee Defendants voluntarily dismissed the SDNY Action with prejudice less than four months after it was filed. The Buzbee Defendants now seek to avoid any responsibility for their conduct through this wholly inadequate motion to dismiss. Their repeated attempts to gaslight this Court fail and the Buzbee Defendants need to be brought to account.

This Court has personal jurisdiction over the Buzbee Defendants, based both on conspiracy jurisdiction and their specific contacts with Alabama and its resident, SDNY plaintiff Jane Doe. The Buzbee Defendants conspired to maliciously prosecute and abuse the process of the courts against Mr. Carter, and they took several overt acts in Alabama in furtherance of that conspiracy. For example, Doe's father informed an investigator that Defendant Fortney personally solicited Doe as a client while she was in Alabama. The Buzbee Defendants, however, solicited Doe as a client through the AVA Law Group and Reciprocity (as defined below). Either way, knowing that she resided in Alabama, the Buzbee Defendants communicated with Doe about the conspiracy through phone calls and emails while she was located in Alabama; they traveled to Alabama at least three times solely to meet with Doe about their lawsuit and their conspiracy; and they facilitated Doe's participation in the defamatory i NBC News Interview – by paying for and arranging her travel from the Southern District of Alabama – to spread the false story and pressure Mr. Carter into a settlement by accompanying her from Alabama to the interview location. Even

aside from conspiracy jurisdiction, these cumulative contacts and the Buzbee Defendants' extensive servicing of the Alabama legal market – having appeared as counsel in at least 10 cases in the state and federal courts in Alabama since 1999 – satisfy the standard for specific personal jurisdiction under a traditional analysis such that the Buzbee Defendants should have reasonably anticipated a possible lawsuit against them in Alabama.

Mr. Carter states claims for malicious prosecution, abuse of process and civil conspiracy:

***Malicious Prosecution***. The Buzbee Defendants, acting in concert with Doe and the Curis Defendants, initiated the SDNY Action against Mr. Carter, advancing horrific and false allegations of sexual assault of a minor. Doe has admitted that the Buzbee Defendants knew the allegations were fabricated and that Mr. Carter was included at Buzbee's direction to increase the settlement value. What's more, the Buzbee Defendants either failed to conduct even the most basic investigation that would have easily disproved Doe's flimsy allegations or actually conducted an investigation and ignored the damning exculpatory evidence they uncovered – evidence which demonstrated there was not a shred of truth to support their false and malicious allegations. And although the Buzbee Defendants ultimately dismissed the SDNY Action with prejudice and without settlement or compromise, constituting a favorable termination for Mr. Carter under New York law, the Buzbee Defendants plainly acted with malice, both because they lacked probable cause to bring the SDNY Action, and because they sought to extort a large settlement with knowingly false allegations, rather than to seek justice. Finally, Mr. Carter pleads concrete and substantial injuries, including the denial of a $55 million personal credit line, loss of lucrative business contracts, denial of a $115 million business loan, and severe reputational and emotional harm going far beyond the ordinary burden of litigation.

***Abuse of Process***. Mr. Carter also alleges the Buzbee Defendants used the SDNY Action not to seek legitimate judicial relief, but as leverage in an extortion scheme. Their original complaint was intentionally vague, designed to create fear and speculation, and was followed by a demand letter threatening public exposure in a lawsuit (that the Buzbee Defendants already filed against Mr. Carter, albeit as a doe defendant) unless Mr. Carter paid a substantial settlement. When Mr. Carter did not do so, the Buzbee Defendants then amended their lawsuit to formally name Mr. Carter as a defendant, with the sole aim of extorting a settlement. This reality is further evidenced by the swift withdrawal of the lawsuit with prejudice when Mr. Carter still refused to be extorted, and began fighting back in earnest. Thus, the Buzbee Defendants' true aim was not to resolve a legitimate dispute, but to coerce Mr. Carter into a financial settlement by threatening his reputation and business interests.

***Civil Conspiracy***. The Buzbee Defendants entered an agreement with Doe and the Curis Defendants to leverage an extortionate payment from Mr. Carter under threat, or in the context, of litigation. Nothing in New York law provides that the Buzbee Defendants cannot conspire with their client, Doe, or their co-counsel, the Curis Defendants.

For these reasons and those discussed below, the Buzbee Defendants' motion to dismiss should be denied.

## Background

The following facts are drawn from Mr. Carter's Second Amended Complaint[1], which are assumed to be true when evaluating a motion to dismiss.

Following the bombshell indictment of Sean "Diddy" Combs in the fall of 2024, the Buzbee Defendants, in partnership with AVA Law Group and a legal marketing firm called

---

[1] "SAC" or the "Second Amended Complaint" refers to *Plaintiff Shawn Corey Carter's Second Amended Complaint and Demand for Jury Trial* (ECF No. 32).

- 4 -

Reciprocity Industries ("**Reciprocity**"), began aggressively soliciting potential plaintiffs nationwide – including in Alabama – via targeted ads on social media platforms such as Instagram and Facebook, as well as a 1-800 hotline. Plaintiff's Second Amended Complaint, Doc. 32 ("SAC") ¶¶ 13-14, 35-39. Under their agreement, Reciprocity agreed to forward any leads to both AVA Law and the Buzbee Defendants. *Id.* at ¶ 32. The Buzbee Defendants' efforts were designed to generate civil claims not only against Combs but also against other high-profile individuals who attended the same parties as Combs. *Id.* at ¶¶ 39, 43.

Shortly thereafter, Defendants hatched their conspiracy against Mr. Carter within the Southern District of Alabama. In the Buzbee Defendants version of events , on or around October 14, 2024, an Alabama resident then present within the state, Jane Doe, responded to a targeted Reciprocity Facebook ad or solicitations from Fortney and retained AVA Law Group to pursue claims against Mr. Carter. *Id.* at ¶ 54-56. Regardless, public records showed that Doe was suffering personal and financial hardships at the time, and had a history of mental health and substance abuse issues – including being in Mental Health Court 90 days before filing her lawsuit against Mr. Carter – as well as a record of making prior false allegations. *Id.* at ¶¶ 63, 66.

Within days, AVA Law Group sent a draft complaint against Combs and Mr. Carter to the Buzbee Defendants. *Id.* at ¶ 60. The Buzbee Defendants have claimed that, after receiving the draft complaint, they vetted Doe's allegations while she was in Alabama. *Id.* at ¶ 61. But either the "vetting" never actually occurred, or the vetting revealed the falsity of Doe's allegations and the Buzbee Defendants proceeded anyway. *Id.* at ¶ 62. Indeed, a simple Google search or basic investigation would have revealed that Doe's allegations were physically, geographically and temporally impossible – and therefore indisputably false. *Id.* at ¶¶ 66, 92-100.

For example, NBC News was able to quickly uncover inconsistencies and factual impossibilities in Doe's story, such as the location of the alleged assault, the presence of certain celebrities, and the timeline of events. *Id*. at ¶ 93. And public records show that Doe has a history of making false allegations and has significant mental health issues, both of which would have been easily discoverable. *Id*. at ¶¶ 63, 66, 104.

Six days after receiving the pre-packed complaint from AVA Law Group, on October 20, 2024, the Buzbee Defendants and the Curis Defendants filed the SDNY Action against Combs, his business entities, and "Does 1-10," with "Celebrity A" (later revealed to be Mr. Carter) as an unnamed defendant. *Id*. at ¶ 68. Doe's complaint alleges that Doe was sexually assaulted at an afterparty following the 2000 MTV Video Music Awards. *Id*. at ¶¶ 71-72.

On November 4, 2024, Fortney and his associate allegedly contacted Doe in Alabama to discuss and obtain her permission to send an extortionate demand letter to Mr. Carter. *Id*. at ¶ 74. Then, on November 5, 2024, Doe and her attorneys sent the letter, threatening to publicly name Mr. Carter in a lawsuit and pursue the false allegations unless he agreed to a substantial settlement. *Id*. at ¶ 74. Although the Buzbee Defendants had already sued Mr. Carter (albeit as one of the Doe defendants), the Buzbee Defendants' letter gave Mr. Carter a two-week deadline to respond, stating that public exposure and reputational ruin would follow if he did not comply. *Id*. at ¶ 76.

When Mr. Carter refused to settle, on December 8, 2024 the Buzbee Defendants filed an amended complaint in the SDNY Action formally naming Mr. Carter as a defendant and as "Celebrity A," and making explicit, detailed, and false allegations of sexual assault of a child. *Id*. at ¶¶ 79-80.

In mid-December 2024, the Buzbee Defendants arranged and paid for Doe to travel from Alabama to Houston, Texas, to participate in an NBC News interview (the "**NBC News**

**Interview**") – the only purpose of which was to stir public outrage over Doe's false and scandalous allegations and coerce a settlement – which aired on December 13, 2024. During the NBC Interview, Doe, accompanied by Defendant Fortney, expanded upon her false and malicious allegations against Mr. Carter to a global audience, fabricating entirely new and false claims. *Id*. at ¶¶ 82, 84. Among other things, she stated that she had "been "fighting trying to get away from [Mr. Carter] and he put his hand over my mouth[,]" (SAC ¶ 87); that Mr. "Combs and Mr. Carter took turns raping" her, while an unidentified female celebrity watched (*id*. at ¶ 88); and that after the purported assault, she walked to a gas station where she called her father who picked her up and drove her home (*id*.)*. This media campaign was orchestrated to further damage Mr. Carter's reputation and increase the extortionate pressure. *See id*. at ¶¶ 85-88.

Basic investigation and media scrutiny, including by NBC News, quickly uncovered numerous factual impossibilities and inconsistencies in Doe's story. *Id*. at ¶¶ 66, 92-100. These included discrepancies about the location and nature of the alleged assault; the presence of supposed witnesses; and Doe's own recollections. *Id*. at ¶¶ 93-100. Public records and interviews with Doe's family further undermined her credibility. *Id*. In response to irrefutable proof of her lies, Doe admitted she "made some mistakes," contemporaneously – and shockingly – disavowing the allegations in her complaint about the location of the alleged incident, admitting she was just guessing. *Id*. at ¶ 102. Fortney "traveled to Alabama after the NBC interview" to speak with Doe for "purpose[s] related to the facts alleged in the Complaint." ECF No. 43-1 (Forney Decl.) ¶¶ 8-9, 12). There were many, many further impossibilities integral to the web of lies that the Buzbee Defendants and Doe had woven, as will be laid bare through discovery in the matter.

The Buzbee Defendants and Doe continued to pursue the lawsuit and make false public statements both regarding Mr. Carter and in an attempt to bolster Doe's nonexistent credibility,

going so far as to publicly commit Doe to taking a polygraph test (which was never done, or which she failed, since the results of such a test have never been released). SAC ¶ 103, 108-09. Fortney would again visit Doe in Alabama, and eventually, after Mr. Carter filed a countersuit in California and the court in the SDNY Action raised issues about Buzbee's conduct and lack of admission to the Southern District of New York, Doe voluntarily dismissed her lawsuit with prejudice on February 14, 2025, without any settlement. SAC ¶¶ 116-17; ECF No. 43-1 (Fortney Decl.) at ¶¶ 8-9.

Doe has since admitted to investigators, in a recorded interview, that her allegations against Mr. Carter were fabricated, and that she had been encouraged by the Buzbee Defendants to proceed with the false claim against Mr. Carter for their mutual financial gain. SAC ¶ 118. Specifically, Doe stated that (*a*) Mr. Carter did not sexually assault her, (*b*) she had originally told Buzbee that Mr. Combs had raped her, (*c*) *Buzbee* suggested she claim that Mr. Carter was another rapist and "pushed" her to pursue the claim against him, (*d*) lawyers with Buzbee's law firm told her she would get a payout if she pursued legal action against Mr. Carter, and (*e*) shortly before defendants dismissed the lawsuit against Mr. Carter, Fortney falsely told Doe that Mr. Carter was threatening to kill her in retaliation of the lawsuit. *Id*. Exs. 3-4.

Mr. Carter's complaint details significant personal, professional, and financial harm resulting from the Buzbee Defendants' actions, including denial of credit, as well as psychological and reputational damage. *Id*. at ¶¶ 126-35. The complaint seeks compensatory and punitive damages for malicious prosecution, abuse of process, civil conspiracy, and defamation, as well as legal costs and such other and further relief deemed appropriate by this Court. *Id*. at ¶¶ 137-182.

## Argument

### I.    This Court Has Personal Jurisdiction Over The Buzbee Defendants

Courts apply the law of the forum state to the issue of personal jurisdiction, even if the substantive claims are governed by the law of another jurisdiction. *See Yard Milkshake Bar Props., LLC v. BBH Creations, LLC*, No. 1:20-cv-498-TFM-MU, 2021 U.S. Dist. LEXIS 273825, at *7 (S.D. Ala. Aug. 20, 2021); *see also In re: Cmty. Health Sys., Inc*., No. 15-cv-222, 2016 U.S. Dist. LEXIS 123030, at *7 (N.D. Ala. Sept. 12, 2016). Therefore, this Court applies Alabama's long-arm statute, Ala. R. Civ. P. 4.2(b), to determine personal jurisdiction. *See Matthews v. Brookstone Stores, Inc.*, 469 F. Supp. 2d 1056, 1066 n.14 (S.D. Ala. 2007).

Alabama's long-arm statute allows for the exercise of personal jurisdiction to the full extent possible under the Constitution. *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355–56 (11th Cir. 2000) ("Alabama permits its courts to exercise jurisdiction over nonresidents to the fullest extent allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution."). In deciding whether personal jurisdiction exists over a defendant, the facts alleged in the complaint must be taken as true to the extent they are uncontroverted by any affidavit. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990).

When a defendant is not intimately connected to a particular forum state, in order to establish specific jurisdiction, a defendant's specific contacts with a state are considered. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021).

A claim "relate[s] to" contacts as long as there is a relationship between the forum and the claims, and there need not be "a causal showing" between them. *Id.* at 361–62. "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state

activity and the litigation will do." *Id.* A plaintiff need not allege that the claim "came about because of the defendant's in-state conduct." *Id.* at 362.

## A. Conspiracy Jurisdiction

In this case, the Court has specific personal jurisdiction over the Buzbee Defendants. The Buzbee Defendants deliberately "reached out" to Alabama in connection with this case when they conspired with an Alabama resident to maliciously prosecute and abuse the legal process against Mr. Carter, and to extort and damage Mr. Carter's personal, professional, and business reputation. Because Mr. Carter has alleged this conspiracy against the Buzbee Defendants, and overt acts as part of that conspiracy, occurred in Alabama, this Court has conspiracy jurisdiction over them. *See Transamerican Equip. Co., LLC v. Indus. Assets Corp.,* No. 7:17-CV-00481-LSC, 2018 WL 831014, at *5 (N.D. Ala. Feb. 12, 2018); *J & M Assocs., Inc. v. Romero*, 488 Fed. App'x, 373, 375 (11th Cir. 2012) ("To establish personal jurisdiction under a conspiracy theory, the plaintiff must 'plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'") (citing *Ex parte McInnis*, 820 So.2d 795, 806–07 (Ala. 2001)).

Notably, the Buzbee Defendants do *not* dispute that, if conspiracy jurisdiction established under Alabama law applies to this case, conspiracy jurisdiction exists over them. Instead, they argue *only* that conspiracy jurisdiction is not a cognizable theory recognized in the Eleventh Circuit that supports jurisdiction. *See* ECF No. 43 at 13–16. But the Buzbee Defendants' argument is at odds with the law of the Eleventh Circuit, and of this Court.

Contrary to the Buzbee Defendants' arguments, this Circuit has expressly accepted conspiracy jurisdiction.[2] *See id*. at 423 (2024) ("Most federal jurisdictions apply some version of

---

[2] Only the Fifth Circuit has expressly rejected conspiracy jurisdiction theories. *See Price & Jarvis*, 76 Stan. L. Rev. at 423 (citing *Guidry v. U.S. Tobacco Co.,* 188 F.3d 619, 625 (5th Cir. 1999)); *see also N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co*., 124 F.4th 1322, 1339 (11th Cir. 2025) (holding that under the conspiracy theory of jurisdiction, a state's long-arm statute could confer personal jurisdiction on the Defendants even if none of them

the doctrine. The D.C., Second, Third, Fourth, Seventh, Tenth, and Eleventh Circuits have expressly adopted some version of the theory."); *id.* at 427 ("The Eleventh Circuit, relying repeatedly on Alabama and Florida law, also applies the doctrine in accordance with state law.") (citing *J&M Assocs. v. Romero*, 488 Fed. App'x, at 375 (per curiam)).

> Conspiracy jurisdiction has emerged as a species of specific jurisdiction. The gist is that acts of a co-conspirator performed in a forum state in furtherance of a conspiracy create sufficient minimum contacts to establish personal jurisdiction over a remote co-conspirator, even when that co-conspirator had no other direct contacts with the forum state.

*See* Naomi Price and Jason Jarvis, *Conspiracy Jurisdiction*, 76 Stan. L. Rev. 403, 409 (2024).[3]

At a minimum, no case in this district casts doubt on the validity of conspiracy jurisdiction. For example, in the Southern District of Alabama, the Court has recognized conspiracy jurisdiction based on Alabama state courts' adoptions of it. *Matthews*, 469 F. Supp. 2d at 1066–67 (citing *Ex parte Companies, Inc.,* 936 So.2d 1049 (Ala. 2006); *Ex parte McInnis*, 820 So.2d 795, 806–07 (Ala. 2001)). And the Buzbee Defendants have conceded that conspiracy jurisdiction exists in Alabama. *See* Doc. 43 at 13 (admitting that conspiracy jurisdiction is a state law theory "that Alabama courts have recognized").

"To establish personal jurisdiction under a conspiracy theory, a plaintiff must plead with particularity the conspiracy and the overt acts taken within the forum in furtherance of the conspiracy." *J & M Assocs., Inc. v. Romero*, 488 Fed. App'x, at 375 (citing *Ex parte McInnis*, 820 So.2d 795, 806–07 (Ala. 2001)). "[T]he conspiracy theory of personal jurisdiction comes into play under Alabama law only when the complaint includes particularized allegations of both the

---

personally acted in Florida); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009) (holding that a state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in the state in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually had no relevant contact with the state).

[3] "Put another way, a remote defendant's contacts with the forum state are linked through the instrumentality of a conspiracy rather than directly. The link requires transfer of one defendant's in-state acts to the other defendant, so long as both defendants have acted in furtherance of a conspiracy, a concept colloquially known as 'attribution'" *Id.*

conspiracy and the overt acts within the forum taken in furtherance of same." *Pro. Locate v. Prime, Inc.*, 2007 U.S. Dist. LEXIS 40979, at *7 (S.D. Ala. June 4, 2007).

In *Med. Props. Tr., Inc. v. Viceroy Rsch.*, Case No. 23-cv-00408, 2023 U.S. Dist. LEXIS 112393 (N.D. Ala. June 30, 2023), several defendant financial research firms and individual citizens allegedly conspired to manipulate the plaintiff's stock price in order to short its position. *Id.* at *1–2. One defendant issued a report noting its short position, and then the individual defendants promoted the report online. *Id.* at *6-7. No defendants were in Alabama, but they traveled to Alabama in furtherance of the conspiracy. *Id.* at *12. As the court in the Northern District of Alabama stated in finding personal jurisdiction existed over the defendants via conspiracy theory:

> Here, even if Plaintiff could not establish jurisdiction under the effects test (and, to be clear, it can), it could do so under the conspiracy theory of jurisdiction. Plaintiff alleges that Defendants "engaged in concerted action with one another and ... an[other] investment research firm and its agents to promote and amplify false and defamatory statements about MPT." (Doc. 1 ¶ 101). Plaintiff contends that Defendants did so "for the purposes of imputing dishonesty or corruption to MPT and of prejudicing MPT in its trade or business." (*Id.* ¶ 102). So, Plaintiff has plainly alleged a civil conspiracy claim under Alabama law. Plaintiff further maintains that "on February 13 and 14, 2023, a co-conspirator traveled to Alabama for an in person 'diligence' trip concerning MPT." (*Id.* ¶ 83). Thus, Plaintiff has alleged the overt acts within Alabama in furtherance of the conspiracy. Accordingly, Plaintiff has also established personal jurisdiction over Defendants under the conspiracy theory.

*Med. Props. Tr., Inc. v. Viceroy Rsch.*, Case No. 23-cv-00408, 2023 U.S. Dist. LEXIS 112393, at *28 (N.D. Ala. June 30, 2023).

In this case, as part of their conspiracy, the Buzbee Defendants took several "overt acts" within Alabama in furtherance of the conspiracy. The *first* act within Alabama was when they solicited Doe as a client to file the initial lawsuit against Mr. Carter, while knowing that Doe was

in and a resident of Alabama.[4] SAC ¶¶ 32, 35–36. Before filing the lawsuit, and as the *second* overt act within Alabama, the Buzbee Defendants hatched the idea of the conspiracy with Doe and communicated with her in Alabama to further that scheme. Further, after filing the initial lawsuit, and as the *third* overt act within Alabama, the Buzbee Defendants had several key conversations with Doe while she was in Alabama to discuss the strategy for the initial lawsuit and to continue to execute their ongoing scheme. *Id*. at ¶¶ 59, 61, 74. The Buzbee Defendants, in their *fourth* and *fifth* overt acts, traveled to Alabama to meet with Doe in person regarding their conspiracy, and in their *sixth* and final overt act, the Buzbee Defendants facilitated Doe's participation in a defamatory NBC News Interview – which occurred in the presence of Defendant Fortney – by providing her with a flight from Alabama to Texas, where the interview was conducted. *Id*. at ¶¶ 17, 82, 121. And following the interview, Defendant Fortney travelled to Alabama to meet with Doe. Each of the six overt acts described above were taken in Alabama through concerted action by the Buzbee Defendants to identify someone vulnerable to recruit as a plaintiff so that they could extort money from celebrities with wealth based on their acquaintance with Sean Combs. Therefore, each of the Buzbee Defendants were part of a civil conspiracy, and overt acts in furtherance of that conspiracy occurred *in Alabama* with Doe (an Alabama resident), so the Court has personal jurisdiction over the Buzbee Defendants under the conspiracy theory.

Importantly, the only question the Court need decide here is if, under Alabama law, conspiracy jurisdiction is accepted in the Eleventh Circuit. The Buzbee Defendants never argue that, *if this Court finds that conspiracy jurisdiction exists* under Alabama law and in the Eleventh

---

[4] While the Buzbee Defendants claim they never instructed AVA Law Group or Reciprocity to advertise in Alabama, it is notable they do not claim – obviously because they cannot claim – that they instructed AVA Law Group or Reciprocity only to solicit in some specific other jurisdiction or jurisdictions; nor do they claim – because they cannot – that they instructed AVA Law Group or Reciprocity *not* to solicit clients in Alabama. Moreover, if the Buzbee Defendants had no intention of representing plaintiffs in Alabama, they would have immediately declined to represent Doe upon learning that she lived in Alabama.

Circuit, conspiracy jurisdiction still fails. Therefore, if the Court agrees that the Eleventh Circuit has accepted conspiracy jurisdiction, it is uncontroverted that Mr. Carter has met his burden of establishing its applicability in this case.

Finally, the fact that some of the contacts in Alabama occurred after the New York lawsuit was filed is irrelevant. For Count I for Malicious Prosecution and Count II for Abuse of Process, the conspiracy to plan the extortionate lawsuit is part of the claim, but also the *continued* prosecution and related defamatory statements are also part of the claim. *See* SAC ¶¶ 148, 161 ("The Defendants' initiation and continued prosecution of the frivolous lawsuit was willful and malicious and intended to oppress and cause injury to Mr. Carter."); *id.* at ¶ 164 (describing the malicious prosecution and abuse of process as the underlying torts forming the conspiracy).

## B.  Specific Contacts

Even if conspiracy jurisdiction does not exist over the Buzbee Defendants (it does), personal jurisdiction over them still exists based on the totality of the circumstances and their contacts with Alabama, including:

- Upon information and belief, on September 25, 2024, the Buzbee Defendants hired Reciprocity to solicit potential plaintiffs to bring claims against Combs in the Southern District of Alabama (and elsewhere) with targeted advertisements on Instagram and Facebook.  SAC ¶¶ 35–36, 38.

- "As part of their strategy to locate plaintiffs to sue Sean Combs and anyone who attended the same party as Combs, in September 2024, Reciprocity, AVA Law, and the Buzbee Defendants entered into an agreement whereby Reciprocity agreed, after intaking a potential plaintiff, to forward the leads to both AVA Law and the Buzbee Defendants."  *Id*. at ¶ 32.

- The Buzbee Defendants solicited Doe as a client, through Reciprocity and the AVA law group, while she was in the Southern District of Alabama.  *Id*. at ¶¶ 55–56.  Doe either contacted Reciprocity responding to a Facebook ad targeted to her, or Fortney initially solicited Doe as a client while she was in the Southern District of Alabama. *Id.*

- "The conspiracy against Mr. Carter was, therefore, hatched within the Southern District of Alabama as it arose out of activities directly related to and arising from contacts with

Doe in the Southern District of Alabama" and nearly every communication with Doe occurred while Doe was in Alabama. *Id*. at ¶ 59.

- In furtherance of the conspiracy, the Buzbee Defendants interviewed Doe about her allegations against Mr. Carter while she was in the Southern District of Alabama and sent an investigator to talk to her here. *Id*. at ¶ 61.

- Fortney and his associate contacted Doe in the Southern District of Alabama on November 4, 2024, to discuss and obtain her permission to send the extortionate November 5, 2024 demand letter. *Id*. at ¶ 74.

- The Buzbee Defendants paid for Doe to travel from her home in the Southern District of Alabama to the Buzbee Defendants' offices in Houston, Texas to sit for the NBC News Interview.

- Fortney, on behalf of himself, Buzbee, the Defendant Buzbee Law Firm, and the other co-conspirators, traveled to the Southern District of Alabama *twice* to meet with Doe about the lawsuit and their conspiracy. *Id*. at ¶ 17.

- Following Doe's confession to investigators that the SDNY Action was a sham, the Buzbee Defendants "sent an associate to Alabama once" during their conspiracy to "escort Jane Doe back to Texas." *See* ECF No. 43-1 at ¶ 20.

The Buzbee Defendants wrongly argue that certain contacts, such as their contract of representation with Doe, are insufficient to establish minimum contacts, but they ignore the *cumulative* impact of their contacts, something that is relevant to analyzing whether contacts are sufficient for personal jurisdiction purposes.

For example, when deciding whether a contract itself is enough of a contact to establish specific jurisdiction, courts will consider the substance of the transaction and the circumstances of the contract. *See Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc*., 593 F.3d 1249, 1268 (11th Cir. 2010) (holding that when inspecting a contractual relationship for minimum contacts, courts must focus on the substance of the transaction: "prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing."). In other words, courts consider the "totality" of a defendant's contacts when analyzing specific personal jurisdiction. *See Commc'n Equip. & Contracting Co. v. Municipality of Anchorage, Alaska*, 498 F. Supp. 632,

- 15 -

635 (M.D. Ala. 1980) (considering totality of alleged contacts when assessing specific personal jurisdiction and stating that "the law in this area dictates that the Court consider carefully the facts of each individual case in deciding whether the assertion of personal jurisdiction is consistent with the commands of due process.").[5] When their contacts are considered together, the Buzbee Defendants clearly purposefully availed themselves of the privileges of doing business in Alabama and subjected themselves to the jurisdiction of Alabama courts in doing so.

This distinguishes the cases cited by the Buzbee Defendants. In those cases, while the plaintiffs / former clients lived in the states where the lawsuits were filed, there were no allegations or evidence that the defendants / law firms targeted or marketed to those clients in the forum states. ECF No. 43 at 6 (citing *Rowe v. Gary, Williams, Parteni, Watson & Gary PLLC*, 723 Fed. App'x, 871, 875 (11th Cir. 2018)); *see also Thomas v. Brown*, 504 Fed. App'x, 845, 848-49 (11th Cir. 2013) (finding no personal jurisdiction because, unlike the Buzbee Defendants, in this case there was no evidence that the defendant law firm marketed to the forum state or that the defendant law firm solicited the representation of the plaintiff in the forum state). By contrast, the Buzbee Defendants either personally solicited Doe as a client while she was in Alabama or identified Doe as a client through advertisements in Alabama. SAC ¶ 56.

For example, in *Rowe*, the court noted that there was a contract for legal representation between the client (in the forum state) and the law firm. However, the court found that this, standing alone, was insufficient to create personal jurisdiction because the contacts with the forum state were minimal. 723 Fed. App'x, at 875-76. First, in *Rowe,* the initial meeting between the client and the law firm only occurred in the forum because the defendant attorney happened to be

---

[5] *See also Molex Co., LLC v. Andress*, 887 F. Supp. 2d 1189, 1203 (N.D. Ala. 2012) (holding that even in the absence of a direct contact with Alabama, defendant's activities such as performing services for an Alabama company, frequently contacting the employees in Alabama by telephone or email, and discussing business strategies and customer information with the Alabama staff were sufficient contacts for purposes of personal jurisdiction).

in the forum for an unrelated matter and had stopped by to see the client while there. *Id.* at 876 (stating the lawyer "happened to be in Atlanta working on an unrelated case at the time Rowe initiated contact" with the law firm). The lawyer did not actually travel to the forum for the purpose of having an initial meeting with the client. The Buzbee Defendants, on the other hand, specifically traveled to Alabama three times for no purpose other than to meet with Doe. SAC ¶¶ 17; *see* ECF No. 43-1 (Fortney Decl.) at ¶¶ 8-9, 20.

Second, in *Rowe*, even though there was one specific strategy meeting in the forum state, the underlying litigation spanned multiple years such that a single strategy meeting in the forum state was actually a very small percentage of the total strategy meetings. *Rowe*, 723 Fed. App'x, at 876. The Buzbee Defendants, on the other hand, met with Doe at least three times in the forum state (twice before the SDNY Action dismissal and once thereafter), and the litigation only lasted for a very short time, namely just over two months, before the Buzbee Defendants abandoned it with prejudice. Further, during this short time, Doe and the Buzbee Defendants had four physical meetings, three-quarters of which were in Alabama, thus further contrasting this case to *Rowe*.

Third, in *Rowe*, the plaintiff-client had many phone calls with the defendant-attorney while the plaintiff was outside of the forum state and while the defendant-attorney was in various locations. *Rowe*, 723 Fed. App'x, at 876. Conversely, the Buzbee Defendants never claim to have spoken to or met with Doe when she was anywhere except in Alabama (or in Texas, when they physically brought her there). Based on this context, the Buzbee Defendants' connection to Alabama are materially stronger because the Buzbee Defendants purposefully injected themselves into Alabama. Also unlike in *Rowe,* the Buzbee Defendants either personally solicited Doe as a client while she was in Alabama or identified Doe as a client through advertisements in Alabama. SAC ¶ 56.

Likewise, in *Thomas v. Brown*, an underlying lawsuit was filed in Ohio federal court in which the lawyer represented a client in litigation against a company. 504 Fed. App'x, at 846. The client filed the lawsuit at issue there in Florida against the lawyer for his inadequate representation in the Ohio case. *Id.* The court held that there was no personal jurisdiction because, among other reasons, the lawyer did not market to Florida or conduct any matters related to the underlying litigation in Florida. *Id.* at 848. Specifically, the lawyer did not travel to Florida or solicit the representation in Florida. *Id.* But, as noted above, the Buzbee Defendants have: they contracted with Reciprocity and AVA law group to solicit clients across the country including in Alabama, (SAC ¶¶ 35–36, 38); either personally solicited Doe as a client while she was in Alabama, or identified Doe as a client through advertisements in Alabama (SAC ¶ 56); and they traveled to Alabama at least three times to meet with Doe about the litigation and spoke to Doe while she was Alabama (SAC ¶ 17). *See also* ECF No. 43-1 (Fortney Decl.) at ¶¶ 8-9, 20. The Buzbee Defendants have also been participating in the Alabama legal market for decades, having represented other clients and filed several *pro hac vice* motions for admission to Alabama courts. *See* Declaration of W. Patton Hahn In Support Of Plaintiff Shawn Corey Carter's Memorandums of Law In Opposition To Defendants' Motions To Dismiss ("Hahn Decl.") at Exs. 6-1 – 6-10. Finally, the Buzbee Defendants rely on the out-of-circuit case *Newsome v. Gallacher* to argue that their legal relationship with Doe is insufficient to confer personal jurisdiction. ECF No. 43 at 6 (citing *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013)). In *Newsome*, the plaintiff was a Delaware corporation operating exclusively in Oklahoma, and the defendant was a Canadian law firm operating in Canada. *Id.* at 1261. The Court found the contacts – that the defendant Canadian law firm received payment in Canada from Oklahoma bank accounts, and facilitated placing liens on Oklahoma properties while representing plaintiff's parent company - insufficient for Oklahoma

to exercise personal jurisdiction. *Id.* at 1262, 1279-81. However, the court specifically left open the possibility that if the plaintiff client had evidence that the defendant attorney *reached out to the client's home forum to solicit the business*, may have been enough to establish personal jurisdiction. *Id.* at 1281. The court also said that there could be other unspecified distinguishing factors that are not present in the facts before the court that would apply. *Id.* Here, again, the Buzbee Defendants either personally solicited Doe as a client while she was in Alabama, or identified Doe as a client through advertisements in Alabama (SAC ¶ 56); traveled to Alabama at least three times to meet with Doe about the litigation and spoke to Doe while she was Alabama (SAC ¶ 17; ECF No. 43-1 ¶ 20); communicated with Doe while she was in Alabama and participated in the Alabama legal market for decades (*see* Hahn Decl. Exs. 6-1 – 6-10 ).

### 1.  First Contact: The Buzbee Defendants Solicited Doe As A Client

As the *first contact* with Alabama, the Buzbee Defendants solicited Doe as a client while she resided and was presently located in Alabama. SAC ¶¶ 32, 35–36. Conflicting testimony reflects that the Buzbee Defendants solicited Doe in one of two ways. First, Doe's father informed an investigator that Defendant Fortney personally solicited Doe as a client while she was in Alabama.  *Id.* at ¶ 56.  The Buzbee Defendants differently testified in their declarations that they found Doe after they entered a contract with Reciprocity and AVA Law Group to look for clients for the Buzbee Defendants to represent; and that Reciprocity, acting on the express instructions it received from the Buzbee Defendants, solicited clients across the country, including in Alabama. *Id.* at ¶¶ 36, 38; *see also e.g.* ECF No. 43-1 ¶ 5. In the latter case, these actions of the Buzbee Defendants, in advertising services across the internet, were reasonably calculated to reach Alabama so as to purposefully avail themselves of the privileges of doing business in Alabama. *See CoachComm, LLC v. Westcom Wireless, Inc.*, No. 21-cv-743, 2023 U.S. Dist. LEXIS 76151, at *14 (M.D. Ala. May 2, 2023) ("The proper inquiry is whether Westcom's advertising efforts

were reasonably calculated to reach Alabama such as to purposefully avail itself of the privilege of doing business in Alabama."); *S.E.C. v. Carrillo*, 115 F.3d 1540, 1545 (11th Cir. 1997) ("It is well settled that advertising that is reasonably calculated to reach the forum may constitute purposeful availment of the privileges of doing business in the forum.").

Whether Fortney directly contacted Doe or whether the Buzbee Defendants found her through Reciprocity and AVA Law Group solicitations is irrelevant for purposes of this question. In either event, their actions in seeking to avail themselves of the privileges of doing business in this district were successful, because on October 14, 2024, the Buzbee Defendants successfully retained a resident of the Southern District of Alabama to spearhead their false and extortionate claims against Mr. Carter from Alabama. SAC ¶ 54.

In this way, the facts at hand are more like *Wood Auto., Inc. v. Morrow Aviation* in which the defendant (through a third party) placed an aircraft for sale on a third-party website that was accessible to buyers in Alabama, and the defendant then intentionally entered a purchase contract with the plaintiff company that did business in Alabama. No. 24-cv-372, 2025 U.S. Dist. LEXIS 28397, at *1-3 (N.D. Ala. Feb. 18, 2025). The Court held that this advertisement and the resulting contract were enough to establish personal jurisdiction in Alabama. *Id.* at *6-7. ("Taking Wood's alleged facts as true, which the court must do at the pleading stage, Morrow intentionally allowed Controller to advertise its aircraft to Alabama buyers. That's enough, as shown by the Eleventh Circuit's recent finding that the relatedness element was 'readily met' when Booking.com and Expedia used their websites to target Florida residents and some Florida residents used those sites to book rooms.") (citing *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275 (11th Cir. 2022)).

Solicitation occurring through social media platforms also supports personal jurisdiction. *See Rivers v. Noom, Inc.*, No. 21-cv-1226, 2023 U.S. Dist. LEXIS 11041, at *4 (N.D. Ala. Jan. 23,

2023) ("In her complaint, Rivers alleges that the court has personal jurisdiction because Noom sells its weight loss services to Alabama residents; Noom advertises its program to Alabama residents through Facebook and other social media platforms; and Noom employs 'coaches' who work in Alabama by remotely helping Noom customers. . . . The court finds that that Noom's advertising and sales satisfy the relatedness element."). And, even setting aside the availability of conspiracy jurisdiction, if indeed Reciprocity and the AVA Law Group's advertising identified Doe, the Buzbee Defendants are responsible for the actions of Reciprocity and the AVA Law Group because these entities acted as agents in soliciting Doe in Alabama to advance their extortion scheme. The cases cited by the Buzbee Defendants relate solely to imputing agent contacts to a parent corporation and therefore are wholly inapposite in these circumstances.[6]

Under the Federal Rules of Civil Procedure, personal jurisdiction is established over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1); *see also* Price & Jarvis, 76 Stan. L. Rev. at 405 (2024). In Alabama, "an appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States." Ala. R.

---

[6] The Buzbee Defendants cite to cases that have declined to apply personal jurisdiction over defendants, but these cases are distinguishable. For example, in *Goldthrip v. Johnson and Johnson*, the court considered the actions of one co-defendant and declined to ascribe its actions to the other co-defendant because even though "[f]ederal courts have 'consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over [a corporation] that would not ordinarily be subject to personal jurisdiction in that court when the … corporation is an alter ego .. of a corporation that would be subject to personal jurisdiction in that court,'" in this case, the elements of alter ego had not been met. No. 15-cv-00651, 2016 U.S. Dist. LEXIS 170801, at *14 (S.D. Ala. Dec. 8, 2016). Likewise, in *Storey v. James Hardie Building Industries, PLC*, the court noted that a company can be an agent for its parent company, but only if the company *was* an agent related to the forum contacts. No. 22-cv-625, 2023 U.S. Dist. LEXIS 173961, at *13-14 (M.D. Ala. Sept. 28, 2023). In this case, because Reciprocity and the AVA law group had entered into a contract with the Buzbee Defendants and/or on behalf of the Buzbee Defendants specifically to solicit clients, including those in Alabama, to engage in an extortionate conspiracy, it meets the threshold for agency and imputed contacts under *Storey*.

Civ. P. 4.2(b);  *see also Marival, Inc. v. Planes, Inc.*, 302 F. Supp. 201, 209 (N.D. Ga. 1969) (citing

*Kokomo Opalescent Glass Co. v. Arthur W. Schmidt Int'l, Inc.*, 371 F.2d 208 (7th Cir. 1966))

(holding that a contract, in addition to two visits by agents of the defendant, and other actions of

the agents, were enough contacts to establish personal jurisdiction over the defendant)).

In this case, Reciprocity and AVA Law Group were agents of the Buzbee Defendants

because, as the Buzbee and Fortney affidavits provide, the Buzbee Defendants' law firm "had a

contractual relationship with AVA Law Group" and the advertisements and solicitations of Doe

were performed by "AVA Law Group."   ECF No. 43-1 at 2; 43-2 at 1–2, 6. Therefore, it is

irrelevant whether the Buzbee Defendants specifically directed their agents to solicit Alabama

clients. Because they acted within the scope of their agreement, those acts of the AVA Law Group

are imputed to their principals, the Buzbee Defendants. *See SouthTrust Bank v. Jones, Morrison,*

*Womack & Dearing, P.C.*, 939 So. 2d 885, 905–06 (Ala. Civ. App. 2005) (holding that a lawyer's

actions were attributable to his client, even though they were contrary to the client's express

instructions); *Morgan v. North MS Medical Center, Inc.*, 403 F. Supp. 2d 1115, 1120 (S.D. Ala.

Dec. 2, 2005) (finding personal jurisdiction against a defendant Mississippi hospital (that lacked a

business presence in Alabama) because the hospital "dispatched its agents and equipment into this

State" when it transferred plaintiff via ambulance to his home in Alabama where plaintiff

ultimately died because of the hospital's negligence); *Pesaplastic, C.A. v. Cincinnati Milacron*

*Co.*, 750 F.2d 1516, 1522 (11th Cir. 1985) (upholding a lower court finding of personal jurisdiction

over a principal because Florida, like Alabama, confers jurisdiction through acts of agents). As

alleged in the Complaint, for example, "attorneys employed by the Buzbee Law Firm and/or *their*

*agents* solicited Doe in Alabama." SAC ¶ 16 (emphasis added). Nothing in the affidavits

contradicts the fact that agents of the Buzbee Defendants, through an agreement with them, solicited Doe as a client.[7]

### 2. Second And Third Contacts: The Buzbee Defendants Discussed Their Conspiracy Against Mr. Carter With Doe In Alabama

For the *second* and *third contacts* with Alabama, after soliciting and retaining Doe as a client, the Buzbee Defendants discussed with her (while she was in Alabama) their conspiracy to extort Carter, and they had countless phone calls and email communications with Doe (while she was in Alabama) in furtherance of that conspiracy. SAC ¶ 59 ("The conspiracy against Mr. Carter was, therefore, hatched within the Southern District of Alabama as it arose out of activities directly related to and arising from contacts with Doe in the Southern District of Alabama" and nearly every communication with Doe occurred while Doe was in Alabama). The Buzbee Defendants interviewed Doe about her allegations while she was in Alabama and claim to have investigated her while she was in Alabama. *Id.* at ¶ 61. Defendant Fortney and his associate contacted Doe in Alabama on November 4, 2024, for her permission to send the November 5, 2024 demand letter. *Id.* at ¶ 74.

A phone call or multiple phone calls directed to a forum state are factors that weigh in favor of finding specific personal jurisdiction over an out-of-state participant, even when the out-of-state participant did not initiate the phone call. *See Bowling v. Founders Title Co.*, 773 F.2d 1175, 1176, 1179 (11th Cir. 1985) (ruling that the court had personal jurisdiction over an out-of-state party accused of fraud because the out-of-state party had participated in phone calls with the plaintiffs in Alabama, and further explaining that jurisdiction was proper because the defendant was a

---

[7] Also, even if Reciprocity and AVA Law Group were not agents, they still acted as co-conspirators. When a co-conspirator engages in overt acts in the forum state in furtherance of the conspiracy, the court will uphold specific personal jurisdiction over the other co-conspirators. *See J&M Assocs., Inc. v. Romero*, 488 F. App'x 373, 376 (11th Cir. 2012) (holding that because six defendants worked together to fraudulently induce plaintiff to enroll in a VEBA plan, and because one overt act occurred in Alabama when one defendant presented to plaintiff about the benefits of enrolling in the VEBA plan, there was specific personal jurisdiction over all defendants in this case).

sophisticated, established commercial entity that should not have been surprised at the maintenance of a suit in Alabama); *see also Mansell & Assocs., LLC v. Ritchey Metals Co., Inc.,* No. 22-cv-01169, 2023 U.S. Dist. LEXIS 10080, at *33-34 (N.D. Ala. Jan. 20, 2023*)* (holding that the defendant purposefully availed itself of the privilege of conducting business in Alabama because it "initiated contact with [the plaintiff in Alabama]; during negotiations, two [defendant] representatives visited [plaintiff's] manufacturing plant in Alabama to inspect [plaintiff's] work and conduct further negotiations; [defendant] signed a contract governed by Alabama law and delivered it to [plaintiff] for execution in Alabama; [defendant] mailed payments to [plaintiff] in Alabama; and *[defendant] regularly communicated with [plaintiff] via Zoom, telephone, and email*") (emphasis added).

In this case, the phone calls and electronic discussions are of particular importance to the Buzbee Defendants' procurement and inducement of Doe as a client and co-conspirator because, but for those phone calls, the Buzbee Defendants would not have been able to send the extortionate demand letter or bring the lawsuit at issue on behalf of Doe, an Alabama resident. *See Bowman v. Hodge Mgmt. Grp., LLC*, No. 15-cv-01318, 2016 U.S. Dist. LEXIS 82950, at *15 (N.D. Ala. June 27, 2016) ("This telephone call meets the first 'minimum contacts' requirement because it is related to this action. The central allegation in this lawsuit is that the defendants owe Bowman a commission on the sale of the aircraft Bowman found as a result of Daniel's 2014 telephone call. … Bowman's involvement in the potential transaction was not the result of fortuitous, attenuated, or a random contact, but was the result of Daniel's phone call on behalf of Hodge Management/Air Bear. As defendants point out, the issue of initiating contact is of particular significance.") (internal citations omitted); *contra Rowe v. Gary, Williams, Parteni, Watson & Gary PLLC*, 723 Fed. App'x, 871, 875-76 (11th Cir. 2018) (finding phone calls and emails to be insufficient contacts

because while some of those phone calls and emails occurred while plaintiff was in the forum state, the plaintiff admitted that others occurred while plaintiff was in other states, and the location where plaintiff received the calls seemed random).

### 3. Fourth and Fifth Contacts: The Buzbee Defendants Traveled to Alabama Three Times To Meet With Doe About Their Conspiracy

For the *fourth* and *fifth contacts*, Defendant Fortney, on behalf of himself, Buzbee, the Buzbee Law Firm, and the other co-conspirators, traveled to the Southern District of Alabama ***three times*** to meet with Doe about the lawsuit and their conspiracy. SAC ¶ 17 ("Fortney traveled to Alabama on at least two occasions for 'purpose[s] related to the facts alleged in th[is] Complaint'"), ¶ 121 ("Fortney traveled to Alabama to convince Doe to drop her lawsuit."); ECF No. 43-1 (Fortney Decl.) at ¶¶ 8-9, 20. "And although physical presence in the forum is not a prerequisite to jurisdiction, [*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)], physical entry into the State – either by the defendant in person or through an agent, goods, mail, or some other means – is certainly a relevant contact." *Vascular Ventures, LLC v. Am. Vascular Access, LLC*, No. 16-cv-00481, 2016 U.S. Dist. LEXIS 170030, at *29 (S.D. Ala. Dec. 7, 2016); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) ("[T]erritorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there"). Fortney's travel to Alabama shows that he knew Doe lived in Alabama, and that his conduct on behalf of the Buzbee Defendants would harm Carter in Alabama.

### 4. Sixth Contact: The Buzbee Defendants Paid For And Facilitated Doe's Participation In The Defamatory Interview By Arranging Her Travel From The Southern District Of Alabama

Finally, for the *sixth contact*, the Buzbee Defendants paid for and facilitated Doe's participation in an interview – which occurred in Defendant Fortney's presence – knowing that Doe would make defamatory statements in the interview in furtherance of their conspiracy. SAC

¶ 82 ("In the second week of December 2024, the Buzbee Defendants paid for Doe to travel from her home in the Southern District of Alabama to the Buzbee Defendants' offices in Houston, Texas to sit for an interview with NBC News."). The defamatory interview was scheduled to occur in Texas and but, for the Buzbee Defendants' purchase of the plane ticket for Doe to take her from the Southern District of Alabama to Texas, there would have been no interview as part of their conspiracy. Defendant Fortney even travelled to the Southern District of Alabama after the NBC News Interview.  Further, following Doe's confession to investigators that the SDNY Action was a sham, the Buzbee Defendants "sent an associate to Alabama once" during their conspiracy to "escort Jane Doe back to Texas." *See* ECF No. 43-1 (Fortney Decl.) at ¶ 20.

In *Rowe v. Gary, Williams, Parteni, Watson and Gary PLLC*, 723 Fed. App'x, 871, 875 (11th Cir. 2018), a case on which the Buzbee Defendants rely, the court analyzed the other contacts between the defendant and the forum and found these insufficient to create personal jurisdiction in the Northern District of Georgia *because of the circumstances related to the contacts.* In *Rowe*, the initial meeting was in Georgia *only because* the defendant attorney *happened to be in Georgia* for an unrelated matter and stopped by to see the plaintiff while there. *Id.* at 876. He did not actually come to Georgia for the purpose of having an initial meeting with the plaintiff. *Id.* Likewise, while there was a specific strategy meeting in Georgia, the underlying litigation spanned multiple years so one strategy meeting in Georgia was actually a small number of the total strategy meetings. *Id.*

In this case, on the other hand, Defendant Fortney and his associate *specifically* traveled to Alabama for the *sole* purpose of meeting with or escorting Doe, and the underlying extortionate litigation in the Southern District of New York was short lived and lasted only a couple of months, so the two times Defendant Fortney traveled to Alabama are particularly meaningful in context and show that this case is nothing like *Rowe*.

## C. Fair Play and Substantial Justice

Finally, the Southern District of Alabama has an interest in this lawsuit because it involves a conspiracy with a resident of the Southern District of Alabama in which several overt acts occurred within its borders. *See, e.g., CSX Transp., Inc. v. Preussag Intern. Steel Corp.*, 201 F.Supp.2d 1228, 1237 (M.D. Ala. 2002) ("Although none of the parties to the present action are Alabama residents, Alabama nonetheless has 'a compelling interest in protecting persons and property within its borders from' the hazards that accompany train derailments"); *FFR SE, LLC v. Sanborn*, No. 14-cv-5439, 2015 U.S. Dist. LEXIS 84467, at *18 (E.D. Pa. June 30, 2015) (finding that a state has a "strong interest in deterring actors from committing torts within its territory"); *K.A. v. Boy Scouts of Am.*, No. 17-cv-0021 KBM/KK, 2017 U.S. Dist. LEXIS 79046, at *21 (D.N.M. May 23, 2017) (finding that Indiana had an interest in deterring criminal conduct by an Indiana resident that occurred both inside and outside of its borders).

Even though some of the actions including the filing of the extortionate lawsuit happened in New York, much of the actual conspiracy and the planning leading up to that moment occurred in the Southern District of Alabama, with an Alabama citizen and Southern District of Alabama resident. For example, some of the ongoing contacts in Alabama include the plans the Buzbee Defendants orchestrated with Doe in Alabama (and without Doe, who is in Alabama, there is no lawsuit).

But it is not just the acts taken in connection with this conspiracy that are relevant. The Buzbee Defendants continuously and deliberately exploited the courts in Alabama by representing several clients there with whom they have ongoing relationships, by moving for *pro hac vice* admission in Alabama courts, and by filing at least ten lawsuits in Alabama courts. *See* Hahn Decl.

Ex. 6-1 – 6-10[8] (collected *pro hac vice* applications in Alabama by Anthony Buzbee and/or the Buzbee Law Firm); SAC ¶ 16. These cases are alleged (upon information and belief) to generate significant revenue for the Buzbee Defendants. *Id.* The applications for admission to the Alabama State Bar and federal courts for *pro hac vice* admission in Alabama courts cover many years (from as early as 1999 and through at least 2023) and show how extensive these contacts were. Thus, the Buzbee Defendants should reasonably anticipate being haled into Alabama courts to defend the actions they have taken on behalf of clients living in this State. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980).

The bottom line is that where Defendants "systematically serve a market" and advertise there, they are subject to personal jurisdiction there. To illustrate, in one recent case, the Supreme Court considered whether a plaintiff could sue Ford for a vehicle defect that caused an accident in states where Ford did not sell the specific cars involved in the crashes. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021). The Court held that because Ford "had systemically served a market" in the forum states, advertised, sold, and serviced car models in both states for many years, "there is a strong 'relationship among the defendant, the forum, and the litigation'" which is the "essential foundation" of specific jurisdiction. *Id.* In other words, because the defendant comprehensively served a given market, the defendant has sufficient minimum contacts, even if the instrumentality of the plaintiff's injury was not specifically directed at the forum state. *See* Price & Jarvis, 76 Stan. L. Rev. at 412. A forum state may have jurisdiction over a defendant even when the instrumentalities of the injury are indirect. *Id.*

---

[8] Courts may take judicial notice of the public record in other judicial proceedings to recognize judicial acts taken. *See Endurance Assurance Corp. v. Zoghbi*, 403 F.Supp.3d 1301, 1304 n.2 (S.D. Fla. Sept. 13, 2019); *McDowell Bey v. Vega*, 588 F. App'x 923, 926–27 (11th Cir. 2014) (finding that the district court properly took judicial notice of entries appearing on the state court's docket sheet).

The Buzbee Defendants, like Ford, have significant contacts with Alabama. They advertised into Alabama for clients, and they have represented – and continue to represent – dozens of clients in Alabama and in Alabama courts over a period of many years. Therefore, like Ford, the Buzbee Defendants comprehensively served Alabama's legal market, and there is a strong relationship between the Buzbee Defendants and Alabama. This is sufficient for Alabama to exercise specific personal jurisdiction.

\*        \*        \*

In sum, Doe, a citizen of Alabama and resident of the Southern District of Alabama at all relevant times, is the central figure in the conspiracy; i.e. the hook needed for the Buzbee Defendants to bring their extortionate lawsuit and damage Mr. Carter's reputation. Everything hinges on Doe in Alabama and her connection to the conspiracy, and therefore the Court may exercise specific personal jurisdiction over the Buzbee Defendants in Alabama. It is not unreasonable for the Buzbee Defendants to anticipate being haled into an Alabama court when they solicited and conspired with an Alabama citizen, even traveling into the jurisdiction in furtherance of the conspiracy.

## II.    Venue Is Appropriate In This Judicial District

In the Buzbee Defendants' Motion to Dismiss, they assert (i) that none of the events pertaining to Plaintiff's malicious prosecution and abuse of process claims occurred in this district; and (ii) that no overt acts in furtherance of the conspiracy in question occurred in this district. The Buzbee Defendants are wrong at each turn.

### A.    A Substantial Part Of The Events Giving Rise To Plaintiff's Claim Occurred In This District

The Buzbee Defendants' venue challenge fails because it relies on an improperly narrow view – both of what qualifies as an "event" giving rise to Mr. Carter's claims, and of how courts

analyze the location of those events. They attempt to restrict this Court's attention solely to the
physical drafting and filing of the SDNY Complaint,[9] disregarding the broader factual context and
communications in which they convinced Doe to falsely accuse Mr. Carter of heinous acts to
secure a payday for her and for them. Courts interpreting § 1391(b)(2) have made clear that venue
is not limited to the geographic location where the tortious acts allegedly occurred. Rather, courts
must consider the *entire sequence of events* that gave rise to the claim, including communications
and decisions that may have occurred in other districts but were directed into, or took effect in, the
forum district.

> In analyzing *Jenkins Brick Co.*, this Court previously held that—
>
> It is true that "[o]nly the events that directly give rise to a claim are relevant."
> Jenkins Brick Co. v. Bremer, 321 F.3d 1366, 1371 (11th Cir. 2003). **It is also true,
> however, that courts "should review the entire sequence of events underlying
> the claim."** Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004) (citations and
> internal quotation marks omitted); *see also Astro–Med, Inc. v. Nihon Kohden
> America, Inc.*, 591 F.3d 1, 12 (1st Cir. 2009) (similar); *Cox v. Sullivan*, 2014 WL
> 4352088, *3 (N.D. Okla. Sept. 2, 2014) (for purposes of § 1391(b)(2), "courts are
> instructed to focus on the entire sequence of events giving rise to the claim, rather
> than merely where the 'triggering event' occurred").
>
> *SE Prop. Holdings, LLC v. Center*, No. CIV.A. 15-0033-W, 2015 U.S. Dist. LEXIS 95168,

at *5 (S.D. Ala. July 21, 2015) (emphasis added). A proper review thus includes *all* those events

bearing a close nexus to the wrong at issue. *See also First Fin. Bank v. CS Assets, LLC*, No. CIV.A.

08-0731WSM, 2009 WL 1211360, at *4 (S.D. Ala. May 4, 2009) (finding venue proper in

transferee district in right of redemption case where communications related to foreclosure

occurred in transferee district, even if foreclosure giving rise to right of redemption did not occur

in transferee district).

---

[9] ECF No. 43 at 19.

Applying the proper standard to the present case, Plaintiff has alleged a series of facts that, taken together, demonstrate that a substantial part of the events giving rise to the claims occurred in this district. These allegations include:

- Between October 14, 2025 and November 5, 2024, the Defendants held a number of conversations while Jane Doe was present in this district where the false allegations were discussed and agreed to. *See* SAC ¶ 15 ("Upon information and belief, and unless specifically alleged otherwise, Doe was physically present in this District at all relevant times."); SAC Ex. 5, at 5:20–6:08 (That being said, as stated, **we are vetting every call that we receive**. We have had to turn away some for each. **We ask for corroboration for each . . . We have on staff now a former detective from the major offenders Unit of Houston Police Department who is helping us vet each claim.**") (emphasis added).

- While in this district, "[Jane Doe] told Mr. Buzbee that she had been raped by Sean Combs and a world-renowned female celebrity was also present for the assault." SAC, Ex. 3, at 2 ¶ 8.e. In response, "**Mr. Buzbee suggested [Jane Doe] claim that Mr. Carter was another rapist.**" *Id.* (emphasis added.) As she told investigators James Butler and Charlotte Henderson, "Buzbee brought Jay-Z into it" and "was the one that kind of pushed me towards going forward with him, with Jay-Z." *Id.* at 2 ¶ 8.f.

- During conversations between the Buzbee Defendants and Jane Doe, while Jane Doe was in this district, "lawyers at Mr. Buzbee's law firm told [Jane Doe] that, if she pursued Mr. Carter, she would get a payout." *Id.* at 2 ¶ 8.i.

- The Buzbee Defendants' efforts to convince Jane Doe to falsely expand her claims were successful and on or before October 20, 2024 – from this district – Doe approved the Complaint against Sean Combs and Celebrity A for filing.

- The Buzbee Defendants then sent the November 5, 2024 demand letter to Jane Doe for her approval, which she gave on a phone call while in this district. *See* SAC ¶ 74.

These allegations are not contested. In fact, the only allegations contested by the Buzbee Defendants pertain to their physical location when the above-referenced conversations took place. Even if the subject allegations were contested, though, the Court is obligated to accept the substance of the conversations between the Buzbee Defendants and Doe as true for purposes of the venue analysis. *Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1327 (M.D. Ala. 2012) ("The court will assume that facts alleged in the plaintiff's complaint are true if they are not controverted by the defendant.").

- 31 -

The Buzbee Defendants' feeble objection to the allegations of the Second Amended Complaint that they were not physically present in Alabama during the key conversations, does not alter the venue analysis. Courts have repeatedly held that venue is still proper when critical communications are transmitted to and from the forum district. *See N. Am. Commc'ns, Inc. v. Eclipse Acqui, Inc.*, at \*11-13, Civ. A. No. 3:17-167, 2018 U.S. Dist. LEXIS 15518, at \*11-13 (W.D. Pa. Jan. 31, 2018) ("**venue [is] proper in the location where a party received and transmitted communications**.") (emphasis added); *Pasulka v. Sykes*, 131 F. Supp. 2d 988, 995 (N.D. Ill. 2001) ("'**[V]enue under [§ 1391(b)(2)] may be satisfied by a communication to or [from] the district in which the cause of action was filed**, given a sufficient relationship between the communication and the cause of action.'") (emphasis added); *see also Sacody Techs. v. Avant, Inc.*, 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994) ("The standard set established [sic] in § 1391(a)(2) may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.") (*citing Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867-8 (2d Cir. 1992)).

Because this Court may rely on foreign communications directed into this district for purposes of establishing proper venue, the only relevant question is whether the Buzbee Defendants' communications with Doe while she was in this district have a sufficient connection to the claims at issue. They do. The communications were not incidental – they were central to the fabrication of claims against Plaintiff and to the initiation of the scheme to extort Plaintiff through the November 5th Letter and the SDNY Action.

## B. Venue Is Proper As To Each Claim Based On Common Core Allegations Bearing On Mr. Carter's Claims

As discussed below, the Court may exercise pendent venue even if venue is proper as to a single claim. *See infra*, at § II.D. However, even if the Court were to require venue to be proper

as to each claim, that standard is met by virtue of the allegations common to all of Mr. Carter's claims against the Buzbee Defendants.  Specifically, Mr. Carter alleges that the Buzbee Defendants conspired with Doe to fabricate the heinous accusation that Mr. Carter raped her when she was thirteen years old for the purpose of securing a high-dollar payday from him.[10] *See* SAC ¶ 4. This malicious fabrication is core to each of the claims asserted against the Buzbee Defendants in the Second Amended Complaint. *See* SAC ¶¶ 137–148 (describing illegitimate purpose to extort Mr. Carter in claim for malicious prosecution and lack of "probable cause" in pursuing SDNY Litigation); ¶¶ 149–161 (describing "improper purpose" to extort Mr. Carter through knowingly false claims); ¶ 162 (describing the agreement to "initiate and continue the false and malicious lawsuit in the shared objective of extorting Mr. Carter[.]"). Mr. Carter has further alleged that this fabrication took place through communications directed into this district to Jane Doe by the Buzbee Defendants. *See id.* at ¶ 15 ("Doe conspired with her attorneys to extort Mr. Carter from Alabama[.]"); Ex. 3, at 2 ¶ 8.i ("Jane Doe said to me that lawyers at Mr. Buzbee's law firm told her that, if she pursued Mr. Carter, she would get a payout"). The Buzbee Defendants have not refuted these allegations by affidavit, and consequently, the Court must assume the truth of these allegations. *See Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1327 (M.D. Ala. 2012) ("The court will assume that facts alleged in the plaintiff's complaint are true if they are not controverted by the defendant."); *see also First Fin. Bank v. CS Assets, LLC*, No. CIV.A. 08-0731WSM, 2009 WL 1211360, at *4 (S.D. Ala. May 4, 2009) (finding venue proper in transferee district in right of redemption case where communications related to foreclosure

---

[10] To avoid unnecessary duplication, this section does not separately address how the communications described above further satisfy the elements of malicious prosecution, abuse of process, and conspiracy. That analysis is provided below. *See infra*, at 31-34 § III.A.1; 37-39 § III.B.2; 51-52 § III.E; 55 § III.H.

occurred in transferee district, even if foreclosure giving rise to right of redemption did not occur in transferee district). As such venue is proper as to each claim.

### C. The *Press* Case Does Not Control This Case

The Buzbee Defendants rely heavily on *Rubber Res., Ltd., LLP v. Allen P. Press* to challenge venue. 2009 U.S. Dist. LEXIS 5678 (M.D. Fla. Jan. 27, 2009). That reliance is misplaced. *Press* involved only generic connections to the forum district – service of process and a deposition – not any planning or execution of the alleged wrongful acts. Specifically, the four defendants sued in *Press* were each residents of or domiciled in Missouri and were accused of bringing a knowingly bogus patent infringement lawsuit against a competitor. *See generally Rubber Res., Ltd., LLP v. Allen P. Press et al.*, No. 08-cv-01730 (ECF No. 5). With respect to venue, the plaintiff in *Press* only alleged that it was a Florida company that sat for deposition and received service of process in Florida – the conspiracy itself was not alleged to have taken place in Florida. *See generally Rubber Res., Ltd., LLP v. Allen P. Press et al.*, No. 08-cv-01730, at *6, *13 (Doc. 25). In contrast, Carter alleges that the core misconduct was initiated and directed into this district.[11]

*Kozel v. Kozel* is illustrative of the analysis that *should* be employed in circumstances such as the instant case. 2016 U.S. Dist. LEXIS 197439 (W.D. Penn. May 23, 2016). *Kozel*, like the instant case, involved a multi-state conspiracy to fabricate sexual assault and abuse allegations against the plaintiff. In that case, the plaintiff alleged that his ex-wife, daughters, and attorneys conspired against him for financial gain. 2016 U.S. Dist. LEXIS 197439 (W.D. Penn. May 23, 2016). The plaintiff alleged that his daughters – who went to school at a therapeutic boarding school in Arizona – returned home for the holidays in 2012. *Id.* at *8. According to the plaintiff,

[11] *See* SAC ¶¶ 15, 16, 59, 62, 74.

- 34 -

in order to extort him for child support, while home, plaintiff's daughters and his ex-wife, "had the opportunity to [and did] formulate the story that was eventually told to law enforcement . . . Kozel specifically avers that during the December visit 'pivotal events' took place in South Carolina leading to the 'spontaneous' revelation by [his daughter] of sexual abuse." *Id.* at *8. The plaintiff's daughter returned to school in Arizona and while there, disclosed a "sex offense" involving the plaintiff to a counselor that resulted in Arizona law enforcement being sent to the school to interview the daughter. *Id.* at *9. In short order, Arizona law enforcement transferred the investigation to Pennsylvania law enforcement where plaintiff lived. *Id.* at *10. An investigation process ensued whereby the plaintiff and all defendants were interviewed. *Id.* A criminal complaint was then filed against plaintiff and he was eventually tried and acquitted after a jury trial. *Id.* at *1, *10.

The plaintiff then brought suit in the Western District of Pennsylvania against several parties involved in his criminal case, including his ex-wife and daughters. *Id.* at *1. The plaintiff's ex-wife and daughters sought to transfer the civil suit brought by the plaintiff and the Court analyzed whether venue in the proposed transferee district – South Carolina – was proper under § 1391(b)(2). In granting the motion to transfer, the court held—

> [I]t is fair to say that, outside of the investigation and trial, the significant events that form the basis of Kozel's claims in this action occurred in South Carolina and Arizona. According to Kozel, **the planning of the alleged fraud occurred in South Carolina, and the plan was actually put in motion in Arizona**. Therefore, under § 1391(b)(2), venue is proper in South Carolina.

*Id.* at *10–11 (emphasis added).

Just as in *Kozel*, the "planning of the alleged fraud" occurred in this district. While Doe was present in this district, the Buzbee Defendants directed communications here where they

- 35 -

developed a plan to accuse Plaintiff of acts they knew or should have known he did not commit to receive money they knew they did not deserve.[12]  Venue is proper in this district.

### D.  The Court Does Not Need To Find That Venue Is Proper As To Each Claim

For the reasons set forth above and throughout, venue is proper in the Southern District of Alabama as to each claim. However, even if venue were not proper as to *each* claim the Court may nevertheless exercise pendent venue over the claims that are not otherwise subject to venue here on the basis of Plaintiff's conspiracy claim, which is alleged against all Defendants.

Once a court has determined that venue is proper as to one claim, it may exercise pendent venue to adjudicate closely related claims. *Martensen v. Koch*, 942 F. Supp. 2d 983, 998 (N.D. Cal. 2013) (citing *Legal Additions LLC v. Kowalski*, 2009 U.S. Dist. LEXIS 41835, at *30 (N.D. Cal. Apr. 30, 2009); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 965 (N.D. Cal. 2012)).

Without restating the detailed allegations already discussed, it is clear Plaintiff's conspiracy claim – which ties together the acts of all Defendants to falsely accuse and extort a knowingly innocent man – is properly venued in this district. This conspiracy was hatched here in this district and would have been impossible without the result of communications to and from Doe while she was in this district. As venue for this claim is undoubtedly proper in this district, all other claims – because they are closely related to the conspiracy – are properly venued in this district. Accordingly, the Court may exercise pendent venue over all claims.

### III.    Mr. Carter States A Claim For Malicious Prosecution

Mr. Carter pleads each of the elements of a malicious prosecution claim: that (*a*) the Buzbee Defendants initiated the SDNY Action; (*b*) the Buzbee Defendants lacked probable cause to file

---

[12] *See* SAC, Ex. 3, at 2 ¶ 8.e; *id.* at 2 ¶ 8.1i.

the SDNY Action; (*c*) the Buzbee Defendants acted with malice; (*d*) the SDNY Action has terminated in Mr. Carter's favor; and (*e*) Mr. Carter suffered special injury. *See Honzawa v. Honzawa*, 268 A.D.2d 327, 329 (1st Dep't 2000). The Buzbee Defendants acknowledge that they initiated the SDNY Action but contest all other elements. The Buzbee Defendants' arguments are baseless, and Mr. Carter states a claim for malicious prosecution.

### A.  Mr. Carter Alleges That The Buzbee Defendants Lacked Probable Cause

The Buzbee Defendants do not contend that that the SDNY Action was meritorious. Nor do they describe what, if anything, gave them probable cause to bring the SDNY Action. They instead argue that Mr. Carter's allegations that the Buzbee Defendants lacked probable cause are "mere conjecture" and that the Court should "presume" that they had probable cause. ECF No. 43 at 31-33.  The Buzbee Defendants are wrong on both accounts.

### 1.  Mr. Carter Pleads That The Buzbee Defendants Knew The SDNY Action Was Meritless Before They Filed It

To state a claim for malicious prosecution, Mr. Carter need not show that the Buzbee Defendants had no cause to bring the SDNY Action. *Heilbut v. Cassava Scies., Inc*., No. 24-cv-05948, 2025 U.S. Dist. LEXIS 56283, at *38 (S.D.N.Y. Mar. 26, 2025) (collecting cases); *Sparrow Fund Mgmt., LP v. MiMedx Grp., Inc.*, No. 18-cv-04921, 2019 U.S. Dist. LEXIS 195042, at *14 (S.D.N.Y. Nov. 7, 2019), *report and recommendation adopted by Sparrow Fund Mgmt. LP v. Mimedx Grp., Inc*., 2020 U.S. Dist. LEXIS 49813, at *2 (S.D.N.Y. Mar. 22, 2020). Rather, Mr. Carter need only plead that the Buzbee Defendants brought the SDNY Action "despite not having any reasonable cause that 'would persuade a person of ordinary care and prudence to believe in the truth of the charge.'" *Heilbut*, No. 24-cv-05948, 2025 U.S. Dist. LEXIS 56283, at *38. The question of probable cause is for the jury where reasonable people might draw different inferences.

- 37 -

*Sparrow Fund Mgmt*, No. 18-cv-04921, 2019 U.S. Dist. LEXIS 195042, at *15 (citing *Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 529 (1991)).

      Mr. Carter pleads that not only did the Buzbee Defendants know that the SDNY Action was false, but that it was also manufactured at Buzbee's direction. SAC ¶¶ 5-7, 118. Indeed, Doe admits that Mr. Carter did not assault her and that her allegations about him were false. *Id*. She further reveals in her smoking gun confession that "Buzbee brought Jay-Z into it." *Id*. at ¶¶ 5, 7. And she explains that Buzbee pushed her to go forward with the false story against Mr. Carter to make the case better and get them more money. *Id*. at ¶¶ 5-9. Doe's smoking gun confession alone is thus sufficient to show that the Buzbee Defendants lacked probable cause.[13] *See Honzawa*, 268 A.D.2d at 331 (reversing dismissal of malicious prosecution claim because a lawyer may not "zealous representation has it limits" and "[a] lawyer must not overstep those limits by creating or using false evidence, or assisting a client with the aid of evidence he knows to be false"); *Thomas v. G2 FMV, LLC*, 2016 N.Y. Misc. LEXIS 272, at *20-2 (Sup. Ct. Jan. 27, 2016) (no probable cause where emails indicated that the complaint in the underlying action may have contained false allegations), *aff'd* 147 A.D.3d 700, 701 (1st Dep't 2017); *Kennedy Lewis Inv. Mgmt., LLC v. StimQ Med. LLC*, 2024 N.Y. Misc. LEXIS 4046, at *8-9 (Sup. Ct. June 24, 2024) (denying summary judgment because the "plaintiff alleges that Movant engaged in actions for the sole purpose of getting plaintiff to expend financial resources even though she knew these claims lacked merit").

      Even setting aside Doe's damning confession, Mr. Carter's complaint details the Buzbee Defendants' complete abdication of the most basic professional responsibilities, including their failure to conduct any meaningful vetting of Doe's allegations. They instead thoughtlessly rushed to file a lawsuit containing sensational – and indeed impossible – decades-old allegations just six

---

[13] The Buzbee Defendants' motion completely ignores Doe's confession.

days after the case was referred to them. They did all this while simultaneously "vetting" and filing thirteen other cases against Combs, demonstrating a clear pattern of prioritizing publicity and financial gain over truth or due diligence. SAC ¶¶ 41-46, 67-68. Underscoring the utter disregard for the truth, Buzbee filed the SDNY Action sight unseen – he did not even meet with Doe until months after filing the SDNY Action. *Id*. at ¶¶ 7, 82.

The declarations submitted by the Buzbee Defendants in support of their motion to dismiss confirm that they lacked probable cause to bring the SDNY Action. Buzbee and Fortney admit that:

- No one from Buzbee Law traveled to Alabama to meet Jane Doe before filing the SDNY Action. ECF No. 43-2 (Buzbee Decl.) ¶ 10; ECF No. 43-1 (Fortney Decl.) at ¶ 10.

- No one from Buzbee Law traveled to Alabama to meet Jane Doe before amending the lawsuit to specifically name Mr. Carter. ECF No. 43-2 (Buzbee Decl.) ¶ 11; ECF No. 43-1 (Fortney Decl.) at ¶ 11.

- No meetings with Jane Doe in Alabama occurred prior to the drafting or sending of the Demand Letter. ECF No. 43-2 (Buzbee Decl.) ¶ 13; ECF No. 43-1 (Fortney Decl.) at ¶13.

- Buzbee Law did not hire any investigator to travel to Alabama for any purpose related to Jane Doe or the facts of the lawsuit. ECF No. 43-2 (Buzbee Decl.) ¶ 19; ECF No. 43-1 (Fortney Decl.) at ¶ 20.

Notably, while Fortney testifies to having reviewed the original complaint, Buzbee does not make such a statement, suggesting a possible lack of direct involvement by Buzbee in that aspect of the case. *Compare* ECF No. 43-2 (Buzbee Decl.) ¶ 12 *with* ECF No. 43-1 (Fortney Decl.) at ¶ 12. The Buzbee Defendants' failure to conduct even a basic investigation into Doe's allegations shows that they lacked probable cause to bring the SDNY Action.  *See Honzawa*, 268 A.D.2d at 329 (no probable cause where "[t]he attorney who prepared that affidavit for the 27-year old Yukihiro in 1995 should have known that the affiant would have been nothing more than a precocious youngster at the time of the events of which he assertedly was personally knowledgeable").

- 39 -

## 2. The Buzbee Defendants' Factual Arguments Are Premature And, In Any Event, Are False

The Buzbee Defendants' excuse – that they could not have known about Doe's lies until after her NBC News Interview – is baseless and belies the fact that the SDNY Action was premised on an intentional lie they orchestrated themselves. Even assuming the Buzbee Defendants did not premise the SDNY Action on an intentional lie (and they did), what the Buzbee Defendants "could" have found had they done their diligence is, at most, a question of fact that cannot be resolved on a motion to dismiss. *Sparrow Fund Mgmt.,* No. 18-cv-04921, 2019 U.S. Dist. LEXIS 195042, at *15  (collecting cases).

Moreover, Mr. Carter's complaint shows how even the most minimal investigation – indeed, a simple Google search – prior to filing the SDNY Action would have immediately exposed Doe's story as a sham and her heinous allegations as utterly untethered to reality: (*a*) The alleged location of the assault did not match any property associated with Combs (SAC ¶ 98); (*b*) public records and media coverage placed Mr. Carter and Combs at a different location (a nightclub) at the relevant time (*id*. at ¶ 93); and (*c*) other details, such as the existence of a jumbotron outside the VMAs, were demonstrably false (*id*. at ¶¶ 99, 143, 155). There were many other readily discoverable and verifiable falsehoods in the SDNY Action. *Id*.

Worse still, a basic search of online records would have revealed that Doe has a documented history of making false sexual assault allegations in other matters, as well as a history of mental health and substance abuse issues, including being in Mental Health Court 90 days before filing her lawsuit against Mr. Carter. *Id*. at ¶¶ 63, 66. Had the Buzbee Defendants asked Doe about any corroborating witnesses, the Buzbee Defendants would have learned that:

- The unnamed "friend" who allegedly drove Doe from Rochester, New York and left her alone in Manhattan on the night of the 2000 MTV Video Music Awards was dead and thus of course could not corroborate the story (*id*. at ¶¶ 170).

- The only celebrity Doe claimed to have spoken with at the party was proven to be in another city on tour (*id*. at ¶¶ 95-96).

- Doe's father, who was allegedly involved in a key part of her story – traveling from Rochester in the middle of the night more than 5 hours drive away from his home in Rochester, to a verifiably non-existent gas station near Combs' non-existent residence to pick Doe up and bring her back to Rochester – has no recollection of the events (but thinks he would have remembered had any such thing occurred) (*id*. at ¶¶ 97, 143, 155, 170).

The Buzbee Defendants either deliberately ignored these damning facts or, even more egregiously, discovered them and chose to proceed anyway. *Id*. at ¶¶ 140-46, 152-61. Either scenario is indefensible and destroys any pretense of probable cause. *See Honzawa*, 268 A.D.2d at 331; *see Emanuel v. Griffin*, No. 13-cv-1806, 2013 U.S. Dist. LEXIS 142723, at *26 (S.D.N.Y. Oct. 2, 2013) ("Plaintiffs allege facts suggesting that Dr. Lewittes conducted a deficient and unreliable investigation into the allegations of child abuse; this suffices to allege a lack of probable cause").

Finally, Doe's NBC News Interview aired on December 13, 2024, yet the Buzbee Defendants only dismissed the SDNY Action on February 18, 2025. Their failure to immediately dismiss the SDNY Action after "learning" of its utter baselessness (if indeed that was the first time they did so) further confirms their lack of probable cause and demonstrates a reckless disregard for the truth. *See Sapienza v. Notaro*, 172 A.D.3d 1418, 1419-20 (2d Dep't 2019) (holding that the plaintiff pled malice because the defendants "continued" the underlying lawsuit "with the improper purpose of extorting a settlement from" the plaintiff "based on claims that were barred by res judicata").

In sum, there was never any probable cause to sue Mr. Carter.

### 3. The SDNY Court Never Addressed The Merits Of The SDNY Action

The Buzbee Defendants urge the Court to "presume" they had probable cause to bring the SDNY Action because the court allegedly acknowledged the potential merit of the case when it

denied Mr. Carter's Fed R. Civ. P. 12(f) motion to strike.[14] ECF No. 43 at 32. This argument mischaracterizes the SDNY court's order, which made no substantive finding regarding the merits of the case.

On December 18, 2024, Mr. Carter moved under Rule 12(f) to strike "redundant, immaterial, impertinent, or scandalous" matter. *Doe v. Combs*, No. 24-cv-07975 (S.D.N.Y. Dec. 18, 2024), ECF No. 48. The SDNY court denied Mr. Carter's motion in a footnote to a larger order that addressed several other motions. Hahn Decl. Ex. 1 at 4 n. 2. In its footnote, the court found, without discussion, that Mr. Carter's motion did not meet Rule 12(f)'s "high bar" for striking material as redundant, immaterial, impertinent, or scandalous. *Id*. At no point did the SDNY court address, let alone endorse, the merits of the SDNY Action. *See id*.

The Buzbee Defendants' reliance on the SDNY court's use of the phrase "[o]n the merits" is misleading. The SDNY court's order makes clear that the court was only addressing the "merits" of Mr. Carter's motion to strike, *not* the merits of the SDNY Action itself. *Id*. As the SDNY court made clear, it was merely distinguishing the "merits" of Mr. Carter's motion to strike from the procedural issues raised in the main body of the order. *Id*.

In fact, in the very same order, the SDNY court expressly stated that Mr. Carter could file a Rule 11 motion for sanctions based on the frivolity of the SDNY Action, and shortly thereafter granted Mr. Carter leave to file a motion to dismiss under Rule 12(b)(6). Hahn Decl. Exs. 1 at 4, 2-3. If the court had already determined that the SDNY Action was meritorious, neither a Rule 11 nor a Rule 12(b)(6) motion would have been necessary or permissible.

The Buzbee Defendants' cited cases are inapposite. In those cases, the courts made substantive determinations reflecting a judicial assessment of the merits – such as judgments based

---

[14] Notably, the Buzbee Defendants do not bother providing the Court with a copy of the SDNY court's decision. Doe does not advance the Buzbee Defendants' argument.

on documentary evidence or denials of summary judgment due to triable issues of fact. *Tray Wrap, Inc. v. Pac. Tomato Growers, Ltd.*, 2008 NYLJ LEXIS 763, at *47 (N.Y. Sup. Ct. Jan. 25, 2008) (presuming probable cause, at the summary judgment stage, because the Secretary of Agriculture issued a judgment based "on documentary evidence"); *Rubin v. Lutfy*, 2009 N.Y. Misc. LEXIS 3398, at *2-3 (N.Y. Sup. Ct. Nov. 23, 2009) (finding probable cause where the court in the underlying case denied a motion for summary judgment because there were triable issues a fact, a decision which was upheld on appeal); *Levitin v. Miller*,  92-cv-0520, 1994 U.S. Dist. LEXIS 9701, at *16-18 (S.D.N.Y. July 14, 1994) (denial of motion for summary judgment indicated probable cause). No such determination occurred in the SDNY Action.

Because the SDNY court never made any substantive adjudication of the merits of the SDNY Action, its footnote denying Mr. Carter's motion to strike scandalous material is insufficient to create any presumption that the SDNY Action was brought with probable cause.

## B.  Mr. Carter Alleges Malice

Malice exists where a case is pursued "'due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Tommy Hilfiger Licensing Inc. v. Bradlees, Inc.*, 99-cv-4677, 2002 U.S. Dist. LEXIS 7191, at *31 (S.D.N.Y. Apr. 25, 2002) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir. 1996)). "Malice . . . may be alleged generally." Fed. R. Civ. P. 9(b). Mr. Carter pleads malice by alleging that the Buzbee Defendants pursued the SDNY Action without probable cause and for the improper purpose of extorting an unwarranted settlement.

### 1.  Mr. Carter's Allegations That The Buzbee Defendants Lacked Probable Cause Also Provide Sufficient Allegations Of Malice

Under New York law, malice may be inferred from a lack of probable cause. *Martin v. City of Albany*, 42 N.Y.2d 13, *17-18 (1977) (collecting cases); *Tommy Hilfiger Licensing*, No. 99 Civ.

4677, 2002 U.S. Dist. LEXIS 7191, at *32 (collecting cases). This is because "it is difficult to conceive how a prosecution initiated without probable cause could be initiated with anything *other* than bad faith motives." *Boose v. Rochester*, 71 A.D.2d 59, 70 (4th Dep't 1979). Because, as discussed above, Carter pleads that the Buzbee Defendants lacked probable cause to bring the SDNY Action (*supra* at § III.A), Carter also pleads that the Buzbee Defendants brought the SDNY Action with malice. *See Martin*, 42 N.Y.2d 13 ("Since there was legally sufficient evidence to support a finding of lack of probable cause, under the law of the case, as well as under well-settled decisional law, the jury was authorized by law, if they found a lack of probable cause, to infer the existence of actual malice"); *Tommy Hilfiger Licensing*, No. 99 Civ. 4677, 2002 U.S. Dist. LEXIS 7191, at *32; *Emanuel*, No. 13-cv-1806, 2013 U.S. Dist. LEXIS 142723, at *26 (allegation of malice sufficient because "lack of probable cause generally raises an inference of malice" (internal citations and quotations omitted)).

## 2. Mr. Carter Alleges The Buzbee Defendants Acted For An Improper Purpose

Mr. Carter alleges that the Buzbee Defendants initiated and pursued the SDNY Action not to seek justice or redress any legitimate wrong, but rather to extort a large monetary settlement from Carter. *See e.g.,* SAC ¶¶ 63-66. He details that the defendants knowingly advanced false and sensational allegations of sexual assault, timed and publicized to inflict maximum reputational and economic harm, with the explicit goal of coercing Mr. Carter into paying "something of substance" to avoid public exposure and further damage. *See e.g., id.* at ¶¶ 76-77. The Buzbee Defendants' scheme involved filing a lawsuit with fabricated claims, sending an extortionate demand letter threatening to publicly name Mr. Carter unless he settled, and leveraging media coverage, including Buzbee telling TMZ that Doe had not ruled out filing a criminal complaint against Mr. Carter, in order to increase pressure – all motivated by greed and the prospect of a substantial financial windfall, rather than any genuine belief in the truth of the allegations or a desire for

justice. *See e.g.,* SAC ¶¶ 66-91. These allegations alone are sufficient to plead malice.[15] *Sapienza v. Notaro*, 172 A.D.3d 1418, 1419-20 (2nd Dep't 2019) (holding that the plaintiff plead malice by alleging that the defendants "continued with the Queens County Action with the improper purpose of extorting a settlement . . . based on claims that were barred by res judicata" (cleaned up)); *Thomas v. G2 FMV, LLC*, 147 A.D.3d 700, 700 (1st Dep't. 2017); Restatement (Second) of Torts 676, cmt. c (providing that malice may also be established where a lawsuit is "initiated for the purpose of forcing a settlement that has no relation to the merits of the claim").

The sequence in which the SDNY Action was filed with a foreboding reference to a "Celebrity A" to be named, before the extortionate demand letter was sent, demonstrates the Buzbee Defendants' malice. Of course it is possible that a party seeking redress for a legitimate grievance might first send a demand letter or attempt to resolve the matter privately before resorting to litigation. Here, the reverse occurred: the Buzbee Defendants first filed the SDNY Action against an unnamed "Doe" and "Celebrity A," which the Buzbee Defendants have since admitted was a placeholder for Mr. Carter. SAC ¶¶ 4, 65, 69-70.

Then, despite already suing Mr. Carter, the Buzbee Defendants sent Mr. Carter a demand letter, making it clear that unless he agreed to a "confidential mediation" and paid "something of substance," the Buzbee Defendants would publicly sue him. *Id*. at ¶¶ 4, 65, 69-70, 74-77 The fact that the SDNY Action was filed first, and then used as a silent cudgel in the demand letter, demonstrates that the SDNY Action was not motivated by a desire for justice, but by a desire to coerce payment through fear of reputational and economic harm. *Id*.

---

[15] *Boose v. City of Rochester*, which the Buzbee Defendants rely on, actually supports Mr. Carter because in that case, the court denied summary judgment because a jury could conclude that "defendant's officers had arrested this plaintiff without probable cause and with actual malice for just that purpose." 71 A.D.2d 59, 70 (4th Dep't 1979). Unlike the plaintiff in *Santoro v. Town of Smithtown*, Mr. Carter pleads that the Buzbee Defendants filed the SDNY Action despite knowing that it contained false allegations against Mr. Carter. 40 A.D.3d 736, 738 (2nd Dep't 2007) (plaintiff failed to plead "some deliberate act punctuated with awareness of conscious falsity" (internal citations and quotations omitted)).

That the Buzbee Defendants chose not to even meet with Doe prior to filing the SDNY Action, or sending their extortionate demand letter, also shows that the Buzbee Defendants were looking for a quick buck, rather than justice. *Id*. at ¶ 82.

The Buzbee Defendants' plea for leniency on the grounds of "zealous advocacy" is both baseless and offensive. There are no allegations in the Amended Complaint – let alone the Buzbee Defendants' brief – that support such an inference. And New York law is unequivocal: zealous representation does not permit attorneys to manufacture or use false evidence, or to assist a client in advancing claims they know or should know to be false. *See Honzawa*, 268 A.D.2d at 330-31. The Court is not required to accept Buzbee's self-serving narrative when Mr. Carter's Amended Complaint sets forth a far more plausible – and damning – explanation: that the Buzbee Defendants acted with malice, motivated by greed and a reckless disregard for the truth.[16]

For these reasons, Mr. Carter more than adequately pleads malice.

**C. Mr. Carter Alleges A Special Injury**

Mr. Carter adequately alleges the Buzbee Defendants' malicious prosecution of the SDNY Action caused him to suffer a special injury. To plead special injury, a plaintiff need only show an interference with a person, property, or business. *See Sparrow Fund Mgmt*. No. 18-cv-4921, 2020 U.S. Dist. LEXIS 49813, at *15 (quoting *Dudick v. Gulyas*, 277 A.D.2d 686, 688 (3d Dep't 2000)). Special injury is plead where the harm goes beyond the ordinary burdens of defending a lawsuit – such as lost business opportunities, reputational harm, or severe emotional distress. *See Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *43 (S.D.N.Y. Mar. 26, 2025) (collecting cases); *Dudick*, 277 A.D.2d at 688 ("damages for harm to reputation are recoverable in a malicious prosecution

---

[16] The cases cited by the Buzbee Defendants involve claims and issues that are unrelated to those in this case. *See ADA v. Cigna Corp*., 605 F.3d 1283, 1294 (11th Cir. 2010) (holding that the plaintiff's "bare assertion[s]" was insufficient to state a RICO claim); *Lenaar v. Lubavitch*, 2019 N.Y. Misc. LEXIS 4873, at *50 (Civ. Ct. Sept. 6, 2019) (granting in part and denying in part a motion for sanctions in a landlord-tenant dispute after a live hearing).

action"); *Thryoff v. Nationwide Mut. Ins. Co.*, No. 05-CV-6607T, 2006 U.S. Dist. LEXIS 71706, at *12 (W.D.N.Y. Sep. 29, 2006) (emotional harm).

In his complaint, Mr. Carter specifically alleges that the Buzbee Defendants' malicious prosecution of the SDNY Action caused: (*a*) concrete lost business opportunities; and (*b*) concrete reputational harm. SAC ¶¶ 126-136. Each of these allegations is, independently, sufficient to satisfy the special injury requirement under New York law.

### 1. Mr. Carter Pleads Concrete Lost Business Opportunities

Mr. Carter details concrete and significant interferences with his business and personal affairs flowing from the Buzbee Defendants' malicious prosecution of the SDNY Action, including:

- As a direct result of the malicious prosecution and attendant reputational harm, Mr. Carter was denied a $55 million personal credit line (*Id.* at ¶ 131).

- As a direct result of the malicious prosecution and attendant reputational harm, Mr. Carter and his business, Roc Nation – of which he is both a founder and an owner –lost contracts in the sports and entertainment sector that would have generated, at least, $20 million in revenue from minimum fee guarantees, with the potential for even greater losses had the contracts been performed (*Id.* at ¶ 130).

- As a direct result of the malicious prosecution and attendant reputational harm, including negative publicity, a consumer brand business in which he holds a 50% interest was denied a $115 million loan (*Id.* at ¶ 132).

These allegations far exceed the typical costs or inconveniences of litigation and are exactly the type of specific, substantial harm that New York courts recognize as a special injury. *See Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *44 (relied on by Doe) (lost investment opportunities); *Thomas v. G2 FMV, LLC*, 2016 N.Y. Misc. LEXIS 272, at *14 (Sup. Ct. Jan. 27, 2016) ("the [plaintiff] alleges that he lost a $20,000 per month retainer agreement . . . This is special injury beyond defending a lawsuit."), *aff'd* 147 A.D.3d 700 (1st Dep't 2017); *In re Eerie World Entm't, L.L.C.*, 2006 Bankr. LEXIS 770, at *27 (relied on by the Buzbee Defendants) (Bankr. S.D.N.Y. Apr. 28,

2006) (lost financing); *Strumpf v. Asdourian*, 2006 N.Y. Misc. LEXIS 3976, at \*10 (Sup. Ct. Dec. 12, 2006) (loss of clients and increased insurance rates); *Sparrow*, No. 18-cv-04921, 2020 U.S. Dist. LEXIS 4981, at \*16 (revenue losses and difficulty raising capital).

Despite recognizing that Mr. Carter's lost business constitutes special injury, the Buzbee Defendants argue that Mr. Carter should not benefit from the rule because Mr. Carter sometimes conducts business through an entity. The Buzbee Defendants are wrong and rely on inapposite cases from non-New York jurisdictions in which the plaintiffs asserted rights and claims that were not theirs, personally, but clearly belonged to a corporation instead. *See* ECF No. 43 at 41-42 (citing *Lawrence v. DAP Prods.,* Case No. ADC-22-2651, 2022 U.S. Dist. LEXIS 112387, at \*7 (D. Md. June 23, 2022) (no claim individual claim under 42 U.S.C. § 1981 for interfering with an LLC's ability to contract); *Martin v. Santorini Capital, LLC,* 236 A.3d 386, 390 (D.C. 2020) (guarantor of loans was not "real party in interest" under D.C. Super. Ct. R. Civ. P. 17(a)(1) because guarantor "lacks a legal interest in the ownership rights in the real properties," but refusing to dismiss claim for independent injuries); *Irish v. Ferguson*, 970 F. Supp. 2d 317, 349 (M.D. Pa. 2013) (no standing under RICO where the plaintiff alleged "that Defendants engaged in acts of mail and wire fraud that harmed Lakefront under the doctrine of corporate waste" and "looting of a company"); *Schoen v. Underwood*, No. W-11-CA-00016, 2012 U.S. Dist. LEXIS 200869, at \*13 (W.D. Tex. May 15, 2012) (no standing for a counterclaim "based on misappropriation of the company's name"); *Cohen v. Williams*, 294 Ala. 417, 421, 318 So. 2d 279, 281 (1975) (piercing corporate veil)). Mr. Carter, in contrast, specifically alleges that he *personally* lost out on a $55 million line of credit because *he* was falsely and maliciously named by the Buzbee Defendants in the SDNY Action. SAC ¶ 131**.** This allegation easily rises to the level of a special injury under New York law. Moreover, the entities that Mr. Carter alleges lost substantial 9-figure amounts due

to the malicious prosecution of the SDNY Action are entities that are tied directly and inextricably to his reputation as a principal basis for their ongoing success, operations, and financing.

In all events, a special injury is sufficiently pled where, as here, the plaintiff plausibly *alleges* that malicious prosecution caused an injury to the plaintiff's business interests, regardless of whether the plaintiff operates the business through an entity. For example, courts have found special damages based on allegations that an underlying lawsuit "harmed [plaintiff's] company and its relations with investors during the IPO process." *Heilbut*, 2025 U.S. Dist. LEXIS 56283, at \*46; *see also Silvestri-Edwards v. Cappello*, 2025 N.Y. Misc. LEXIS 3365, at \*14 (Sup. Ct. March 20, 2025) (special damages found in defamation lawsuit where the plaintiff "now claims her revenues have dropped 90%, due to continuing damage impact arising out of defendant's defamatory remarks"). Mr. Carter alleges his personal brand and business interests are inextricably linked: damage to Mr. Carter directly impacts Roc Nation's business opportunities and revenue, and vice versa. SAC ¶¶ 126, 133. The loss of contracts, denial of financing, and other business losses are thus properly considered special injuries for pleading purposes. *See Heilbut*, 2025 U.S. Dist. LEXIS 56283, at \*46; *Cappello*, 2025 N.Y. Misc. LEXIS 3365, at \*10 ("Plaintiff [an individual] has also alleged special damages, due to her alleged 33% loss in business revenues"); *Sisler v. Gannett Co.*, 516 A.2d 1083, 1097 (N.J. 1986) (holding, in the defamation context, that "Plaintiff merely chose to funnel the business opportunities that were lost through his wholly-owned corporation, and thus, evidence of what the corporation lost was correctly deemed to be evidence of plaintiff's personal losses.…").

Mr. Carter clearly pleads a special injury. The Buzbee Defendants effectively ask the Court to ignore Mr. Carter's allegations of personal special injury resulting from their demonstrably false allegations that he violently raped a minor and bar any individual who conducts business through

a corporate entity from claiming special injury or pursuing a claim for malicious prosecution. The Buzbee Defendants cite no authority to support their request. The Court should decline it.

### 2. Mr. Carter Pleads Concrete Emotional And Reputational Harm

Mr. Carter alleges the SDNY Action was designed to publicly smear him, disrupt his personal life, and inflict severe emotional and reputational harm, all to force Mr. Carter to capitulate to Defendants' extortionate demands. SAC ¶¶ 69, 146. The complaint details how the false and malicious sexual assault allegations were widely disseminated through court filings, media coverage, and a nationally-televised interview, resulting in:

- A dramatic deterioration in Mr. Carter's public image, as evidenced by approximately 1.3 million social media mentions and a net sentiment score of 94% negative (a sharp increase from prior years) (*id.* at ¶ 135);

- Widespread public contempt, including threats of violence and accusations of criminal conduct, including calls for Mr. Carter to be imprisoned, threats of violence, and accusations of being a "satanist," "trafficker," "terrorist," and "monster[,]" (*id.* at ¶ 134);

- Emotional distress and humiliation, particularly in having to address allegations of rape of a minor with his children and family (*id.* at ¶ 128).

These allegations are supported by specific facts and quantifiable data, and are exactly the kind of reputational and emotional harms that courts have found to constitute special injury. *See Chisolm-Mitchell v. Ahmed*, No. 20-cv-3434, 2021 U.S. Dist. LEXIS 26083, at *10-11 (E.D.N.Y. Feb. 11, 2021); *Dudick*, 277 A.D.2d at 688; *Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *46.

The Buzbee Defendants incorrectly argue that that reputational harm is not a special injury. Under New York law, however, "damages for harm to reputation are recoverable in a malicious prosecution action."[17] *Dudick*, 277 A.D.2d at 688; *G2 FMV*, N.Y. Misc. LEXIS 272, at *19

---

[17] Numerous cases cited by the Buzbee Defendants (several of which are also cited by Doe) are distinguishable because they were not decided at the motion to dismiss stage. *See, e.g., Engel v. CBS, Inc.,* 182 F.3d 124, 131 (2d Cir. 1999) (affirming summary judgment dismissal); *Campion Funeral Home v. State,* 569 N.Y.S.2d 518, 520 (3d Dept. 1991) (same); *Loftus v. Arthur,* 847 N.Y.S.2d 902 (Sup. Ct. 2007)(same). The other cases they cite, meanwhile, either upheld the plaintiff's allegations of specific damages, *see Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.,* 1997

(observing that although *Engel*, 182 F.3d at 127 held that vague allegations of emotional harm were insufficient, *Engel* "approvingly cited *Groat v Town Bd. of Town of Glenville* . . . [which] held that there was a sufficient interference with person or property where the plaintiff was suspended from the police force without pay, dismissed, ***and temporarily disgraced in the police department and the community***" (emphasis added)). And courts refuse to dismiss a malicious prosecution claim where, as here, the plaintiff pleads concrete reputational harm. *See, e.g., Chisolm-Mitchell*, 2021 U.S. Dist. LEXIS 26083, at *10 (finding special injury where the plaintiff alleged damage to reputation, career, and ability to provide for her family).

The Buzbee Defendants also incorrectly argue that the emotional distress they intentionally – indeed, callously and maliciously – caused is not a special injury. This argument has been squarely rejected by New York courts. In *Heilbut*, for example, the plaintiff was allegedly "doxed by thousands of posts on X [formerly Twitter] and other websites [by Cassava investors and supporters] that reveal his home address and characterize him as a 'thief' or a 'devil,'" which the court found rose to the level of special injury, in part, because it "continue[d] to create fear and

---

U.S. Dist. LEXIS 12976, at *15 (S.D.N.Y. Aug. 27, 1997), or turned on vague and conclusory allegations that are far less specific than and bear little resemblance to Mr. Carter's allegations here, *see O'Brien v. Alexander*, 101 F.3d 1479, 1485 (2d Cir. 1996) (dismissing malicious prosecution claim where plaintiff did not contend that his former employers "obtained a provisional remedy or imposed any other burden on him beyond the ordinary[,]" arguing only general "damaging consequences" from the underlying litigation); *Rubin*, 2009 N.Y. Misc. LEXIS 3398, at *5 ("Plaintiff's allegations regarding the time and money spent in the litigation and vague assertions of damage to reputation do not constitute special damages."); *Engel*, 182 F.3d at 127 (plaintiff alleged, "in a general way, that he suffered emotional" harm); *McCaul v. Ardsley Union Free School Distric*t, 514 F. App'x 1, 6 (2d Cir. 2013) (plaintiff alleged mere "distress and anxiety" from the "demands of defending herself in the civil neglect proceeding."); *Brown v. Brown*, 343 F. Supp. 2d 195, 198 (E.D.N.Y. 2004) (plaintiff only pled damages "directly related to the present lawsuit . . . [consisting of] bare allegations of emotional distress, pain, and suffering."); *Molinoff v. Sassower*, 471 N.Y.S.2d 312, 313 (2d Dep't 1984) (plaintiff alleged he had to "bear the suffered a severe psychological burden of being a defendant in a lawsuit for which he had no insurance coverage for punitive damages"); *In re Eerie World Entm't, L.L.C.*, 2006 Bankr. LEXIS 770, at *29 (Bankr. S.D.N.Y. Apr. 28, 2006) (dismissing claims of vague "harm to reputation and emotional damage and mental stress" while finding that plaintiff sufficiently alleged loss of business as a special injury); *Sankin v. Abeshouse*, 545 F. Supp. 2d 324, 328 (S.D.N.Y. 2008) (costs and attorneys fees); *Loftu*, 847 N.Y.S.2d at 902 (alleged four month postponement of a use of a barn was not a special injury).

anxiety for [plaintiff] and his family." 2025 U.S. Dist. LEXIS 56283, at *46 (S.D.N.Y. Mar. 26, 2025).

Here, as in *Heilbut,* Mr. Carter alleges that the Buzbee Defendants' malicious prosecution of the SDNY Action caused him to suffer emotional distress, including because her false allegations caused widespread public contempt of Mr. Carter, embodied in some instances in threats of violence and accusations of criminal conduct, calls for Mr. Carter to be imprisoned, threats of violence, and accusations of being a "satanist," "trafficker," "terrorist," and "monster." SAC ¶ 134. Mr. Carter thus suffered a special injury far beyond the typical psychological burdens of litigation.

Accordingly, Mr. Carter's well-pled allegations and supporting evidence clearly satisfy the special injury requirement under New York law.

### D. Mr. Carter Alleges That The SDNY Action Was Terminated In His Favor

A lawsuit is resolved in favor of a defendant if its dismissal was not pursuant to a settlement agreement or compromise. *Cantalino v. Danne*r, 96 N.Y.2d 391, 395 (2001). The SDNY Action terminated in Mr. Carter's favor because the Buzbee Defendants voluntarily dismissed it with prejudice and without settlement. SAC ¶ 117.

The Buzbee Defendants attempt to characterize a February 4, 2025 email exchange ("**Kasowitz Email**") between Alex Spiro – Mr. Carter's counsel – and Marc Kasowitz – counsel for Doe and the Buzbee Defendants, as a settlement agreement. It is not.

Mr. Carter vigorously denies that the SDNY Action was settled or compromised. And Kasowitz himself acknowledged, in writing, that the Kasowitz Email was not a settlement. SAC Ex. 7 at 4. Moreover, the stipulation of discontinuance does not indicate that it was the result of a settlement. SAC ¶ 10; ECF No. 44-4. Accordingly, at most, there is a factual dispute about the Kasowitz Email that cannot be resolved at the motion to dismiss stage. *See Tommy Hilfiger*

*Licensing*, 2002 U.S. Dist. LEXIS 7191, at *21 (denying motion to dismiss because "there is at least some question as to whether or not the discontinuance of the civil forfeiture action with prejudice was procured by way of settlement or whether it was merely a voluntary discontinuance with prejudice which did not involve any compromise"). The cases cited by the Buzbee Defendants' support the denial of their motion to dismiss. [18] *See e.g., Aquilina v. O'Connor*, 59 A.D.2d 454, 457  (3rd Dep't 1977) (stipulation was not a "settlement or compromise" because no payment or concession was made); *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 289 (E.D.N.Y. 2014) ("The stipulation of dismissal indicates that the Underlying Litigation was terminated pursuant to a voluntary dismissal and as the Court has credited Plaintiff's allegation that this stipulation does not reflect a settlement or compromise, the Court finds that this is sufficient to satisfy the favorable termination element of a malicious prosecution claim."); *Mobile Training & Educ., Inc. v. Aviation Ground Sch. of Am.*, 2010 N.Y. Misc. LEXIS 3990, at *24 (Sup. Ct. June 23, 2010) (finding that the underlying lawsuit terminated in the plaintiff's favor because "there is no evidence that" the case was settled); *Putnam v. Otsego Mut. Fire Ins. Co.*, 41 A.D.2d 981, 982  (3rd Dep't 1973), *subsequent history* 45 A.D.2d 556, 558  (initially denying summary judgment because there was "a conflict" about whether the parties agreed to settle their dispute).

The Buzbee Defendants contend that Mr. Carter agreed to withdraw his Rule 11 motion for sanctions and refrain from contacting Doe if Doe agreed to dismiss the SDNY Action. The

---

[18] The Buzbee Defendants' other cases are plainly distinguishable because in those cases, unlike here, there was no dispute that the cases were settled. *See, e.g., Levy's Store, Inc. v. Endicott-Johnson Corp.*, 272 N.Y. 155, 162 (1936) (no malicious prosecution where the defendant gave the plaintiff "reasonable ground for believing" that the defendant "had obtained credit which would permit payment of its indebtedness"); *Pagliarulo v. Pagliarulo*, 30 A.D.2d 840, 840 (2nd Dep't 1968) (parties stipulation provided that the underlying action was "settled and discontinued"); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198  (2000) ("a dismissal on speedy trial grounds is a favorable termination"); *Rubin*, 2009 N.Y. Misc. LEXIS 3398, at *5 (case was settled and the court in the underlying lawsuit determined that there was a potential basis for liability).

Buzbee Defendants' characterization is false because Mr. Carter offered no such *quid pro quo*. SAC ¶¶ 122-125, Ex. 6 (Spiro Declaration). The Kasowitz Email does not show otherwise.

*First*, in response to Mr. Carter's Rule 11 motion in the SDNY Action, on January 28, 2025, the United States District Judge presiding over the SDNY Action, Judge Analisa Torres, ordered Buzbee to file proof of admission to the Southern District of New York. *Doe v. Combs*, No. 24-cv-7975, ECF No. 80. But Buzbee had a problem because, despite filing lawsuits and pleadings in the Southern District of New York, Buzbee was not admitted. *Id.* ECF No. 61 at 12. Kasowitz, Buzbee's personal attorney, therefore reached out to Mr. Carter's counsel to discuss dismissing the SDNY Action. Mr. Carter's counsel made clear to Kasowitz that Mr. Carter would **never** settle the SDNY Action or pay any money to resolve it given Doe's heinous false accusations. SAC Ex. 6 at ¶ 4.

*Second*, the Buzbee Defendants' voluntary dismissal with prejudice of the SDNY Action was not conditioned on any compromise by Mr. Carter. SAC Ex. 6 at ¶¶ 3-5. On February 4, 2025, Kasowitz told Mr. Carter's counsel that Buzbee would dismiss the SDNY Action with prejudice by February 14, 2025, the same day by which Judge Torres had ordered him to file proof of his admission to the SDNY Action. *Id.* at ¶ 9. In light of Kasowitz's statement that Buzbee was going to voluntarily dismiss the SDNY Action, which achieved the same result Mr. Carter sought through his Rule 11 motion, Mr. Carter's counsel told Kasowitz that he would hold in abeyance further pursuit of the Rule 11 Motion, without prejudice, pending dismissal of the SDNY Action. Given that Mr. Carter had, by that point, already achieved the purpose of bringing the Rule 11 motion in the first place, the motion was about to become moot. *Id.* at ¶ 10. And given that Buzbee still faced repercussions for his failure to seek admission in the Southern District of New York in light of the many other lawsuits he had filed there, Mr. Carter's withdrawal of the Rule 11 motion without

prejudice was an insignificant event that compromised nothing. The Buzbee Defendants' characterization of Mr. Carter's withdrawal of his motion as somehow being in furtherance of a "negotiated dismissal" of the lawsuit is plainly wrong, as Kasowitz acknowledged in writing that it was not a settlement at all. SAC ¶ 122.

Accordingly, the swift dismissal with prejudice of the lawsuit just two months after naming Mr. Carter was a resounding victory for Mr. Carter and a clear indication the allegations in the SDNY Action were false in the first instance and that the extortionate plot by Doe, the Buzbee Defendants and the Curis Defendants had failed.

*Third*, even under the Buzbee Defendants' version of events, the Kasowitz Email is simply a statement from Doe's attorney that the SDNY Action would be dismissed with prejudice by February 14, 2025, which was the same date by which the court had ordered Buzbee to file proof of admission – which he could not do, as he was not admitted, and (as Mr. Carter and the rest of the world would learn a week later) Buzbee's application for admission to the SDNY had been denied on February 12 by the Chair of the SDNY Disciplinary Committee for his many misdeeds and indisputably bad moral character. Mr. Carter's alleged consent to Buzbee's dismissal with prejudice does not constitute a compromise or settlement. *See Louvad Realty Corp. v. Anfang*, 267 A.D. 567, 568-69 (1st Dep't 1944) (holding that New York law "does not require the plaintiff to establish that in the earlier action it had resisted a discontinuance to which the defendant had consented").

The Buzbee Defendants also argue that Mr. Carter's dismissal of his motion for Rule 11 sanctions indicates that the Kasowitz Email memorialized a settlement or compromise between Doe and Mr. Carter. Not so. For starters, Mr. Carter's Rule 11 motion was only brought against Buzbee, and not Doe. *Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y. Jan. 8, 2025), ECF Nos. 60-61.

Indeed, the Rule 11 motion only raised two issues, each having to do only with Buzbee: (a) Buzbee violated Rule 11 by either filing a knowingly false complaint or failing to conduct a reasonable inquiry into the facts; and (b) Buzbee failed to obtain admission *pro hac vice* to practice in the Southern District of New York, despite having signed numerous pleadings and other filings. Thus, withdrawal of the Rule 11 motion benefitted _only_ Buzbee, resulting in no consideration at all to Doe for the falsely claimed *quid pro quo* "settlement."

Moreover, Mr. Carter withdrew his Rule 11 motion *without prejudice*. *Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y. Feb. 4, 2025), ECF No. 83. As Mr. Carter retained the right to refile the motion, the withdrawal was not a bargained-for exchange or a negotiated compromise because it offered nothing in return. Rather, it was a practical response to Kasowitz's representation that the SDNY Action would be dismissed with prejudice. As Mr. Carter's counsel testified: "Our withdrawal of the Rule 11 motion without prejudice was an insignificant event. Kasowitz's characterization of our withdrawal as being done in furtherance of a 'negotiated dismissal' of the lawsuit is not correct. In fact, Kasowitz acknowledged in writing that this was not a settlement." Thus, withdrawal of the Rule 11 does not constitute consideration for the falsely claimed *quid pro quo* "settlement." *See Honzawa*, 268 A.D.2d at 330 ("At no time did Mitsuhiro, in the course of settlement negotiations, relinquish this right of action suggested in the resolution of the Federal litigation.")

The context and timing of the with prejudice dismissal of the SDNY Action only confirm that it was not the result of a compromise or settlement. Mr. Carter alleges that Fortney traveled to Alabama on February 13, 2025 to convince Doe to drop her lawsuit. SAC ¶¶ 112-17, 122-25. There would have been no reason for Fortney to travel to Alabama to convince Doe to drop the SDNY

Action on February 13, 2025, if a settlement already occurred more than a week earlier, on February 4, 2025.

Similarly, on February 4, 2025, Mr. Carter also moved to dismiss Doe's complaint. *See Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y. Feb. 4, 2025), ECF Nos. 85-86. There would also have been no need for Mr. Carter to move to dismiss the SDNY Action had the parties settled the case. Indeed, Mr. Carter's withdrawal of his Rule 11 motion without prejudice could not have induced Doe to dismiss her case with prejudice since Mr. Carter moved to dismiss Doe's complaint *after* Mr. Carter withdrew his Rule 11 motion and *before* Doe filed her notice of voluntary dismissal with prejudice.

Accordingly, the record demonstrates that the dismissal of the SDNY Action was not the product of any settlement or compromise between the parties.

## IV.     Mr. Carter States A Claim For Abuse of Process

Under New York law an abuse of process claim is stated against a party who: (1) employs a regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Bd. of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assoc., Inc.,* 38 N.Y.2d 397, 399  (N.Y. 1975). With respect to the second element, an allegation that process was issued "maliciously with the intent to injure and to harass plaintiff" is sufficient to satisfy this element. *Id.* As to the third element, a plaintiff may meet this element when process is used to obtain the collateral objective of inflicting damage upon a party's business, to compel a party to comply with unreasonable demands or to exact retribution upon a party. *See e.g., Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (applying New York law); *Pagliarulo v. Pagliarulo*, 30 A.D.2d 840, 841 (2nd Dept. 1968).

The Buzbee Defendants contend that Mr. Carter's abuse of process claim fails because the filing of a complaint is not "process" capable of being abused and, in any event, Mr. Carter does not show how the Buzbee Defendants abused the complaint. The Buzbee Defendants are wrong.

New York courts hold that the use of a lawsuit for an improper purpose constitutes an abuse of process. *See, e.g, Pagliarulo*, 30 A.D.2d at 841; *Levine v. Sherman*, 384 N.Y.S.2d 685, 687 (Sup. Ct. 1976) (denying motion to dismiss abuse of process claim where plaintiff sufficiently pled that defendant filed the underlying lawsuits for harassment purposes); *Cardy v. Maxwell*, 169 N.Y.S.2d 547, 549-50 (Sup. Ct. 1957) (denying motion to dismiss abuse of process claim where the complaint "contain[ed] additional allegations which [] established a perversion of the action from its lawful and proper purposes to a vehicle for attempted extortion" including "threaten[ing] plaintiff with adverse newspaper publicity unless he paid several million dollars," that "defendants caused the scandalous . . . allegations of the complaint to be given extensive and lurid publicity when plaintiff refused to comply with their demands" and "alleg[ations] that all the defendants participated in a conspiracy to force plaintiff to pay them money to escape adverse publicity rather than defend the action"). Thus, in *Pagliarulo*, which the Buzbee Defendants rely on, the court refused to dismiss an abuse of process claim based on the commencement of a prior proceeding. 30 A.D.2d at 841. Instead, the court held that plaintiff stated a claim because the complaint alleged that the "prior action was commenced 'for the sole purpose of compelling these plaintiffs, through fear and duress, to comply with unreasonable and unfounded demands made by the defendants upon the plaintiffs with respect to compliance with the award in arbitration." *Id*. Here, Mr. Carter similarly alleges that the Buzbee Defendants initiated litigation not to resolve a genuine dispute, but to compel Mr. Carter "through fear and duress, to comply with unreasonable and unfounded

- 58 -

demands made by the defendants upon" Mr. Carter, thus satisfying the requirements for an abuse
of process claim under New York law.[19]

The Buzbee Defendants next argue that Mr. Carter's abuse of process claim fails because
the Buzbee Defendants did not file the SDNY Action for an improper purpose.  This argument is
incorrect and misconstrues the facts pled.

The Buzbee Defendants attempt to distract from and blur the facts pled by Mr. Carter by
claiming that the relevant abuse of process alleged is solely the pursuing and initiation of the
extortionate lawsuit. This is incorrect and misconstrues the facts pled. The Buzbee Defendants'
plan was clear and simple. First, the Buzbee Defendants' original complaint names Sean Combs,
Combs' business entities, and "Does 1-10" as defendants. Mr. Carter alleges (and the Buzbee
Defendants concede) that Mr. Carter was one of the unnamed "Does," and that the complaint was
intentionally vague to create leverage. It was also designed to stir up publicity and speculation by
alleging vile claims of sexual assault of a minor by a celebrity known as "Celebrity A." The
purpose of this tactic was to instill fear in Mr. Carter that he would be publicly named and accused
of heinous acts unless he agreed to a settlement. The complaint was "the opening salvo to their
extortion scheme and used as a tool to seek collateral advantage and to gain leverage over Mr.
Carter." SAC ¶ 70.

---

[19] The Buzbee Defendants' other cases are distinguishable because the plaintiffs in those cases did not allege that the
lawsuits were commenced for and improper purpose. *See e.g., Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 480 N.Y.S.2d
466, 468 (1984) (no abuse of process claim because "[t]hey do not contend that the summons issued by defendants
was improperly used after it was issued but only that defendants acted maliciously in bringing the action"); *Tray Wrap*,
2008 NYLJ LEXIS 763, at *34 (recognizing that "a cause of action for abuse of process lies not for the commencement
of an action but for the perversion of the process after it is commenced"); *Hauser v. Bartow*, 273 N.Y. 370, 374 (1937)
(dismissing abuse of process claim because the defendant "used the process of the court for the purpose for which the
law created it"); *I.G. Second Generation Partners, L.P. v. Reade*, 17 A.D.3d 206, 207-08, 793 N.Y.S.2d 379, 381 (1st
Dep't 2005) (seeking a declaration of entitlement to premises "was entirely appropriate and in no way collateral to
their objective of securing an exclusive right to possess the premises"). But unlike the plaintiffs in those cases, the
Buzbee Defendants used the filing of the SDNY in an improper attempt to extort and leverage a settlement by formally
naming him in SDNY Action which contained utterly false, fabricated, and horrific allegations.

Second, after filing the original complaint, the Buzbee Defendants sent Mr. Carter an extortionate demand letter. This letter made it clear that unless Mr. Carter agreed to a confidential mediation and a substantial settlement, they would file a lawsuit against Mr. Carter and the false allegations would be made public. But Doe had *already* filed a lawsuit against Mr. Carter (albeit as one of the Doe defendants). Doe's threat was explicit: Mr. Carter could either pay "something of substance" to avoid public exposure and reputational ruin, or face the devastating consequences of being named in a lawsuit alleging sexual assault of a minor.

Third, the Buzbee Defendants made good on their threats to publicly name Mr. Carter in the SDNY Action. With the media whipped into a frenzy, the Buzbee Defendants then paid for Doe to travel from her home in the Southern District of Alabama to the Buzbee Defendants' offices in Houston, Texas to sit for an interview with NBC News.  During the NBC News Interview – which Doe attended on a voluntary basis, and which occurred in the presence of Fortney – Doe lied about Mr. Carter to a ***global television audience***. Indeed, the NBC News Interview was set up with the specific intent that the resulting broadcast reach the largest possible audience, including viewers who reside in the United States, including Alabama, and a worldwide audience.  It was also set up to allow Doe (and the Buzbee Defendants) to further propagate the lies in the sham SDNY Action, as well as new lies told during the NBC News Interview, in the hopes of bringing intense additional pressure to bear on Mr. Carter and thus force him into a settlement.

Accordingly, the Buzbee Defendants and Doe did not file the SDNY Action against Mr. Carter to obtain any legitimate relief from the judicial process. Rather, Doe and her attorneys schemed and concocted a plan to knowingly file the original complaint with fabricated claims with the intent of using it as leverage and as collateral advantage in their blackmail and extortion of Mr. Carter. Doe admitted that before the filing of the complaint, she agreed with the Buzbee

Defendants to name Mr. Carter in the action – despite knowing that Doe had no legitimate claims against Mr. Carter – in hopes of a "payout." ECF 32-4. Doe and her attorneys knew that the vile accusations against Mr. Carter were baseless and false. They knew that such vile accusations were harmful to Mr. Carter's reputation and image as a celebrity and hoped that naming Mr. Carter in the SDNY Action alongside Mr. Combs, who faced a publicized criminal indictment for sexual allegations, would give them the leverage needed to extort Mr. Carter. As Doe later confessed, the purpose of filing the SDNY was to use it extort large sums of money from Mr. Carter – not to obtain any alleged relief from the judicial process. The "consummation of such threats do not constitute a legitimate and proper use of the court" and is sufficient to plead abuse of process. *See Cardy v. Maxwell*, 169 N.Y.S.2d 547, 550 (Sup. Ct. 1957) (denying motion to dismiss where plaintiff sufficiently alleged that defendants conspired to file the complaint and summons for the purpose of extorting payment, and threated to give wide publicity to the content of the complaint); *Levine v. Sherman*, 1976 N.Y. Misc. LEXIS 2560, at *7-8 (Sup. Ct. June 9, 1976) (denying motion to dismiss abuse of process claim where plaintiff sufficiently pled that defendant filed the underlying lawsuits for harassment purposes).

## V.    The Complaint States A Claim For Civil Conspiracy

To state a claim for civil conspiracy under New York law, the plaintiff must demonstrate the primary tort, as well as: (1) an agreement between two or more parties; (2) an overt act in furtherance of that agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 671 (S.D.N.Y. 2007). The Buzbee Defendants nevertheless argue –without any legal basis – that Mr. Carter's conspiracy claim should be dismissed for two reasons. First, she contends that the conspiracy claim must be dismissed if Mr. Carter's underlying claims are dismissed. Second,

she asserts that lawyers are immune from liability for conspiring with their law firm, other lawyers, and/or their clients.

### A. Mr. Carter Pleads Cognizable Tort Claims

As discussed in detail above, Mr. Carter asserts viable claims against the Buzbee Defendants for malicious prosecution and abuse of process. (*See* Sections III-IV, *supra*.) Mr. Carter further brings states claims for malicious prosecution and abuse of process against the Doe and the Curis Defendants, which directly and unequivocally connect the Buzbee Defendants' actions to an actionable, underlying tort and demonstrate that those actions were part of a unified, deliberate scheme. *Pasquali*, 498 F. Supp. 2d at 671 (denying motion to dismiss civil conspiracy claim); *World Wrestling Fed'n Entm't v. Bozell*, 142 F. Supp.2d 514, 532 (S.D.N.Y. 2001) (same). Mr. Carter has stated an underlying, predicate tort, and therefore his conspiracy claim must not be dismissed on this ground.

### B. Lawyers Are Not Absolutely Immune From Liability For Conspiring With Their Clients

The Buzbee Defendants' argument – that an attorney cannot conspire with his client – is as wrong as it is offensive. The Buzbee Defendants do not (and cannot) cite a single case to support this argument because no New York court has held that an attorney is absolutely immune from conspiring with their clients.[20] This Court should not be the first.

---

[20] None of the cases cited by the Buzbee Defendants hold that an attorney "cannot 'conspire' with his client." ECF 43 at 46, 50-51. They simply stand for the unremarkable proposition that, "[a]bsent a showing of fraud or collusion, or of a malicious or tortious act, an attorney is not liable to third parties for purported injuries caused by services performed on behalf of a client or advice offered to that client." *Burger v. Brookhaven Medical Arts Bldg.*,., 131 A.D.2d 622, 624 (2d Dep't 1987) (citing *Levine v Graphic Scanning Corp.*, 87 A.D.2d 755 (1st Dep't 1982); *Hahn v Wylie*, 54 A.D.2d 629 (1st Dep't 1976)); *see also Kline v. Schaum*, 173 Misc. 2d 108, 110 (2d Dept. 1997) (dismissing conspiracy claim against an attorney and their client because "the only factual allegations in the verified complaint of the attorney for plaintiff allege that defendant Schaum participated in the closing and that he intentionally and maliciously conspired to deprive her of her commission by tortiously interfering with her contractual rights."). Mr. Carter easily meets this standard.

Indeed, the Buzbee Defendants' own cases make clear that "the mere fact that one is an attorney acting in a professional capacity does not make him absolutely immune from responsibility for his wrongful acts." *Dallas v. Fassnacht*, 42 N.Y.S.2d 415, 417 (Sup. Ct. 1943) ("an attorney is personally liable to a third party who sustains an injury in consequence of his wrongful act or improper exercise of authority where the attorney has been guilty of fraud or collusion, or of a malicious or tortious act"); *Vernes v. Phillips*, 266 N.Y. 298, 301 (1935); *Schierloh v. Kelly*, 253 A.D. 373, 374 (2d Dep't 1938). Thus, to survive a motion to dismiss, Mr. Carter's claim "based upon an alleged conspiracy between [Doe] and her attorney[s] . . . [must] allege[] sufficient facts to show that [Doe] and her attorney[s] instituted a baseless action against him." *Dallas*, 42 N.Y.S.2d at 417 (dismissing conspiracy claim because, unlike here, "it contain[ed] no allegations of fact which [we]re sufficient to support th[at] claim"). That is the very essence of the Mr. Carter's complaint: that the Buzbee Defendants and Doe instituted a baseless action as part of their broader conspiracy to extort and defame Mr. Carter.

Accordingly, Mr. Carter sufficiently pleads a conspiracy claim.

## C. New York Recognizes "Intracorporate" Civil Conspiracies

The Buzbee Defendants argue they are incapable of conspiring with each other under the intracorporate conspiracy doctrine. ECF 43 at 47. That is incorrect.

"Under the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [his] employment, are legally incapable of conspiring together." *Little v. City of New York,* 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (internal marks omitted). But it is not "determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together independent centers of decision making. If it does, the entities are capable of conspiring." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195-96 (2010)

(examining the "now-defunct doctrine known as the "intraenterprise conspiracy doctrine" in the antitrust context). (citation omitted). The doctrine does not bar Mr. Carter's conspiracy claim.

> **First**, the intraconspiracy doctrine is invalid. *Id*. [21]

> **Second**, the doctrine does not even apply here because the conspiracy alleged in the Second Amended Complaint is not limited to a single enterprise or organization.

> **Third**, assuming the alleged conspiracy was limited to the Buzbee Defendants (and it is not), New York law provides "an exception to this doctrine [] where a plaintiff adequately alleges that each defendant possessed an independent, conspirational purpose, wholly separate and apart from the entity." ECF No. 43 at 49 (citations omitted). The Second Amended Complaint more than adequately alleges that the Buzbee Defendants, the Curis Defendants, and Doe each had their own independent motive for conspiring to defame and extort Mr. Carter. *See, e.g.,* SAC ¶¶ 17, 162.

> *Reich v. Lopez,* 38 F. Supp. 3d at 436 (S.D.N.Y.), is illustrative. The court explained that, "[w]hile an employee ensuring the profitability of his company is not exceptional, if Plaintiffs are capable of showing that [an employee]'s alleged conspiratorial activities provided him disproportionately great profit as compared to [his employer]'s derived benefit (or at the expense of [the employer]), such a showing may constitute a personal stake." *Id*. at 465. Similarly, the court stated that a "conspiracy relates to [a defendant]'s attempt to harm Plaintiffs in order to, in part, protect himself from the surfacing of the bribery activity" are sufficient to overcome the intracorporate conspiracy bar because "[s]elf-protection is separate and apart from the concerns of the company." *Id.* The court therefore held that the alleged conspiracy claim was not barred by

---

[21] While *Am. Needle* was a Sherman Act case, "it would be logically inconsistent to hold that agents of a corporation, acting in their official capacity, together constitute only a single actor for the sake of some conspiracies but not for others. There is no distinction among the types of conspiracies covered by the aforementioned federal statutes as compared to New York state common law that would explain disparate application of the intracorporate conspiracy doctrine." *Reich v. Lopez,* 38 F. Supp. 3d 436, 463 (S.D.N.Y. 2014); *Doherty v. Am. Motors Corp.,* 728 F.2d 334, 339 (6th Cir. 1984) ("the same rule has been consistently applied in allegations of conspiracy"). It follows that, if the doctrine is no longer a viable defense to antitrust claims, it is equally unavailable to Defendants here.

intracorporate conspiracy doctrine because the plaintiffs alleged that the co-conspirator "'profited wildly' from the ongoing illegal bribery scheme" because it "implies a 'personal stake in achieving the corporation's objective' that goes beyond 'merely carrying out the corporation's managerial policy.'").

Here, as in *Reich*, the Second Amended Complaint is replete with allegations showing that Buzbee, Fortney, and Curis each had their own personal motives for conspiring with each other, their law firms, and their client, Doe. *See e.g.,* SAC ¶ 162. For instance, as in *Reich*, the Second Amended Complaint alleges each defendant had their own individual financial motives for extorting Mr. Carter. *See, e.g., id.* at ¶17; *Reich*, 38 F. Supp. 3d at 465. Mr. Carter also alleges the Buzbee Defendants and Curis Defendants were motivated, in part, by a desire to "coverup" their extortion scheme. *See, e.g.*, *id.* at ¶¶1, 15-16. Accordingly, as in *Reich*, the intracorporate conspiracy doctrine does not bar Mr. Carter's conspiracy claim. *See Reich*, 38 F. Supp. 3d at 465.

## VI. The Recent Decision of The California Superior Court In Carter v. Buzbee Is Irrelevant

In 2024, Mr. Carter sued Buzbee and the Buzbee Firm for defamation, extortion, and intentional infliction of emotional distress in the California Superior Court, Los Angeles Division. On June 30, 2025, Judge Epstein of that court granted Buzbee and the Buzbee Firm's special motion to strike ("SMS") in *Carter v. The Buzbee Law Firm*, No. 24SMCV05637 (Superior Ct. L.A. County June 30, 2025) (Hahn Decl. Ex. 4). Because Judge Epstein's decision was issued after the Buzbee Defendants filed their motion to dismiss, it was not addressed in their motion. However, Mr. Carter anticipates they will incorrectly seek to cite the decision in support of their reply brief.

As discussed below, Judge Epstein's reasoning and decision do not support the Buzbee Defendants' positions in this case and, to the contrary, underscore the strength of Mr. Carter's

claims in this action. ***First, th***e California case involved Mr. Carter's claims against Buzbee and his firm for extortion, defamation, and intentional infliction of emotional distress. This case, however, involves claims of malicious prosecution, abuse of process, and civil conspiracy against Doe, the Buzbee Defendants and the Curis Defendants.

***Second,*** Judge Epstein's decision was made under an exacting standard of California state law review that is inapplicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). California's procedural law (which does not apply here under any circumstances) required Mr. Carter to establish, before discovery, a likelihood of prevailing, including by submitting evidence the court determines to be "reasonably possible" will be admissible at trial. *See Sweetwater Union High School Dist. v. Gilbane Building Co.*, 6 Cal. 5th 931, 947 (2019). By contrast, on a motion to dismiss, all well pled facts in Mr. Carter's complaint are presumed to be true and he need only plead a plausible right to relief, which, as discussed in this brief, he does. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

***Third***, in his decision, California State Court Judge Epstein held that although Doe's confession to investigators concerning the falsity of the SDNY Action and that Buzbee had concocted the idea to falsely accuse Mr. Carter would likely be admissible at trial, it was inadmissible at the SMS stage. Yet the allegations in Mr. Carter's complaint are deemed true for purposes of the Buzbee Defendants' motion to dismiss. *Twombly*, 550 U.S. at 555. Thus, unlike Judge Epstein at the SMS stage, this Court at the motion to dismiss stage must accept, as true, Mr. Carter's allegations that Doe admitted that Mr. Carter did not assault her and that indeed it was her attorney, Buzbee, who pushed her to propagate the false narrative of the sexual assault by Mr. Carter to leverage a maximum payday from him. *See Douglas v. Bayview Loan Servicing, LLC*, 2012 U.S. Dist. LEXIS 11943, at *8 (S.D. Ala. Jan. 13, 2012).

If anything, Judge Epstein's decision shows why the Buzbee Defendants' motion should be denied. For instance, Judge Epstein noted that he would not have dismissed Mr. Carter's claims in the California action if his hands were not tied by specific California state court precedent on the inadmissibility of Doe's confession at the SMS stage, which are plainly inapplicable here at the motion to dismiss stage.[22] *Carter v. Buzbee*, No. 24SMCV05637. at 63 ("*but for the court's evidentiary ruling*, the court would come out the other way on this motion" (emphasis in original)). Indeed, Judge Epstein specifically noted that if Doe's confession was admissible in his California state court under California law, Buzbee's conduct would expose him to liability under a malicious prosecution theory, which was not at issue in the case, and "would be enough to support an inference of actual malice." *Id*. Judge Epstein also held that Mr. Carter adequately showed special damages in the form of injury to his "property, business, trade, profession, or occupation." *Id*. at 63-64

Because Judge Epstein's decision in the California state court case is irrelevant to these proceedings due to the peculiarities of California state law by which Judge Epstein's analysis and decision making were cabined, it should not be considered by this Court. However, were it to be considered, it would have the opposite effect of what the Buzbee Defendants suggest, strongly supporting denial of the Buzbee Defendants' unsustainable motion.

## <u>Conclusion</u>

For these reasons, the Court should deny the Buzbee Defendants' motion to dismiss in its entirety.

---

[22] In fact, the tentative version of Judge Epstein's decision considered Doe's confession and sustained Mr. Carter's extortion claim against Buzbee. Hahn Decl. Ex. 5

Case 1:25-cv-00086-TFM-MU    Doc# 64    Filed 07/23/25    Page 80 of 81    PageID# 845

Dated: July 23, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ W. Patton Hahn
W. PATTON HAHN
WILLIAM G. SOMERVILLE
JADE E. SIPES

*Attorneys for Plaintiff Shawn Carter*

</div>

**OF COUNSEL:**
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
1901 Sixth Avenue North, Suite 2600
Birmingham, Alabama 35203-5202
Telephone: (205) 244-3821
wsomerville@bakerdonelson.com
phahn@bakerdonelson.com
jsipes@bakerdonelon.com

- 68 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2025, the foregoing has been served upon the following defendants via the Court's electronic filing system as follows:

Matthew Ryan Jackson
11 N. Water St., Suite 23200
Mobile, AL 36602
251-433-3234
matt.jackson@arlaw.com

J. Blair Newman, Jr.
11 N. Water St., Suite 13290
Mobile, AL 36602
251-433-3234
bnewman@mcdowellknight.com

Caroline T. Pryor
Thomas Oliver II
Alexander Townsley
Dennis Oscar Vann
Carr Allison
6251 Monroe Street, Suite 200
Daphne, AL 36526
cpryor@carrallison.com

/s/ *W. Patton Hahn*
OF COUNSEL