# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SHAWN COREY CARTER, | |
| Plaintiff, | Case No. 1:25-CV-00086-TFM-MU |
| v. | |
| ANTHONY BUZBEE, DAVID FORTNEY, ANTHONY G. BUZBEE LP (d/b/a THE BUZBEE LAW FIRM), ANTIGONE CURIS, CURIS LAW, PLLC and JANE DOE, | |
| Defendants. | |

---

## PLAINTIFF SHAWN COREY CARTER'S MEMORANDUM OF LAW IN OPPOSITION TO JANE DOE'S MOTION TO DISMISS

---

**William G. Somerville**
**W. Patton Hahn**
**Jade E. Sipes**
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**
**1901 Sixth Avenue North, Ste. 2600**
**Birmingham, Alabama 35226**
**wsomerville@bakerdonelson.com**
**phahn@bakerdonelson.com**
**jsipes@bakerdonelson.com**

*Attorneys For Plaintiff Shawn Carter*

# Table of Contents

|  |  | Page |
|---|---|---|

Introduction ................................................................................................................ 1

Background ................................................................................................................. 5

Argument .................................................................................................................... 5

I.    Mr. Carter States A Claim Against Doe For Defamation .............................. 5

    A.    Texas or New York Law Apply to Mr. Carter's Defamation Claim ..................... 5

    B.    The Litigation Privilege Is Inapplicable Regardless of What Law Applies .......... 8

    C.    The Fair Reporting Privilege is Inapplicable Regardless of What Law Applies ................................................................................................................ 9

        1.    Texas' Fair Reporting Privilege Is Inapplicable to Parties to a Lawsuit or Other Members of the Public, as Distinguished From Employees or Representatives of Newspapers or Other Periodicals .......... 9

        2.    New York's Fair Reporting Privilege Is Inapplicable Because the SDNY Action Was A Sham .................................................................... 10

        3.    California's Fair Reporting Privilege is Inapplicable to Doe's Defamatory Statements ................................................................................ 12

            a.    Doe Presented Her Alleged Rape to NBC News as "Fact," Not a Report ....................................................................................... 12

            b.    Doe's Statements Could Reasonably be Expected to Affect the Average Reader's Appraisal of the Merits of Her Story ........ 19

            c.    Doe's Arguments, At Most, Raise Questions Of Fact Unresolvable On A Motion To Dismiss ...................................... 20

II.    Mr. Carter States A Claim for Malicious Prosecution ................................. 24

    A.    Mr. Carter Alleges A Special Injury ................................................................... 24

        1.    Mr. Carter Pleads Concrete Lost Business Opportunities ........................ 25

        2.    Mr. Carter Pleads Concrete Emotional And Reputational Harm ............. 28

    B.    Mr. Carter Alleges That The SDNY Action Was Terminated In His Favor ........ 30

III.    Mr. Carter States A Claim For Abuse of Process ......................................... 35

IV.    The Complaint States A Claim For Civil Conspiracy ................................... 39

    A.    Mr. Carter Pleads Cognizable Tort Claims ........................................................ 40

    B.    Lawyers Are Not Absolutely Immune From Liability For Conspiring With Their Clients ..................................................................................................... 40

    C.    New York Law Does Not Bar An "Intracorporate" Civil Conspiracy ................ 41

V.    The Recent Decision of The California Superior Court In *Carter v. Buzbee* Is Irrelevant ........................................................................................................... 43

Conclusion ............................................................................................................... 45

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*Abuemeira v. Stephens*,
 246 Cal. App. 4th 1291 (2016) .................................................................................8

*Adobe Sys. Inc. v. Christenson*,
 891 F.Supp.2d 1194 (D. Nev. 2012) ................................................................13, 15

*Am. Needle, Inc. v. NFL*,
 560 U.S. 183 (2010) ...............................................................................................42

*American Dental Ass'n v. Kohrrami*,
 No. 02-cv-3853, 2004 U.S. Dist. LEXIS 35425 (C.D. Cal. 2004) ...................14, 16

*Aquilina v. O'Connor*,
 59 A.D.2d 454 (3d Dep't 1977) ..............................................................................31

*Argentieri v. Zuckerberg*,
 8 Cal. App. 5th 768 (Cal. Ct. App. 2017) ..............................................................22

*Bd. of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom
 Teachers Assoc., Inc.*,
 38 N.Y.2d 397 (N.Y. 1975) .....................................................................................36

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ...............................................................................................47

*Bilinski v. Keith Haring Found., Inc.*,
 96 F. Supp. 3d 35 (S.D.N.Y. 2015), *aff'd in part*, 632 Fed. App'x, 637 (2d
 Cir. 2015) ................................................................................................................21

*Black v. Ganieva*,
 No. 21-cv-8824, 2022 WL 2354916 (S.D.N.Y. June 30, 2022) .............................10

*Bond v. Lilly*,
 2024 Cal. App. Unpub. LEXIS 7451 (Cal. Ct. App. 2024) ....................................23

*Bridge C.A.T. Scan Associates v. Ohio Nuclear, Inc., et al.*,
 608 F. Supp. 1187 (S.D.N.Y. 1985) ........................................................................10

*Brown v. Brown*,
 343 F. Supp. 2d 195 (E.D.N.Y. 2004) .....................................................................29

*Campion Funeral Home v. State*,
   569 N.Y.S.2d 518 (3d Dept. 1991) ........................................................29

*Canaday v. Peoples-Perry*,
   2017 WL 6405618 (N.D. Cal. Dec. 15, 2017) ...........................................9

*Cantalino v. Danner*,
   96 N.Y.2d 391 (2001) ..........................................................................31

*Cardy v. Maxwell*,
   169 N.Y.S.2d 547 (Sup. Ct. 1957).....................................................36, 39

*Carter v. The Buzbee Law Firm*,
   No. 24SMCV05637 (Superior Ct. L.A. County June 30, 2025)...............46, 47, 48

*Casso v. Brand*,
   776 S.W.2d 551 (Tex. 1989).....................................................................9

*Chako v. Preston*,
   No. 1:23-cv-551, 2024 WL 943455 (E.D. Va. Mar. 5, 2024), *aff'd*, No.
   2401243, 2024 WL 4814885 (4th Cir. 2024) ............................................6

*Chisolm-Mitchell v. Ahmed*,
   No. 20-cv-3434, 2021 U.S. Dist. LEXIS 26083 (E.D.N.Y. Feb. 11, 2021) .......29, 30

*Commodity Trucking Acquisition, LLC v. Aylott*,
   2018 WL 6583843 (Cal. Ct. App. Dec. 14, 2018) .....................................14

*Conte v. Newsday, Inc.*,
   703 F. Supp. 2d 126 (E.D.N.Y. 2010) .....................................................11

*Cook v. Sheldon*,
   41 F.3d 73 (2d Cir. 1994).......................................................................36

*Core-Mark Midcontinent, Inc. v. Tri-State Candy Wholesale, Inc.*,
   2018 U.S. Dist. LEXIS 151207 (E.D.N.Y. Aug. 31, 2018).............................26

*Crane v. Arizona Repub.*,
   972 F. 2d. 1511 (9th Cir. 1992) .....................................................14, 19, 20

*Curiano v. Suozzi*,
   63 N.Y.2d 113 (1984) ............................................................................37

*Dabaneh v. Lopez*,
   2021 Cal. App. Unpub. LEXIS 6258 (Cal. Ct. App. 2021) ...........................15

*Dallas v. Fassnacht*,
   42 N.Y.S.2d 415 (Sup. Ct. N.Y. Cty 1943) ........................................41, 42

*Dellutri v. Elmsford*,
  895 F. Supp. 2d 555 (S.D.N.Y. 2012) ..................................................................37

*Depp v. Heard*,
  102 Va. Cir. 324 (Cir. Ct. 2019) ..........................................................................7

*Doherty v. Am. Motors Corp.*,
  728 F.2d 334 (6th Cir. 1984) ..............................................................................43

*Donald J. Trump for President, Inc. v. CNN Broad., Inc.*,
  500 F. Supp. 3d 1349 (N.D. Ga. 2020) .................................................................6

*Dorsey v. National Enquirer, Inc.*,
  973 F.2d 1431 (9th Cir. 1992) ............................................................................15

*Douglas v. Bayview Loan Servicing, LLC*,
  2012 U.S. Dist. LEXIS 11943 (S.D. Ala. Jan. 13, 2012)......................................47

*Dudick v. Gulyas*,
  277 A.D.2d 686 (3d Dep't 2000) ............................................................24, 25, 29

*In re Eerie World Entm't, L.L.C.*,
  2006 Bankr. LEXIS 770 (Bankr. S.D.N.Y. Apr. 28, 2006).............................26, 29

*El Greco Leather Prod. Co. v. Shoe World, Inc.*,
  623 F. Supp. 1038 (E.D.N.Y. 1985), *aff'd*, 806 F.2d 392 (2d Cir. 1986)..............10

*Engel v. CBS, Inc.*,
  182 F.3d 124 (2d Cir. 1999).............................................................................29, 30

*Fitts v. Minnesota Min. & Mfg. Co.*,
  581 So. 2d 819 (Ala. 1991)..................................................................................5

*GeigTech East Bay LLC v. Lutron Elecs. Co.*,
  No. 18-cv-5290, 2019 U.S. Dist. LEXIS 59319 (SDNY Apr. 4, 2019) ..................12

*Gilman v. Marsh & McLennan Cos.*,
  868 F. Supp. 2d 118 (S.D.N.Y. 2012)..................................................................37

*Goldberg v. TeachBK, Inc.*,
  No. 24-cv-04525, 2025 U.S. Dist. LEXIS 13351 (N.D. Cal. Jan. 24, 2025)....................12, 17

*Gottwald v. Sebert*,
  40 N.Y.3d 240 (N.Y. 2023) .................................................................................10

*Greco v. Christoffersen*,
  70 A.D.3d 769 (2nd Dep't 2010).........................................................................37

*Green Grp. Holdings, LLC v. Schaeffer,*
   No. CV-16-00145-CG-N, 2016 WL 6023841 (S.D. Ala. Oct. 13, 2016) ................................ 7

*Harrison v. Gilligan,*
   2022 Cal. App. Unpub. LEXIS 4563 (Cal. Ct. App. 2022) ....................................................... 23

*Hawran v. Hixson,*
   147 Cal. Rptr. 3d 88 (2012) ....................................................................................................... 15

*Hayward v. Watsonville Register-Pajaronian and Sun,*
   265 Cal. App. 2d. 255 (Cal. Ct. App. 1968) ............................................................... 14, 15, 19

*Healthsmart Pac., Inc. v. Kabateck,*
   7 Cal. App. 5th 416 (Cal. Ct. App. 2016) .................................................................. 13, 15, 18

*Heilbut v. Cassava Scies., Inc.,*
   2025 U.S. Dist. LEXIS 56283 (S.D.N.Y. Mar. 26, 2025) ................................... 25, 27, 29, 30

*Heitkoetter v. Domm,*
   2024 WL 325134 (E.D. Cal. Jan. 29, 2024) .............................................................................. 14

*Heitkoetter v. Domm,*
   No. 22-cv-368, 2024 U.S. Dist. LEXIS 15621 (E.D. Cal. Jan. 29, 2024) .............................. 17

*Hetrick Companies LLC v. IINK Corp.,*
   710 F.Supp.3d 467 (E.D. Va. 2024) ........................................................................................... 6

*Holy Spirit Assoc. for Unification of World Christianity v. New York Times Co.,*
   49 N.Y.2d 63 (N.Y. 1979) ......................................................................................................... 10

*Honzawa v. Honzawa,*
   268 A.D.2d 327 (1st Dep't 2000) ....................................................................................... 24, 35

*Jaliman v. Selendy,*
   2005 N.Y. Misc. LEXIS 3291 (N.Y. Sup. Ct. 2005) ................................................................. 8

*Kanciper v. Lato,*
   989 F. Supp. 2d 216 (E.D.N.Y. 2013) ....................................................................................... 28

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.,*
   1997 U.S. Dist. LEXIS 12976 (S.D.N.Y. Aug. 27, 1997) ....................................................... 29

*Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC,*
   No. 11-cv-3327, 2013 U.S. Dist. LEXIS 14937 (S.D.N.Y. Feb. 1, 2013) .............................. 28

*Landry's, Inc. v. Animal Legal Def. Fund,*
   631 S.W.3d 40 (Tex. 2021) ..................................................................................................... 8, 9

*Lawrence-Leiter & Co. v. Paulson*,
    963 F. Supp. 1061 (D. Kan. 1997) ........................................................................6

*Levine v. Sherman*,
    384 N.Y.S.2d 685 (Sup. Ct. 1976) ................................................................36, 39

*Levy's Store, Inc. v. Endicott-Johnson Corp.*,
    272 N.Y. 155 (1936) ...........................................................................................31

*Liberty Synergistics, Inc. v. Microflo Ltd.*,
    50 F. Supp. 3d 267 (E.D.N.Y. 2014) .............................................................28, 32

*Little v. City of New York*,
    487 F. Supp. 2d 426 (S.D.N.Y. 2007) ................................................................42

*Long v. Marubeni Am. Corp.*,
    406 F. Supp. 2d 285 (S.D.N.Y. 2005) ................................................................21

*Louvad Realty Corp. v. Anfang*,
    267 A.D. 567 (1st Dep't 1944) ...........................................................................34

*Lyon v. Fairweather*,
    63 Cal. App. 194 (1923) .....................................................................................18

*Manhattan Enter. Grp. LLC v. Higgins*,
    816 Fed. App'x, 512 (2d Cir. 2020) ...................................................................37

*McBride v. Sacks*,
    No. 3:24-cv-00212-FDW-SCR, 2024 WL 3448467 (W.D.N.C. July 17, 2024) ......6

*McCaul v. Ardsley Union Free School District*,
    514 Fed. App'x, 1 (2d Cir. 2013) .......................................................................29

*Mobile Training & Educ., Inc. v. Aviation Ground Sch. of Am.*,
    2010 N.Y. Misc. LEXIS 3990 (Sup. Ct. June 23, 2010) .....................................32

*Mohinani v. Charney*,
    208 A.D.3d 404 (1st Dep't 2022) .......................................................................26

*Molinoff v. Sassower*,
    471 N.Y.S.2d 312 (2d Dep't 1984) .....................................................................29

*Neely v. Wilson*,
    418 S.W.3d 52 (Tex. 2013) ..................................................................................9

*Nunes v. NBCUniversal Media, LLC*,
    643 F. Supp. 3d 403 (S.D.N.Y. 2022) ................................................................21

*O'Brien v. Alexander*,
    101 F.3d 1479 (2d Cir. 1996)........................................................................29

*Paglia & Assocs. Construction, Inc. v. Hamilton*,
    98 Cal. App. 5th 318 (Cal. Ct. App. 2023) ...................................................8

*Pagliarulo v. Pagliarulo*,
    30 A.D.2d 840 (2d Dep't 1968) .........................................................31, 36, 37

*Pasqualini v. MortgageIT, Inc.*,
    498 F. Supp. 2d 659 (S.D.N.Y. 2007)..........................................................40

*Pierce v. San Jose Mercury News*,
    214 Cal. App. 3d 1626 (1989) ......................................................................21

*Reich v. Lopez*,
    38 F. Supp. 3d 436 (S.D.N.Y. 2014)........................................................43, 44

*Rubin v. Lutfy*,
    2009 N.Y. Misc. LEXIS 3398 (N.Y. Sup. Ct. Nov. 23, 2009) ............29, 31

*Schierloh v. Kelly*,
    253 A.D. 373 (2d Dep't 1938)......................................................................42

*Silvestri-Edwards v. Cappello*,
    2025 N.Y. Misc. LEXIS 3365 (Sup. Ct. Mar. 20, 2025) .............................27

*Sisler v. Gannett Co.*,
    516 A.2d 1083 (N.J. 1986)............................................................................27

*Smith-Hunter v. Harvey*,
    95 N.Y.2d 191 (2000) ...................................................................................31

*Sparrow Fund Mgmt. LP v. Mimedx Grp., Inc.*,
    2020 U.S. Dist. LEXIS 49813 (S.D.N.Y. Mar. 22, 2020) .....................24, 26

*Strumpf v. Asdourian*,
    2006 N.Y. Misc. LEXIS 3976 (Sup. Ct. Dec. 12, 2006) .............................26

*Sweetwater Union High School Dist. v. Gilbane Building Co.*,
    6 Cal. 5th 931 (2019) ...................................................................................47

*Sykes v. Majestic Mississippi, LLC*,
    2024 WL 655794 (Ala. Feb. 16, 2024).........................................................5

*Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*,
    76 A.D.3d 556 (2nd Dep't 2010)..................................................................37

*Thomas v. G2 FMV, LLC*,
2016 N.Y. Misc. LEXIS 272 (Sup. Ct. Jan. 27, 2016), *aff'd* 147 A.D.3d 700
(1st Dep't 2017) ..................................................................................................25, 29

*Thryoff v. Nationwide Mut. Ins. Co.*,
No. 05-cv-6607T, 2006 U.S. Dist. LEXIS 71706 (W.D.N.Y. Sep. 29, 2006)........................25

*Tommy Hilfiger Licensing Inc. v. Bradlees*, *Inc.*,
2002 U.S. Dist. LEXIS 7191 (S.D.N.Y. Apr. 25, 2002)..........................................................31

*Vernes v. Phillips*,
266 N.Y. 298 (N.Y. 1935) ........................................................................................................41

*Verona v. U.S. Bancorp*,
No. 7:09-cv-057-BR, 2011 WL 1252935 (E.D.N.C. Mar. 29, 2011) .......................................6

*Wells v. Liddy*,
186 F.3d 505 (4th Cir. 1999) ....................................................................................................6

*Wentworth v. Bennett*,
2018 Cal. App. Unpub. LEXIS 4973 (Cal. Ct. App. July 23, 2018) .......................................15

*Westmoreland v. CBS Inc.*,
596 F. Supp. 1170 (S.D.N.Y. 1984)..........................................................................................21

*Wilbanks v. Wolk*,
121 Cal. App. 4th 883 (2004) ...........................................................................................13, 14

*Williams v. Williams*,
23 N.Y.2d 592 (N.Y. 1969) ...............................................................................................10, 12

*Wisk Aero LLC v. Archer Aviation Inc.*,
No. 21-cv-02450, 2023 U.S. Dist. LEXIS 100960 (N.D. Cal. June 9, 2023).........................12

*World Wrestling Fed'n Entm't v. Bozell*,
142 F. Supp.2d 514 (S.D.N.Y. 2001)........................................................................................40

*Youngevity Int'l Corp. v. Andreoli*,
749 Fed. App'x, . 634 (9th Cir. 2019) .....................................................................................13

*Zilkha-Shohamy v. Corazza*,
No. 03-20-00380-CV, 2021 Tex. App. LEXIS 5698 (Tex. App. July 16, 2021) ......................9

**Statutes**

Cal. Civ. Code § 47(b)(2) .........................................................................................................8

Cal. Civ. Code § 47(d)(1) ........................................................................................................12

N.Y. Civil Rights Law § 74 ..................................................................................10, 11

Tex. Civ. Prac. & Rem. Code § 73.002 ...........................................................................9

Fed. R. Civ. P. 12(b)(6)............................................................................................46

## Introduction

Jane Doe, acting in concert with her attorneys – Anthony Buzbee, David Fortney, Anthony G. Buzbee LP (collectively, "**Buzbee Defendants**"), Antigone Curis and Curis Law, PLLC (collectively, "**Curis Defendants**") – lied, filing a knowingly false lawsuit against Shawn Carter in the Southern District of New York ("**SDNY Action**"), falsely and maliciously alleging that he raped her when she was 13 years old. Doe's complaint in the SDNY Action was riddled with demonstrably false and cruel allegations against a father, son, husband and decent man whom she had never met.  She conspired with the Buzbee Defendants and the Curis Defendants to put forth these malicious lies to the world for the purpose of extorting a "payout" from Mr. Carter, to line her and her co-conspirators' pockets.

In addition to knowing that Mr. Carter had never met her – let alone sexually assaulted her when she was 13 years old – Jane Doe's malicious lies were absurd and readily demonstrated to be false, as public records and media coverage placed Mr. Carter elsewhere at the relevant time; the alleged location of the assault did not even exist; and key witnesses were either not where Doe claimed they were, are deceased, or (in the case of her own father) had no recollection of the events. Even a cursory review of publicly available information exposed the SDNY Action as a sham.

Nonetheless, Doe, soullessly motivated by greed, filed the SDNY Action, falsely accusing Mr. Carter for the sole purpose of extorting a substantial financial settlement from him.

But that was just the beginning. Months later, Doe traveled from Alabama to Houston, Texas, to speak to NBC News "for the first time," because she had "been quiet long enough." During her interview, Doe provided NBC News with a first-person narrative of her motivations for coming forward "for the first time," her blow-by-blow account of what (she affirmatively stated) Mr. Carter did to her, and her repeated insistence of the veracity of her statements, even

when presented with contradictory evidence. During this interview (the "**NBC News Interview**"), Doe introduced new accusations against Mr. Carter that she did not raise in the SDNY Action, including that, during the fabricated incident, she was "fighting trying to get away from [Mr. Carter] and he put his hand over my mouth" and that Mr. Carter "told me to stop it -- you know, stop it, cut the BEEP." Doe also used the NBC News Interview to introduce new facts about her own background, stating for the first time that she has autism and suffered "a head injury," and to manufacture a corroborating "witness" for her story – Benji Madden of the band Good Charlotte – while conveniently removing from her story the "witness" she alleges drove her from Rochester, New York to Manhattan by claiming that "the witness" had since died.

NBC News was unimpressed. It quickly uncovered numerous inconsistencies and factual impossibilities in Doe's story, including discrepancies about the location and nature of the alleged assault, the presence of supposed witnesses, and Doe's own recollections. And despite these contradictions, Doe reaffirmed her statements to NBC News, stating that although she "made some mistakes . . . what is the clearest is what happened to me."

Privately, however, Doe tells a very different story. After the NBC News Interview, Doe voluntarily confessed directly to investigators, in her own words as captured on a recording, that the story she and her co-conspirator attorneys brought before the world was a false, malicious lie. Doe admitted that Mr. Carter did not assault her and that indeed it was her attorney, Buzbee, who pushed her to propagate the false narrative of the sexual assault by Mr. Carter to leverage a maximum payday. When asked directly if Mr. Carter assaulted her, Doe responded "No." And she admitted to her part in the conspiracy orchestrated by Buzbee, when she told the investigators that "Buzbee brought Jay-Z into it."

Doe does not dispute the core of Mr. Carter's Complaint: that she and her attorneys, the Buzbee Defendants and Curis Defendants, orchestrated a calculated scheme to extort Mr. Carter with knowingly false allegations of heinous crimes, which they maliciously disseminated to the public to inflict maximum harm on Mr. Carter. Instead, Doe desperately argues that Mr. Carter has no legal remedy because her defamatory statements were supposedly privileged statements about her extortionate sham SDNY Action; Mr. Carter did not suffer a "special injury;" and Mr. Carter allegedly consented to Doe's dismissal of the SDNY Action with prejudice.

All of Doe's arguments fail.

***First***, none of Doe's defamatory statements are privileged.  The litigation privilege, which is limited to statements made in a judicial proceeding, does not shield Doe's defamatory statements in the NBC News Interview. The fair reporting privilege is inapplicable because, under Texas law, it only applies to statements by the media and, under New York law, it does not shield sham litigation. And regardless of the law that applies, Doe's statements to NBC News were not a "fair and true report" of the SDNY Action, but rather Doe's own "factual" narrative – which furthermore expanded meaningfully beyond the four corners of her complaint in the SDNY Action. No reasonable viewer would have interpreted her statements as a report on the SDNY Action because Doe: (i) never mentions the SDNY Action at all; (ii) attempts to defend the veracity of her fabricated allegations in the face of contradictory evidence – at war with any definition of "fair reporting;" and (iii) makes new, more serious allegations not made in the SDNY Action. Doe's attempt in her motion to parse the NBC News Interview highlights the factual nature of Doe's statements during the interview and, in any event, raises more fact questions about the inferences a reasonable viewer would make that are unresolvable at the motion to dismiss stage.

**Second**, Mr. Carter pleads "special injury" as required under New York law to state a claim for malicious prosecution. Mr. Carter pleads concrete and substantial injuries, including the denial of a $55 million personal credit line, loss of lucrative business contracts, denial of a $115 million business loan, and severe reputational and emotional harm going far beyond the ordinary litigation burdens. He also pleads significant reputational and emotional harm beyond the ordinary burdens of defending a lawsuit, including a dramatic increase in negative social media sentiment and widespread public contempt resulting in threats of violence, accusations of criminal conduct, calls for Mr. Carter to be imprisoned and charges of being a "satanist," "trafficker," "terrorist," and "monster." Doe's false and malicious allegations have already caused incalculable and irreparable damages to Mr. Carter's reputation and businesses, which is the very reason why Doe and her attorneys targeted Mr. Carter in the first place.

**Third**, the SDNY Action was terminated in Mr. Carter's favor for purposes of Mr. Carter's malicious prosecution claim because Doe voluntarily dismissed it with prejudice and without any settlement or compromise. Contemporaneous written communications and the sequence of events preceding and following Doe's dismissal of the SDNY Action show that the dismissal was not the result of a negotiated agreement. Indeed, Doe's own recitation of her reason for dismissing the action was that she was told by her co-conspirator (Defendant Fortney) that if she did not immediately dismiss the SDNY Action, "Jay-Z was going to kill [her]" – quite the opposite of a settlement, by any definition. Of course, all allegations about Doe's life being threatened by Mr. Carter are, and always were, false and were designed to strong-arm Doe into dismissing her suit so as to avoid Buzbee being sanctioned for practicing in the SDNY without being admitted. At minimum, these dynamics present triable issues of fact that simply cannot be decided at the pleadings stage.

**Fourth**, Mr. Carter pleads an abuse of process claim by alleging that Doe used legal process not to seek legitimate relief, but as a tool for extortion and to gain collateral advantage.

**Fifth**, Mr. Carter pleads a civil conspiracy claim because he alleges that Doe and her attorneys agreed to commit the underlying torts (defamation, malicious prosecution and abuse of process). New York law provides no blanket rule that a client may not conspire with her attorneys.

For these reasons, and the reasons discussed below, the Court should deny Doe's motion to dismiss.

<u>**Background**</u>

Mr. Carter respectfully refers the Court to his Second Amended Complaint, ECF No. 32, and the *Plaintiff Shawn Corey Carter's Memorandum of Law in Opposition to the Buzbee Defendants' Motion to Dismiss*, ECF No. 64, for a full recitation of the relevant facts.

<u>**Argument**</u>

## I.    Mr. Carter States A Claim Against Doe For Defamation

Doe does not argue that her heinous allegations about Mr. Carter are true. Nor does she state that she *believed* them to be true. Doe instead asks that the Court not hold her liable because her otherwise defamatory statements are shielded by two privileges: the litigation privilege and the fair reporting privilege. ECF No. 44 at 15-26.

As discussed below, Texas or New York law applies to Mr. Carter's defamation claim against Doe. Regardless of the law applied, Doe's invocation of these privileges ignores well-established limitations on their scope, and they do not insulate her from liability.

### A.  Texas or New York Law Apply to Mr. Carter's Defamation Claim

Doe incorrectly argues that California law applies to her defamation claim. Alabama applies the principles of *lex loci delicti* in determining what choice of law to apply to substantive claims.  Under that doctrine, "an Alabama court will determine the substantive rights of an injured

party according to the law of the state where the injury occurred." *Fitts v. Minnesota Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991); *see also Sykes v. Majestic Mississippi, LLC*, 402 So.3d 203, 207 (Ala. 2024) (applying the law of the state where the injury occurred under the *lex loci* doctrine). For defamation claims published in multiple jurisdictions, the specific application of *lex loci* is still an open question because no Alabama courts have discussed this issue.

Some federal and state courts applying *lex loci* choice of law principles in this manner have applied the law of the place of publication of the defamatory statements, while others have applied the law of the location where the plaintiff is domiciled. *See Verona v. U.S. Bancorp*, No. 7:09-cv-057-BR, 2011 WL 1252935, at *10 n.6 (E.D.N.C. Mar. 29, 2011) ("Although the court could not locate a North Carolina case directly on point, the general rule of defamation claims is the place of harm is the place of publication."); *McBride v. Sacks*, No. 3:24-cv-00212-FDW-SCR, 2024 WL 3448467, at *6 (W.D.N.C. July 17, 2024) ("In the context of a defamation claim, 'the place of the harm has traditionally been considered to be the place where the defamatory statement was published, i.e., seen or heard by non-parties.'") (citing *Wells v. Liddy*, 186 F.3d 505, 521–22 (4th Cir. 1999); *Chako v. Preston*, No. 1:23-cv-551, 2024 WL 943455, at *5 n.7 (E.D. Va. Mar. 5, 2024), *aff'd*, No. 2401243, 2024 WL 4814885 (4th Cir. 2024) (applying the law of Virginia because the defamation allegedly occurred in Virginia); *Hetrick Companies LLC v. IINK Corp.*, 710 F.Supp. 3d 467, 500 (E.D. Va. 2024) (applying the law of the state "where the defamatory statement [wa]s communicated" as the place of the wrong); *compare, e.g., Lawrence-Leiter & Co. v. Paulson*, 963 F. Supp. 1061, 1065 (D. Kan. 1997) (applying the law of plaintiff's domicile under Kansas choice of law); *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 500 F. Supp. 3d 1349, 1353 (N.D. Ga. 2020) (same under Georgia choice of law).

This Court has suggested in dicta that Alabama courts, like those in Virginia and North Carolina, would likely consider the place of harm under *lex loci* to be the place of publication. *See Green Grp. Holdings, LLC v. Schaeffer*, No. CV-16-00145-CG-N, 2016 WL 6023841, at *2–3 (S.D. Ala. Oct. 13, 2016). In that case, the plaintiff alleged that defendants conspired to publish defamatory statements about plaintiff's landfill in Alabama. *Id.* The Southern District of Alabama noted that, even though the plaintiff was a Georgia corporation, Alabama law was proper under *lex loci* choice-of-law principles because the defamatory statements were published in Alabama and concerned the plaintiff's Alabama business operations. *Id.* at *6 n.3.

A Virginia state court decision illustrates the proper application of *lex loci* principles to defamation claims in this District. In a multi-jurisdictional case involving defamatory statements uploaded to the internet, the court decided that "[t]he last event necessary for an individual to become liable for defamation in online, multi-jurisdictional cases occurs when the defamatory statement is uploaded to the interne[t]." *See Depp v. Heard*, 102 Va. Cir. 324, 330 (Cir. Ct. 2019). That case involved the defendant Amber Heard's allegedly defamatory Op-Ed about Johnny Depp to be published by the Washington Post through its servers in Virginia. Even though neither party was a resident of Virginia, the court applied Virginia law and concluded that "the place of the wrong in this case is the place where *the act of publication* of Ms. Heard's Op-Ed to the internet occurred. . . . The last event to make Ms. Heard liable for the alleged defamatory statements in her Op-Ed was uploading it to the inte[rn]et [] [u]sing the servers located in Springfield, Virginia." *Id.* at *6 (emphasis added).

Here, as in *Depp v. Heard*, while the defamatory statements' publication spanned multiple jurisdictions, it is undisputed that the statements themselves were made in Texas, where Doe sat for her NBC News Interview. Moreover, NBC News either uploaded the interview from Texas,

where the interview occurred, or New York, where NBC News is located.[1] *See* SAC at ¶ 82 (alleging the interview occurred while Doe was in Texas), 84–85 (alleging NBC News published the interview that was broadcast to a global television audience). Thus, while the harm to Mr. Carter occurred worldwide, for choice of law purposes, the place of Mr. Carter's harm is the place of publication: Texas or New York. In either case, Doe's statements are not privileged.

### B.  The Litigation Privilege Is Inapplicable Regardless of What Law Applies

Doe first argues that her defamatory statements to NBC News are protected by the litigation privilege. The ligation privilege, however, only applies to statements made in a *judicial* proceeding. *See Landry's, Inc. v. Animal Legal Def. Fund,* 631 S.W.3d 40, 49 (Tex. 2021); *Jaliman v. Selendy*, 2005 N.Y. Misc. LEXIS 3291, at *38 (N.Y. Sup. Ct. 2005); Cal. Civ. Code § 47(b)(2). None of Texas', New York's or California's[2] litigation privilege doctrines, however, apply to statements made *to the press*. *Landry's,* 631 S.W.3d at 49 ("Extending the privilege to publicity statements about litigation would detach the privilege from its underlying justifications and allow parties who publicize defamatory allegations to 'escape liability for [defamation] damages' just because they 'ha[ve] made similar charges in [their] court pleadings'"); *Jaliman*, 2005 N.Y. Misc. LEXIS 3291, at *38 (litigation privilege did not apply "to press statements and e-mails by the plaintiff prior to or outside of the judicial proceeding itself"); *Abuemeira v. Stephens*, 246 Cal. App. 4th 1291, 1299 (2016) (holding that "communications to the general public through the Internet and the media are not protected by the litigation privilege"); *Paglia & Assocs. Construction, Inc. v. Hamilton*, 98 Cal. App. 5th 318, 325 (Cal. Ct. App. 2023) (holding that the

---

[1]  The Court may take judicial notice that NBC News is located in New York, New York. https://www.nbcnews.com/information/nbc-news-info/contact-us-n1232521 (accessed July 20, 2025). Mr. Carter's reserves the right to argue that a different law may apply should new facts come to light during the course of discovery.
[2] Alabama choice of law rules compel the application of either Texas or New York law. Because Doe – incorrectly – argues exclusively for application of California law, Mr. Carter addresses those arguments, which fail under the laws of each state.

defendant's online posts related to an ongoing proceeding were merely unprotected "public denunciations of [the plaintiff]."); *Canaday v. Peoples-Perry,* No. 17-CV-05602-JSC, 2017 WL 6405618, at *6 (N.D. Cal. Dec. 15, 2017).

Because Mr. Carter's defamation claim arises from Doe's NBC News Interview and on social media – not in any judicial proceeding – the litigation privilege is inapplicable to her public attacks on Mr. Carter. *See id*.

### C.  The Fair Reporting Privilege is Inapplicable Regardless of What Law Applies

Doe further unavailingly seeks refuge in the fair reporting privilege. She argues that the Court cannot hold her to account because she purportedly "provided a fair report to NBC News of the allegations of her Amended Complaint" in the SDNY Action, which the "average viewer . . . would undoubtedly understand . . . to be associated with the then-ongoing civil lawsuit." ECF No. 44 at 15. Doe is wrong here too.

> **1.  Texas' Fair Reporting Privilege Is Inapplicable to Parties to a Lawsuit or Other Members of the Public, as Distinguished From Employees or Representatives of Newspapers or Other Periodicals**

Texas' fair reporting privilege provides that "[t]he publication ***by a newspaper or other periodical*** of a matter covered by this section is privileged and is not a ground for a libel action." Tex. Civ. Prac. & Rem. Code § 73.002 (emphasis added). The Texas Supreme Court recognizes that the fair reporting privilege does not apply to statements made by the public *to* the media. *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 51 n. 11 (Tex. 2021) (holding that attorney's statements to the media are not protected by the fair reporting privilege); *see also Casso v. Brand*, 776 S.W.2d 551, 553-54 (Tex. 1989) ("The statute simply has no applicability to a private defendant"); *Zilkha-Shohamy v. Corazza*, No. 03-20-00380-CV, 2021 Tex. App. LEXIS 5698, at *15 (Tex. App. July 16, 2021) (holding that the fair reporting privilege "is inapplicable to nonmedia defendants"); *see also Neely v. Wilson*, 418 S.W.3d 52, 56 (Tex. 2013)). Therefore, Doe

cannot invoke the fair reporting privilege to shield her statements in the globally broadcast NBC News Interview.

### 2. New York's Fair Reporting Privilege Is Inapplicable Because the SDNY Action Was A Sham

If New York law applies, Doe also cannot invoke the fair reporting privilege. New York's fair reporting privilege, N.Y. Civil Rights Law § 74, only applies to the "publication of a fair and true report of any judicial proceeding where the substance of the statement is substantially accurate." *See generally Gottwald v. Sebert*, 40 N.Y.3d 240, 255 (N.Y. 2023) (citing *Holy Spirit Assoc. for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67 (N.Y. 1979)). The purpose of the privilege "is the protection of reports of judicial proceedings which are made in the public interest." *Williams v. Williams*, 23 N.Y.2d 592, 599 (N.Y. 1969). However, it would be "contrary to reason to say that the Legislature considered it necessary to protect such defamation in order to implement the salutary aims of the statute." *Id.*

Thus, under New York law, a person may not "maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability." *Williams*, 23 N.Y.2d at 599; *see also Gottwald*, 40 N.Y.3d at 255; *Bridge C.A.T. Scan Associates v. Ohio Nuclear, Inc., et al.*, 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985) ("Under New York law, such a claim is barred neither by the absolute privilege afforded statements made in pleadings, nor by the statutory privilege afforded fair and true reports of such statements," because "for [a party], purposely and maliciously, to stimulate press coverage and wide publicity of a complaint with its allegedly false and malicious statements is beyond the pale of protection."). Likewise, a person may not invoke the fair reporting privilege where the person engaged in "bad-faith conduct undertaken to manipulate the litigation process." *Black v. Ganieva*, No. 21-cv-8824, 2022 WL 2354916, at *23 n.18 (S.D.N.Y. June 30, 2022); *El Greco*

*Leather Prod. Co. v. Shoe World, Inc.,* 623 F. Supp. 1038, 1042 (E.D.N.Y. 1985) (accusation that lawsuit was strategically filed to "coincide" with a trade show "in order to ensure rapid and widespread dissemination of El Greco's defamatory statements to the footwear trade. . . if proven, could lead a jury to conclude that this entire lawsuit was a 'perversion of judicial proceedings,' not within the contemplation of the New York Legislature in enacting Section 74") (cleaned up), *aff'd*, 806 F.2d 392 (2d Cir. 1986); *Gottwald v. Sebert,* 148 N.Y.S.3d at 46 ("Issues of fact exist as to the applicability of the litigation privilege to statements made in Kesha's California action, since a jury could find that Kesha commenced that action . . . to pressure Gottwald into renegotiating her contracts[.]") (citation omitted)); *see also Conte v. Newsday, Inc.,* 703 F. Supp. 2d 126, 146 (E.D.N.Y. 2010) (given allegations that defendants drafted the complaint "with the express purpose of using [it] as a device to protect their subsequent defamatory statements, the Court cannot conclude at this stage of the proceedings that Section 74 protects the out-of-court publication by defendants.").

Here, Mr. Carter alleges, and Doe admits, that she knowingly filed the SDNY Action falsely accusing Mr. Carter of raping a 13-year-old minor. SAC ¶¶ 5, 7, 118. Mr. Carter also alleges, and Doe also admits, that her allegations in the SDNY Action were a malicious lie that could have potentially subjected him to criminal investigation and prosecution: Doe admitted that Mr. Carter did not assault her and that her attorney, Buzbee, pushed her to propagate the false narrative of the sexual assault by Mr. Carter to leverage a maximum payday from him. *Id.*

Thus, because Doe and her co-defendants filed the SDNY Action with its fabricated claims against Mr. Carter with the sole intent of using it as leverage and as collateral advantage in their blackmail and extortion of Mr. Carter, Doe is barred from invoking New York's fair reporting privilege. As the court stated in *Geigtech*, "[b]ased on these facts, and drawing all inferences in

[Mr. Carter]'s favor, one can conclude that [Doe] filed [her] lawsuit, not to prosecute what [she] believed to be a meritorious action, but to defame . . . . The deliberate institution of baseless litigation for the purpose of fabricating a reporting privilege falls squarely within the malicious filing exception to [Section] 74, as first recognized in *Williams*." *GeigTech East Bay LLC v. Lutron Elecs. Co.*, No. 18-cv-5290, 2019 U.S. Dist. LEXIS 59319, *16 (S.D.N.Y. Apr. 4, 2019). Here, as in *Geigtech*, the motion to dismiss should be denied.

### 3. California's Fair Reporting Privilege is Inapplicable to Doe's Defamatory Statements

As discussed above, Texas law (which only applies to the media) or New York law (which is inapplicable because the SDNY Action was a sham) applies to Doe's defamation claim. But even if California law were applied – which for the reasons discussed it should not be – the fair reporting privilege is still inapplicable because Mr. Carter pleads, and Doe's statements show, that she presented her alleged rape on the global broadcast of the NBC News Interview as "fact," not as a "report" on the SDNY Action. It also fails because Doe did not merely announce the filing of a lawsuit or summarize the allegations from the SDNY Action, but instead made new and more serious claims to the press.

#### a. Doe Presented Her Alleged Rape to NBC News as "Fact," Not a Report

The fair reporting privilege protects "a fair and true report in, or a communication to, a public journal, of (A) a judicial . . . proceeding, . . ." Cal. Civ. Code § 47(d)(1). The privilege "does not extend to all statements that acknowledge the existence of a court proceeding." *Goldberg v. TeachBK, Inc*., No. 24-cv-04525, 2025 U.S. Dist. LEXIS 13351, at *42 (N.D. Cal. Jan. 24, 2025) (citing *Wisk Aero LLC v. Archer Aviation Inc.,* No. 21-cv-02450, 2023 U.S. Dist. LEXIS 100960, at *19 (N.D. Cal. June 9, 2023) (explaining that "the purpose of California law" is to provide

"breathing room for newspapers to explain the basis of a judicial proceeding without" facing "exposure for defamation liability")). It only protects statements to the extent a reasonable viewer would understand them as communications *about* the legal proceedings themselves, and not facts underlying the proceedings. *See Healthsmart Pac., Inc. v. Kabateck,* 7 Cal. App. 5th 416, 435-36 (2016); *Adobe Sys. Inc. v. Christenson,* 891 F.Supp.2d 1194, 1210 (D. Nev. 2012); *Wilbanks v. Wolk,* 121 Cal. App. 4th 883, 890 (2004)*.* As the party invoking the privilege, Doe bears the heavy burden of establishing that each one of her defamatory statements falls squarely within the narrow confines of the privilege. *See Carver v. Bonds*, 135 Cal. App. 4th 328, 348-349; *Youngevity Int'l Corp. v. Andreoli*, 749 Fed. App'x, . 634, 635 (9th Cir. 2019)*.* She fails to do so.

An average person would not interpret Doe's statements to be *about* the SDNY Action. Rather, an average person would understand that Doe was providing the global viewing audience of NBC News with a first-person narrative, including (*a*) her motivations for coming forward "for the first time," (*b*) her blow-by-blow account of what (she affirmatively states) occurred, and (*c*) her insistence of the veracity of her statements in the face of contradictory evidence.

From the outset of the NBC News Interview, NBC News frames it as an "NBC News Exclusive" interview of Doe, not a report on the SDNY Action. In her introduction to the NBC News Interview, NBC News correspondent Chloe Melas structures Doe's statements as the focal point of the NBC News Interview, stating that Doe is "speaking out to NBC News *for the first time*." ECF No. 44-5 (emphasis added). Melas then asks Doe her initial question, which again frames the discussion on Doe's factual statements to NBC News, not the SDNY Action: "What made you want to *come forward and talk today*?" *Id*. (emphasis added). Doe responds that "I think *I've been quiet long enough* . . . " *Id*. (emphasis added). No average viewer would infer the statements Doe made during the NBC News Interview "for the first time," "today" after "be[ing]

quiet long enough" were mere reports of the SDNY Action. *Id.*; *see American Dental Ass'n v. Kohrrami*, No. 02-cv-3853, 2004 U.S. Dist. LEXIS 35425, *11-12 (C.D. Cal. 2004) (holding statements are not privileged if "it would not be obvious to an average reader that these Statements a part of the litigation" or a "report of judicial proceedings."); *Wilbank,* 121 Cal. App. 4th at 904-05 (holding Section 47(d) did not protect statements that "were more than a report of an official proceeding"); *Crane v. Arizona Repub.*, 972 F. 2d. 1511, 1519 (9th Cir. 1992) (finding fair report privilege inapplicable as editing altered tenor, because if a report "'produces a different effect' on the reader[,] the privilege [is] suspended.") (citing *Hayward v. Watsonville Register-Pajaronian and Sun*, 265 Cal. App. 2d. 255, 261-62 (Cal. Ct. App. 1968)).

Doe presents her heinous fabricated allegations as her first-hand accounts of truth. She narrates that, while at an MTV Music Awards afterparty, she had a drink "that made her feel woozy," after which "Combs and Mr. Carter took turns raping" her while an unidentified female celebrity watched. *Id*. She declares, never mentioning the SDNY Action (as, indeed, it was not pled in the SDNY Action), that she had been "fighting trying to get away from [Mr. Carter] and he put his hand over my mouth" and that Mr. Carter "told me to stop it -- you know, stop it, cut the BEEP." *Id.* at 23-24. Doe's "factual" narrative is not protected by the fair reporting privilege. *See Heitkoetter v. Domm*, 2024 WL 325134, at *11 (E.D. Cal. Jan. 29, 2024) (holding fair report privilege did not apply to "tangential commentary" since it "produce[s] a different effect" on the listener); *Commodity Trucking Acquisition, LLC v. Aylott,* 2018 WL 6583843, at *9 (Cal. Ct. App. Dec. 14, 2018) (no immunity for "press reports [that] did not accurately capture the gist or sting of the claims made in the employment action, but unduly exaggerated them"); *Wilbank v. Wolk*, 121 Cal. App. 4th 883, 904-05 (2004) (Section 47(d) did not protect defendant where statements "were more than a fair and true report of an official proceeding; they were express and implied

assertions that plaintiffs . . . were incompetent and unethical"); *Adobe Sys.,* 891 F.Supp.2d at 1210-11 (California's fair reporting privilege inapplicable when press release "plainly went beyond merely reporting on the lawsuit and its allegations by directly accusing Defendants of 'swindling' consumers").

Doe's statements to NBC News make no mention of the SDNY Action. Doe's failure to refer to the SDNY Action is fatal because the fair reporting privilege does not protect communications that do not identify the source of the information as the underlying judicial proceeding. [3] *See Hayward,* 265 Cal. App. 2d at 259 ("[I]n order to qualify as privileged . . . an article must state the source of its information."); *Wentworth v. Bennett,* 2018 Cal. App. Unpub. LEXIS 4973, at \*27-28 (Cal. Ct. App. July 23, 2018) (unpublished) (declining to apply fair report privilege where speaker failed to identify source); *accord Dorsey v. National Enquirer, Inc.,* 973 F.2d 1431, 1436-37 (9th Cir. 1992) (statements referring back to what was "stated in the court documents"). As the court stated in *Healthsmart*, "[t]here is [] a critical difference between communicating to the media what is alleged in a complaint and communicating the alleged facts without reference to the complaint." 7 Cal. App. 5th at 435; *see also Hawran v. Hixson,* 147 Cal. Rptr. 3d 88, 109 (2012) ("The fact information in the press release was also disclosed to the SEC . . . does not transform the press release into a report *about* the SEC proceedings or about statements made in the course of that proceeding." (emphasis in original)).

---

[3] This distinguishes the present case from *Dabaneh v. Lopez*, 2021 Cal. App. Unpub. LEXIS 6258 (Cal. Ct. App. 2021), where the defendant submitted "a letter complaint to the chair of the California Assembly Rules Committee" and, "[o]n the same day she mailed the letter, [the defendant] called a press conference to announce that she had submitted the complaint." *Id*. at \*1-2. During the ensuing press conference, the defendant "stated at the outset: 'I'm here to announce that this morning I submitted a report to the Assembly Rules Committee identifying that I was sexually assaulted in January of 2016 by Assembly Member Matt Dababneh.'" *Id*. at \*5; *accord Adobe Sys. Inc. v. Christenson*, 891 F.Supp.2d 1194, 1210 (D. Nev. 2012) (under California law, only press releases that "*merely* inform[] a third party of the *pendency* of the litigation are privileged"). Doe, however, made no such announcement. Indeed, she never even mentions the SDNY Action during the NBC News Interview.

In fact, most of Doe's defamatory statements in the NBC News Interview introduce significant new facts that were never pled in the SDNY Action, making clear that her interview was a calculated attempt to substantiate and create public outcry about her allegations against Mr. Carter, not a mere report of the SDNY Action. For instance, Doe asserts in the NBC News Interview, for the first time, that she was "fighting trying to get away from [Mr. Carter] and he put his hand over my mouth" and that Mr. Carter "told me to stop it -- you know, stop it, cut the BEEP." SAC ¶ 87. Likewise, Doe states, again for the first time, key details that are intended to bolster the credibility of her false allegations such as: (*a*) being "a 38-year-old mother from Alabama;" (*b*) allegedly going to the VMAs "to catch a glimpse of her favorite celebrities;" (*c*) not being scared to be alone in New York as a 13-year-old because "with having autism, is -- like feeling you live your life in a shatter-proof, juggle ball. The worlds on fire, the fire is inside the ball with you, but there's no way for you to get out;" (*d*) having "suffered a head injury;" (*e*) "The night of the 2000s VMAs . . . a friend drove her from Rochester, New York to Manhattan;" (*f*) believing Mr. Combs' limo driver attempted to convey that she "was just pretty;" and (*g*) having to "seek medical treatment due to the stress." *Id.* By definition, none of these new "facts" could be reporting on the SDNY Action.

Doe also attempts to manufacture corroboration for her story by introducing a new "witness" – she claims that, at the party, she spoke to Benji Madden of the band Good Charlotte about his Last Supper tattoo – and by removing the "witness" she alleges drove her from Rochester, New York to Manhattan by claiming that she died. These expansions of her allegations in the SDNY Action further demonstrates that no reasonable viewer would (or could) interpret Doe's statements in the NBC News Interview as a report on the SDNY Action. *See Kohrrami*, 2004 U.S. Dist. LEXIS 35425, at *11-12.

Additionally, Doe falsely alleges in the NBC News Interview that Mr. Carter engaged in additional criminal acts, that are not alleged in the SDNY Action. During the NBC News Interview, Doe claims for the first time that she was "fighting trying to get away from [Mr. Carter] and he put his hand over my mouth." SAC ¶ 87. Doe further alleges, again for the first time, that Mr. Carter "told me to stop it -- you know, stop it, cut the BEEP." *Id*. These statements are significant, more serious allegations than were made in the SDNY Action, which did not describe any physical struggle or attempt by Mr. Carter to silence her in this manner. The SDNY Action also did not describe her autism, which new allegation creates a more serious element of victimization of a mentally impaired minor than was alleged in the SDNY Action. For instance, pursuant to the United States Sentencing Commission Guidelines, offenders convicted of sexual crimes could receive a two point upward level adjustment for victimizing a "vulnerable victim" and "restraint" of a victim pursuant to Chapter 3, §§ 3A1.1 and 3A1.3, respectively, thus recognizing a material distinction in the severity of the offense when those two circumstances are attendant to the offense.

These new details are not minor additions meant to clarify or add context. They are dramatic additions, alleging more serious criminal conduct than what is alleged in the SDNY Action. They are therefore not protected by the fair reporting privilege. *See Heitkoetter v. Domm*, No. 22-cv-368, 2024 U.S. Dist. LEXIS 15621, at *33-34 (E.D. Cal. Jan. 29, 2024) (holding fair report privilege did not apply to the portions of the defendant's video that consisted of "tangential commentary" since it "deviate[d] substantially from reporting [on his counterclaim] and produce[d] a different effect" on the listener); *Goldberg v. TeachBK, Inc*., No. 24-cv-4525, 2025 U.S. Dist. LEXIS 13351, at *42 (N.D. Cal. Jan. 24, 2025) (holding defendant's statements that plaintiff "leaks her clients' information to the Russian government and is a 'double agent'" were not privileged as a fair and true report of a judicial proceeding); *Lyon v. Fairweather*, 63 Cal. App.

194, 197 (1923) ("the statute [Section 47(d)] does not include as privileged facts outside the record or comments by the writer.").

Doe's insistence on the truth of her statements in a follow-up interview with NBC News underscores that she was not simply "reporting" on the SDNY Action. After Melas challenges Doe's story as riddled with obvious inconsistencies, Doe acknowledges in a follow-up interview with NBC News the possibility her prior statements were mistakes, but nevertheless maintains that the essential events she describes in the initial NBC News interview are true, reflecting her intent to convey her statements as facts not a report on her allegations in the SDNY Action. Doe's attorney even notes that she has agreed to submit to a (still unreleased) polygraph and has been intensely interrogated, further suggesting that Doe regards her statements as factual and is willing to have them tested for truthfulness. *See Healthsmart*, 7 Cal. App. 5th at 435-436.

The timing of Doe's statements to NBC News also highlights the distinction between her personal, factual statements to NBC News that are at issue in this case, and NBC News' *separate* reporting on the SDNY Action that are not at issue. Doe first sued Mr. Carter (albeit as a Doe) on October 20, 2024, but did not speak to NBC News until months later, in December 2024. When Doe gave her interview to NBC News, NBC News had *already* published a report about Doe's allegations in the SDNY Action. *See* https://www.nbcnews.com/news/us-news/jay-z-rape-allegation-diddy-sean-combs-lawsuit-what-know-rcna183547 (Dec. 9, 2025). And unlike Doe's first-hand accusations about Mr. Carter to NBC News, NBC News' earlier report on the SDNY Action is titled "What we know *about the lawsuit* accusing Jay-Z of raping a teen with Sean 'Diddy' Combs," and explicitly states that it is reporting on "*what we know about the litigation*," what "*the lawsuit says*," what "*the suit alleges*," and "*What does Carter say about the suit*." *Id.* (emphasis added). No such language appears during the NBC News Interview. Indeed, there would

be no need for the NBC News Interview if its only purpose was to simply report on the SDNY Action, given that NBC News had already reported on it. The contrast between the NBC News Interview – which focuses on the veracity of Doe's statements – and NBC News' earlier report about the SDNY Action thus makes clear that the NBC News Interview was not a report on the SDNY Action at all.

In sum, during each part of Doe's initial NBC News Interview and follow-up interview with NBC News, Doe gave a direct recounting of her (stated) lived experience; she did not summarize, interpret, or even once mention the SDNY Action. Accordingly, Doe's statements are not protected by the fair reporting privilege because she presented them as her own experiences, not as a report on the SDNY Action.

### b. Doe's Statements Could Reasonably be Expected to Affect the Average Reader's Appraisal of the Merits of Her Story

The fair reporting privilege is inapplicable to statements that "could reasonably be expected to affect the average reader's appraisal of the story and evaluation of the merits of the charges" or "produce a different effect on the reader" than the actual truth of the described proceeding. *See Crane*, 972 F.2d. at 1519, 1523 (quoting *Hayward*, 265 Cal. App. 2d. at 261-62). Doe's defamatory statements to NBC News do just that and are not protected by the fair reporting privilege.

The veracity and credibility, or lack thereof, of Doe's statements to NBC News are the central themes of the NBC News Interview. Indeed, Doe's statements to NBC News were clearly designed (and staged by the Buzbee Defendants) to add details to make her story more believable, but instead highlight the inconsistencies in her account, including details about the events, the people involved, and corroborating witnesses. For example, she describes meeting Madden at the afterparty, but Madden's representatives confirmed to NBC News that he was not at the 2000 Video Music Awards, nor could have been, because he was on tour in the Midwest at the time.

Similarly, although Doe told NBC News that her father picked her up after the alleged assault, Doe's father told NBC News that he could not verify her story of him making a 10-plus-hour round-trip car ride in the middle of the night to pick up his 13 year-old daughter, stating: "I felt like I would remember that, and I don't." *Id*. And despite these contradictions, Doe stood by the statements she previously made to NBC News: "When we asked the woman [Doe] about the contradictions in a phone interview on Friday she said that she stands by her statements. I have made some mistakes, she said. Honestly, what is the clearest is what happened to me." *Id.* These contradictions challenging the accuracy of Doe's recollection of the events and the people involved – including a father's recollection after a traumatic and memorable event – would reasonably be expected to affect the average reader's appraisal of the merits of her story. *See Crane*, 972 F. 2d. at 1522-23.

Because Doe's statements to NBC News could reasonably be expected to affect the average reader's appraisal of her story and evaluation of the merits of her allegations, the fair reporting privilege does not apply and Doe's motion should be denied.

### c. Doe's Arguments, At Most, Raise Questions Of Fact Unresolvable On A Motion To Dismiss

Despite never mentioning the SDNY Action, Doe contends that "anyone" would infer that her statements were reporting on the SDNY Action because: (*a*) for a fleeting moment, NBC News displays screenshots of Doe's Amended Complaint; (*b*) Melas at one point mentions the SDNY Action and refers to Doe's "allegations" and "claims;" and (*c*) attorneys are mentioned and make statements. The inferences Doe asks the Court to make are unreasonable and, in fact, highlight why this issue cannot be resolved at the pleading stage. *See e.g. Pierce v. San Jose Mercury News*, 214 Cal. App. 3d 1626, 1634 (1989) ("Where, as here, reasonable minds could disagree on what is fair, the issue is a question of fact to be determined by the jury."); *Nunes v. NBCUniversal*

*Media, LLC*, 643 F. Supp. 3d 403, 413 (S.D.N.Y. 2022) (same); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 48–49 (S.D.N.Y. 2015) ("[a]pplication of the fair reporting privilege is inappropriate at the motion to dismiss stage if a reasonable jury could conclude that the report 'suggest[ed] more serious conduct than that actually suggested in the judicial proceeding.'"), *aff'd in part*, 632 Fed. App'x, 637 (2d Cir. 2015); *Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 291-92 (S.D.N.Y. 2005); *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1174-77 (S.D.N.Y. 1984) (jury question presented where editing gives statement a different meaning than it otherwise would have).

Moreover, Doe mischaracterizes her own statements and the NBC News Interview, none of which remotely support Doe's argument for dismissal:

***Screenshots***. The broadcast of Doe's NBC News Interview is over 5 minutes long. For a mere eighteen (18) seconds (or approximately 5% of the total runtime), NBC News displays falling pieces of paper. Doe contends that an average viewer would closely examine the screen, identify those papers as screenshots of the Amended Complaint and, based on the presence of those papers, conclude that Doe's statements – which do not once reference the SDNY Action – were actually reports about the SDNY Action.

Not true. The papers do not contain a case caption, do not indicate that they are a complaint or judicial filing, or otherwise suggest that Doe was reporting on the complaint. Indeed, while the papers are on the screen, there is a graphic that states: "**NBC NEWS EXCLUSIVE**" and "**WOMAN ACCUSING JAY-Z SPEAKS TO NBC NEWS.**" And the voiceover playing while the papers are displayed does not discuss the SDNY Action, but instead discusses how Doe's friend who allegedly drove Doe to Manhattan could not corroborate her story because she died (a fact nowhere mentioned in the SDNY Action) and Doe's (alleged) interaction with Combs' limo driver.

Because the images are brief, indistinct, and lack any clear indication that they are legal documents about the SDNY Action, nothing about them would lead the average viewer to believe that Doe's statements were a report on the SDNY Action. *See Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 793 (Cal. Ct. App. 2017) ("an attorney's summary of a pleading he filed to commence a judicial proceeding is materially different than an individual's discussion of a citizen complaint she herself had lodged with law enforcement."). At a minimum, these are factual determinations that are due to be decided by a trier of fact.

*Melas' Statements*. Doe argues that an average viewer would understand that Doe was reporting on the SDNY Action because Melas states that "[a] 38-year-old mother from Alabama who has filed a lawsuit . . . is speaking out to NBC News. . ." But Doe uses ellipses to cut off a key portion of Ms. Melas' statement: that Doe was "speaking out to NBC News *for the first time*." ECF 44-5 (emphasis added). Ms. Melas' full statement thus distinguishes between Doe's SDNY Action – which is merely referenced in passing and is not discussed during the broadcast of the NBC News Interview – and Doe's public statements made to NBC News "for the first time," which are the actual subject of the NBC News Interview. Thus, from the outset of the interview, Doe and Ms. Melas frame Doe's statements to NBC News as a direct telling of her (stated) story, not a report on the SDNY Action.

Doe also contends that an average viewer would interpret Ms. Melas' "repeated" use of the words "allegations" and "claims" as references to the SDNY Action. However, Ms. Melas does not refer to the "claims" or "allegations" in the SDNY Action at any point. In fact, the opposite is true. Ms. Melas uses the word "claims" only once, and that is to refer to Doe's father's inability to verify Doe's claim, made to NBC News for the first time, that her father drove her back to

Rochester after the alleged sexual assault in silence and without asking Doe how she, a 13-year-old, purportedly ended up being drugged at celebrity house over 5-hours hours from home:

> **Jane Doe:** We rode home in silence. He didn't ask me what happened, he didn't ask me what I did or where I was.

> **Ms. Melas:** In an interview with NBC News **her father said he could not verify the claims**. "I felt like I would remember that, and I don't. I have a lot going on, but I mean, that's something that would definitely stick in my mind", he said.

ECF 44-5 (Emphasis added). Additionally, all four uses of the word "allegations" by Ms. Melas refer specifically to the statements Doe made to NBC News for the first time. [4] *See, e.g.*, Tr. 2:18-23 (stating that there are inconsistencies in Doe's "allegations"); 4:16-19 ("After the alleged rape, she says she ran to a gas station where she called her father who picked her up and drove her home"); 5:9-17 (warning that "inconsistencies in her account of an incident alleged to have happened 24 years ago does not necessarily mean the allegations are false").

> *Attorneys*. Doe argues that the references to attorneys and their statements at the end of the broadcast of the NBC News Interview would cause the average viewer to infer that Doe was reporting on the SDNY Action. Yet nothing about the attorneys converts Doe's factual, defamatory statements about Mr. Carter, which make no reference to the SDNY Action, to statements about

---

[4] Doe's reliance on *Harrison* and *Bond* are entirely misplaced. *See Harrison v. Gilligan*, 2022 Cal. App. Unpub. LEXIS 4563, *23-25 (Cal. Ct. App. 2022) (finding "the average viewer would not understand the alleged four defamatory lines to be unassociated with statements made in the ongoing investigation" where the allegedly defamatory statements were made after a "statement of denial from Harrison's attorney and a statement" describing the ongoing "multi-agency investigation into allegations" and "prominent placement of statements by Harrison's counsel discrediting and denying the accusations" as part of a "news report further clarif[ing] that both an internal religious and a multi-agency police investigation are ongoing, with a statement attributed to appellant that he can only share certain information with police agencies"); *Bond v. Lilly*, 2024 Cal. App. Unpub. LEXIS 7451, *33-34 (Cal. Ct. App. 2024) ("[a]lthough the Lillys themselves did not expressly mention their complaint, each of the three news articles is titled in a way that makes it immediately clear to the reader that the article is about allegations in a lawsuit. . . . the Lillys' 'statements are interspersed among the reporter's frequent references to the underlying lawsuit'" and are "replete with references to the Lillys' lawsuit. The words 'lawsuit,' 'claims,' 'sued,' and 'allegations' or 'alleges' appear approximately 24 times in the seven-page article. The article repeatedly references the court action using phrases such as 'according to the lawsuit,' 'the lawsuit states,' and 'the suit further alleges.'").

her allegations against Mr. Carter in the SDNY Action. Indeed, Buzbee's statement to Ms. Melas is merely an attempt to save face by stating that he "interrogated" Doe "intensely" and that Doe agreed to submit to a polygraph test. Notably, his statement also does not reference the SDNY Action.

There is thus nothing in Doe's statements to NBC News nor the broadcast of the NBC News Interview that can be construed as reporting on the SDNY Action.

## II.    Mr. Carter States A Claim for Malicious Prosecution

Mr. Carter pleads each of the elements of a malicious prosecution claim: (*a*) Doe initiated the SDNY Action; (*b*) Doe lacked probable cause to file the SDNY Action; (*c*) Doe acted with malice; (*d*) the SDNY Action was terminated in Mr. Carter's favor; and (*e*) Doe caused Mr. Carter special injury. *See Honzawa v. Honzawa*, 268 A.D.2d 327, 329 (1st Dep't 2000). Doe does not dispute the first three elements; namely, that she filed the SDNY Action without probable cause and with malice. She nevertheless contends that Mr. Carter does not plead a special injury and that the SDNY Action was not terminated in Mr. Carter's favor. ECF No. 44 at 2-10. Doe's arguments are baseless.

### A.  Mr. Carter Alleges A Special Injury

Mr. Carter adequately alleges Doe's malicious prosecution of the SDNY Action caused him to suffer a special injury. To plead special injury, a plaintiff need only show an interference with a person, property, or business. *See Sparrow Fund Mgmt. LP v. Mimedx Grp., Inc.*, 2020 U.S. Dist. LEXIS 49813, at *15 (S.D.N.Y. Mar. 22, 2020) (quoting *Dudick v. Gulyas*, 277 A.D.2d 686, 688 (3d Dep't 2000)). Special injury is pled where the harm goes beyond the ordinary burdens of defending a lawsuit - such as lost business opportunities, reputational harm, or severe emotional distress. *See Heilbut v. Cassava Scies., Inc.*, 2025 U.S. Dist. LEXIS 56283, at *16-17, *43

(S.D.N.Y. Mar. 26, 2025) (collecting cases); *Dudick*, 277 A.D.2d at 688 ("damages for harm to reputation are recoverable in a malicious prosecution action"); *Thryoff v. Nationwide Mut. Ins. Co.*, No. 05-cv-6607T, 2006 U.S. Dist. LEXIS 71706, at *12 (W.D.N.Y. Sep. 29, 2006) (emotional harm).

In his complaint, Mr. Carter specifically alleges that Doe's malicious prosecution of the SDNY Action caused: (*a*) concrete lost business opportunities; and (*b*) concrete reputational harm. SAC at ¶¶ 126-136. Each of these allegations is, independently, sufficient to satisfy the special injury requirement under New York law.

### 1.  Mr. Carter Pleads Concrete Lost Business Opportunities

Mr. Carter details concrete and significant interferences with his business and personal affairs flowing from Doe's malicious prosecution of the SDNY Action, including:

- As a direct result of the malicious prosecution and attendant reputational harm, Mr. Carter was denied a $55 million personal credit line (SAC ¶ 131).

- As a direct result of the malicious prosecution and attendant reputational harm, Mr. Carter and his business, Roc Nation – of which he is both a founder and an owner – lost contracts in the sports and entertainment sector that would have generated, at least, $20 million in revenue from minimum fee guarantees, with the potential for even greater losses had the contracts been performed (*id*. at ¶ 130).

- As a direct result of the malicious prosecution and attendant reputational harm, including negative publicity, a consumer brand business in which he holds a 50% interest was denied a $115 million loan (*id*. ¶ at 132).

These allegations far exceed the typical costs or inconveniences of litigation and are exactly the type of specific, substantial harm that New York courts recognize as a special injury. *See Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *44 (lost investment opportunities); *Thomas v. G2 FMV, LLC*, 2016 N.Y. Misc. LEXIS 272, at *14 (Sup. Ct. Jan. 27, 2016) ("the [plaintiff] alleges that he lost a $20,000 per month retainer agreement . . . This is special injury beyond defending a lawsuit."), *aff'd* 147 A.D.3d 700 (1st Dep't 2017); *In re Eerie  World Entm't, L.L.C.*, 2006 Bankr. LEXIS

770, at *27 (Bankr. S.D.N.Y. Apr. 28, 2006) (lost financing; relied on by Doe); *Strumpf v. Asdourian*, 2006 N.Y. Misc. LEXIS 3976, at *10 (Sup. Ct. Dec. 12, 2006) (loss of clients and increased insurance rates); *Sparrow*, No. 18-cv-4921, 2020 U.S. Dist. LEXIS 4981, at *16 (revenue losses and difficulty raising capital).

Doe argues that these allegations are "obviously insufficient" because Mr. Carter's loss of a $55 million line of credit is not a "specific and verifiable loss of <u>business</u>."[5] ECF No. 44 at 6. However, Doe provides no support for her suggestion that a loss of a credit line is not a loss of business, and her position is directly contradicted by established precedent. *See, e.g., Core-Mark Midcontinent, Inc. v. Tri-State Candy Wholesale, Inc.*, 2018 U.S. Dist. LEXIS 151207, at *45 (E.D.N.Y. Aug. 31, 2018) (rejected loan application); *In re Eerie World Entm't, L.L.C.*, 2006 Bankr. LEXIS 770, at *27 (Bankr. S.D.N.Y. Apr. 28, 2006) (lost financing).

Despite recognizing that Mr. Carter's lost business constitutes special injury, Doe argues that Mr. Carter should not benefit from the rule because Mr. Carter sometimes conducts business through an entity. Doe is wrong, and relies on inapposite cases in which the plaintiffs asserted rights and claims that were not theirs, personally, but clearly belonged to a corporation instead. *See Mohinani v. Charney*, 208 A.D.3d 404, 405 (1st Dep't 2022) (breach of fiduciary duty claim was required to be asserted as derivative or double derivative claims on behalf of LLCs). Mr. Carter, in contrast, specifically alleges that he *personally* lost out on a $55 million line of credit because *he* was falsely and maliciously named by Doe in the SDNY Action. SAC at ¶ 131**.** This allegation easily rises to the level of a special injury under New York law. Moreover, the entities that Mr. Carter alleges lost substantial 9-figure amounts due to the malicious prosecution of the

---

[5] Doe also argues, without support, that Mr. Carter does not plead "an actual, concrete injury resulting from any supposed denial of the personal credit line." ECF No. 44 at 7. Mr. Carter, however, need only show a special injury caused by Doe's malicious prosecution, which he easily does here.

SDNY Action are entities that are tied directly and inextricably to his reputation as a principle basis for their ongoing success, operations, and financing. SAC ¶ 126. The opposite facts from the corporate precedent that the Buzbee Defendants inappositely cite to this Court.

In all events, a special injury is sufficiently pled where, as here, the plaintiff plausibly alleges that malicious prosecution caused an injury to the plaintiff's business interests, regardless of whether the plaintiff operates the business through an entity. For example, courts have found special damages based on allegations that an underlying lawsuit "harmed [plaintiff's] company and its relations with investors during the IPO process." *Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *46; *see also Silvestri-Edwards v. Cappello*, 2025 N.Y. Misc. LEXIS 3365, at *14 (Sup. Ct. Mar. 20, 2025) (special damages found in defamation lawsuit where the plaintiff "now claims her revenues have dropped 90%, due to continuing damage impact arising out of defendant's defamatory remarks"); *Sisler v. Gannett Co.*, 516 A.2d 1083, 1097 (N.J. 1986) (holding, in the defamation context, that "Plaintiff merely chose to funnel the business opportunities that were lost through his wholly-owned corporation, and thus, evidence of what the corporation lost was correctly deemed to be evidence of plaintiff's personal losses.…"). Mr. Carter alleges his personal brand and business interests are inextricably linked: damage to Mr. Carter directly impacts Roc Nation's business opportunities and revenue, and vice versa.  SAC ¶¶ 126, 133. The loss of contracts, denial of financing, and other business losses are thus properly considered special injuries for pleading purposes *Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *46; *Cappello*, 2025 N.Y. Misc. LEXIS 3365, at *10 ("Plaintiff [an individual] has also alleged special damages, due to her alleged 33% loss in ***business*** revenues" (emphasis added).

Doe also erroneously argues that Mr. Carter's allegations regarding lost business are insufficiently "specific" and "measurable," but the cases Doe cites do not help her. *See, e.g.*,

*Kanciper v. Lato*, 989 F. Supp. 2d 216, 237-38 (E.D.N.Y. 2013) (dismissing malicious prosecution claim where plaintiff never identified the source of its claimed damages); *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 295 (E.D.N.Y. 2014) (no special damages because the plaintiff failed to allege a connection between purported lost sales and the underlying litigation); *Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11-cv-3327, 2013 U.S. Dist. LEXIS 14937, at *48-49 (S.D.N.Y. Feb. 1, 2013) (dismissing claim where the plaintiff failed to allege any special damages "in the Complaint, and as such, [the issue was] not properly before the Court's consideration"). In contrast to these cases, Mr. Carter's allegations regarding lost personal loans, business loans, and minimum fee guarantees *are* "specific" and "measurable" damages caused by the SDNY Action and rising to the level of special injury. SAC ¶¶ 131-33.

Mr. Carter clearly pleads a special injury. Doe effectively asks the Court to ignore Mr. Carter's allegations of personal special injury resulting from her demonstrably false allegations that he violently raped a minor and bar any individual who conducts business through a corporate entity from claiming special injury or pursuing a claim for malicious prosecution. Doe cites no authority to support her request and the Court should decline it.

### 2. Mr. Carter Pleads Concrete Emotional And Reputational Harm

Mr. Carter alleges that the SDNY Action was designed to publicly smear him, disrupt his personal life, and inflict severe emotional and reputational harm, all in an effort to force Mr. Carter to capitulate to Defendants' extortionate demands. SAC ¶¶ 69, 146. The complaint details how the false and malicious sexual assault allegations were widely disseminated through court filings, media coverage, and a nationally-televised interview, resulting in:

- A dramatic deterioration in Mr. Carter's public image, as evidenced by approximately 1.3 million social media mentions and a net sentiment score of 94% negative (a sharp increase from prior years) (*id*. at ¶ 135);

- Widespread public contempt, including threats of violence and accusations of criminal conduct, including calls for Mr. Carter to be imprisoned, and accusations of being a "satanist," "trafficker," "terrorist," and "monster[,]" (*id.* at ¶ 134); and

- Emotional distress and humiliation, particularly in having to address the allegations with his children and family (*id.* at ¶ 128).

These allegations are supported by specific facts and quantifiable data, and are exactly the kind of reputational and emotional harms that courts have found to constitute special injury. *See Chisolm-Mitchell v. Ahmed*, No. 20-cv-3434, 2021 U.S. Dist. LEXIS 26083, at *10-11 (E.D.N.Y. Feb. 11, 2021); *Dudick*, 277 A.D.2d at 688; *Heilbut*, 2025 U.S. Dist. LEXIS 56283, at *46.

Doe incorrectly argues that it is "well-established" that reputational harm is not a special injury.[6] ECF No. 44 at 5. Under New York law, "damages for harm to reputation are recoverable in a malicious prosecution action." *Dudick*, 277 A.D.2d at 688; *G2 FMV*, 2016 NY Slip Op 30143(U), ¶ 13, 2016 N.Y. Misc. LEXIS 272 (observing that although *Engel*, 182 F.3d at 127 held that vague allegations of emotional harm were insufficient, *Engel* "approvingly cited *Groat v Town Bd. of Town of Glenville* . . . [which] held that there was a sufficient interference with person or property where the plaintiff was suspended from the police force without pay, dismissed, ***and***

---

[6] Many of the cases Doe cites are distinguishable because they were not decided at the motion to dismiss stage. *See, e.g., Engel v. CBS, Inc.,* 182 F.3d 124, 131 (2d Cir. 1999) (affirming summary judgment dismissal); *Campion Funeral Home v. State*, 569 N.Y.S.2d 518, 520 (3d Dept. 1991) (same). The other cases she cites either upheld the plaintiff's allegations of specific damages, *see Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 1997 U.S. Dist. LEXIS 12976, at *15 (S.D.N.Y. Aug. 27, 1997), or turned on vague and conclusory allegations that are far less specific than and bear little resemblance to Mr. Carter's allegations here, *see O'Brien v. Alexander*, 101 F.3d 1479, 1485 (2d Cir. 1996) (dismissing malicious prosecution claim where plaintiff did not contend that his former employers "obtained a provisional remedy or imposed any other burden on him beyond the ordinary[,]" arguing only general "damaging consequences" from the underlying litigation); *Rubin v. Lutfy*, 2009 N.Y. Misc. LEXIS 3398, at *5 (N.Y. Sup. Ct. Nov. 23, 2009) ("Plaintiff's allegations regarding the time and money spent in the litigation and vague assertions of damage to reputation do not constitute special damages.") *Engel*, 182 F.3d at 127 (plaintiff alleged, "in a general way, that he suffered emotional" harm); *McCaul v. Ardsley Union Free School District*, 514 Fed. App'x 1, 6 (2d Cir. 2013) (plaintiff alleged mere "distress and anxiety" from the "demands of defending herself in the civil neglect proceeding."); *Brown v. Brown*, 343 F. Supp. 2d 195, 198 (E.D.N.Y. 2004) (plaintiff only pled damages "directly related to the present lawsuit . . . [consisting of] bare allegations of emotional distress, pain, and suffering."); *Molinoff v. Sassower*, 471 N.Y.S.2d 312, 313 (2d Dep't 1984) (plaintiff alleged he had to "bear the suffered a severe psychological burden of being a defendant in a lawsuit for which he had no insurance coverage for punitive damages"); *In re Eerie World Entm't, L.L.C.*, 2006 Bankr. LEXIS 770, at *29 (Bankr. S.D.N.Y. Apr. 28, 2006) (dismissing claims of vague "harm to reputation and emotional damage and mental stress" while finding that plaintiff sufficiently alleged loss of business as a special injury).

*temporarily disgraced in the police department and the community*" (emphasis added)). And courts refuse to dismiss a malicious prosecution claim where, as here, the plaintiff pleads concrete reputational harm. *See, e.g., Chisolm-Mitchell*, 2021 U.S. Dist. LEXIS 26083, at *10 (finding special injury where plaintiff alleged damage to reputation, career, and ability to provide for her family).

Doe also incorrectly argues that the emotional distress she intentionally – indeed, callously and maliciously – caused is not a special injury. This argument has been squarely rejected by New York courts. For example, in *Heilbut*, which Doe herself relies on, the plaintiff was allegedly "doxed by thousands of posts on X [formerly Twitter] and other websites [by Cassava investors and supporters] that reveal his home address and characterize him as a 'thief' or a 'devil,'" which the court found rose to the level of special injury, in part, because it "continue[d] to create fear and anxiety for [plaintiff] and his family." 2025 U.S. Dist. LEXIS 56283, at *44-46.

Here, as in *Heilbut,* Mr. Carter alleges that Doe's malicious prosecution of the SDNY Action caused him to suffer emotional distress, including because her false allegations caused widespread public contempt of Mr. Carter, embodied in some instances in threats of violence and accusations of criminal conduct, calls for Mr. Carter to be imprisoned, threats of violence, and accusations of being a "satanist," "trafficker," "terrorist," and "monster." SAC ¶ 134. Mr. Carter thus suffered a special injury far beyond the typical psychological burdens of litigation.

Accordingly, Mr. Carter's well-pled allegations and supporting evidence clearly satisfy the special injury requirement under New York law.

### B.  Mr. Carter Alleges That The SDNY Action Was Terminated In His Favor

A lawsuit is resolved in favor of a defendant if its dismissal was not pursuant to a settlement agreement or compromise. *Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001). The SDNY Action

terminated in Mr. Carter's favor because Doe voluntarily dismissed it with prejudice and without settlement. SAC ¶ 117.

Doe attempts to characterize a February 4, 2025 email exchange ("**Kasowitz Email**") between Alex Spiro – Mr. Carter's counsel – and Marc Kasowitz, counsel for Doe and the Buzbee Defendants, as a settlement agreement. ECF No. 44 at 8-10. It is not.

Mr. Carter vigorously denies that the SDNY Action was settled or compromised. Kasowitz himself acknowledged, in writing, that the Kasowitz Email was not a settlement. SAC Ex. 7 at 4. Moreover, Doe's stipulation of discontinuance does not indicate that it was the result of a settlement. Accordingly, at most, there is a factual dispute about the Kasowitz Email that cannot be resolved at the motion to dismiss stage. *See Tommy Hilfiger Licensing Inc. v. Bradlees*, *Inc*., 2002 U.S. Dist. LEXIS 7191, at *21 (S.D.N.Y. Apr. 25, 2002) (denying motion to dismiss because "there is at least some question as to whether or not the discontinuance of the civil forfeiture action with prejudice was procured by way of settlement or whether it was merely a voluntary discontinuance with prejudice which did not involve any compromise"). The cases cited by Doe support the denial of her motion to dismiss.[7] *See, e.g., Aquilina v. O'Connor,* 59 A.D.2d 454, 457 (3d Dep't 1977) (stipulation was not a "compromise or settlement" because no payment or concession was made); *Microflo Ltd.,* 50 F. Supp. 3d at 289 ("The stipulation of dismissal indicates that the Underlying Litigation was terminated pursuant to a voluntary dismissal and as the Court has credited Plaintiff's allegation that this stipulation does not reflect a settlement or compromise,

---

[7] Doe's other cases are plainly distinguishable because in those cases, unlike here, there was no dispute that the cases were settled. *See, e.g., Levy's Store, Inc. v. Endicott-Johnson Corp.*, 272 N.Y. 155, 162 (1936) (no malicious prosecution where the defendant gave the plaintiff "reasonable ground for believing" that the defendant "had obtained credit which would permit payment of its indebtedness"); *Pagliarulo v. Pagliarulo*, 30 A.D.2d 840, 840 (2d Dep't 1968) (parties stipulation provided that the underlying action was "settled and discontinued"); *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 198 (2000) ("a dismissal on speedy trial grounds is a favorable termination"); *Rubin*, 2009 N.Y. Misc. LEXIS 3398, at *5 (case was settled and the court in the underlying lawsuit determined that there was a potential basis for liability).

the Court finds that this is sufficient to satisfy the favorable termination element of a malicious prosecution claim."); *Mobile Training & Educ., Inc. v. Aviation Ground Sch. of Am.,* 2010 N.Y. Misc. LEXIS 3990, at *24 (Sup. Ct. June 23, 2010) (finding that the underlying lawsuit terminated in the plaintiff's favor because "there is no evidence that" the case was settled).

Doe contends that Mr. Carter agreed to withdraw his Rule 11 motion for sanctions and refrain from contacting Doe if Doe agreed to dismiss the SDNY Action. Doe's characterization is false because Mr. Carter offered no such *quid pro quo*. SAC ¶¶ 122-25, Ex. 6 (Spiro Declaration). And the Kasowitz Email does not show otherwise.

*First*, in response to Mr. Carter's Rule 11 motion in the SDNY Action, on January 28, 2025, the United States District Judge presiding over the SDNY Action, Judge Analisa Torres, ordered Buzbee to file proof of admission to the Southern District of New York. *Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y.), ECF No. 80. But Buzbee had a problem because, despite filing lawsuits and pleadings in the Southern District of New York, Buzbee was not admitted. *Id.*, ECF No. 61 at 12. Kasowitz, Buzbee's personal attorney, therefore reached out to Mr. Carter's counsel to discuss dismissing the SDNY Action. Mr. Carter's counsel made clear to Kasowitz that Mr. Carter would **never** settle the SDNY Action or pay any money to resolve it given Doe's heinous false accusations. SAC Ex. 6 ¶ 4.

*Second*, Doe's voluntary dismissal with prejudice of the SDNY Action was not conditioned on any compromise by Mr. Carter. SAC Ex. 6 ¶¶ 3-5. On February 4, 2025, Kasowitz told Mr. Carter's counsel that Buzbee would dismiss the SDNY Action with prejudice by February 14, 2025, the same day by which Judge Torres had ordered him to file proof of his admission to the SDNY Action. *Id.* at ¶ 9. In light of Kasowitz's statement that Buzbee was going to voluntarily dismiss the SDNY Action, which achieved the same result Mr. Carter sought through his Rule 11

motion, Mr. Carter's counsel told Kasowitz that he would hold in abeyance further pursuit of the Rule 11 Motion, without prejudice, pending dismissal of the SDNY Action. Given that Mr. Carter had, by that point, already achieved the purpose of bringing the Rule 11 motion in the first place, the motion was about to become moot. *Id.* at ¶ 10. And given that Buzbee still faced repercussions for his failure to seek admission in the Southern District of New York in light of the many other lawsuits he had filed there, Mr. Carter's withdrawal of the Rule 11 motion without prejudice was an insignificant event that compromised nothing. Doe's characterization of Mr. Carter's withdrawal of his motion as somehow being in furtherance of a "negotiated dismissal" of the lawsuit is plainly wrong, as Kasowitz acknowledged in writing that it was not a settlement at all. SAC ¶ 122.

Accordingly, the swift dismissal with prejudice of the lawsuit just two months after naming Mr. Carter was a resounding victory for Mr. Carter and a clear indication that the allegations in the SDNY Action were false in the first instance and that the extortionate plot by Doe, the Buzbee Defendants and the Curis Defendants had failed.

***Third***, even under Doe's and Kasowitz's version of events, the Kasowitz Email is simply a statement from Doe's attorney that the SDNY Action would be dismissed with prejudice by February 14, 2025, which was the same date by which the court had ordered Buzbee to file proof of admission - which he could not do, as he was not admitted, and (as Mr. Carter and the rest of the world would learn a week later) Buzbee's application for admission to the SDNY had been denied on February 12, 2025 by the Chair of the SDNY Disciplinary Committee for his many misdeeds and indisputably bad moral character. Mr. Carter's alleged consent to Buzbee's dismissal with prejudice does not constitute a compromise or settlement. *See Louvad Realty Corp. v. Anfang*, 267 A.D. 567, 568-69 (1st Dep't 1944) (holding that New York law "does not require the plaintiff

to establish that in the earlier action it had resisted a discontinuance to which the defendant had consented").

Doe also argues that Mr. Carter's dismissal of his motion for Rule 11 sanctions indicates that the Kasowitz Email memorialized a settlement or compromise between Doe and Mr. Carter. Not so. For starters, Mr. Carter's Rule 11 motion was only brought against Buzbee, and not Doe. *Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y. Jan. 8, 2025), ECF Nos. 60-61. Indeed, the Rule 11 motion only raised two issues, each having to do only with Buzbee: (a) Buzbee violated Rule 11 by either filing a knowingly false complaint or failing to conduct a reasonable inquiry into the facts; and (b) Buzbee failed to obtain admission *pro hac vice* to practice in the Southern District of New York, despite having signed numerous pleadings and other filings. Thus, withdrawal of the Rule 11 motion benefitted *only* Buzbee, resulting in no consideration at all to Doe for the falsely claimed *quid pro quo* "settlement."

Moreover, Mr. Carter withdrew his Rule 11 motion *without prejudice*. *See Doe v. Combs*, No. 24-cv-7975 (S.D.N.Y. Feb. 4, 2025), ECF No. 83. As Mr. Carter retained the right to refile the motion, the withdrawal was not a bargained-for exchange or a negotiated compromise because it offered nothing in return. Rather, it was a practical response to Kasowitz's representation that the SDNY Action would be dismissed with prejudice. As Mr. Carter's counsel testified: "Our withdrawal of the Rule 11 motion without prejudice was an insignificant event. Kasowitz's characterization of our withdrawal as being done in furtherance of a 'negotiated dismissal' of the lawsuit is not correct. In fact, Kasowitz acknowledged in writing that this was not a settlement." SAC ¶ 122. Thus, withdrawal of the Rule 11 motion benefitted *only* Buzbee, resulting in no consideration at all to Doe for the falsely claimed *quid pro quo* "settlement."

The context and timing of the with prejudice dismissal of the SDNY Action only confirm that it was not the result of a compromise or settlement. Mr. Carter alleges that Fortney traveled to Alabama on February 13, 2025 to convince Doe to drop her lawsuit. SAC ¶¶ 113-14. There would have been no reason for Fortney to travel to Alabama to convince Doe to drop the SDNY Action on February 13, 2025, if a settlement already occurred more than a week earlier, on February 4, 2025. *See Honzawa*, 268 A.D.2d at 330 ("At no time did Mitsuhiro, in the course of settlement negotiations, relinquish this right of action suggested in the resolution of the Federal litigation.")

Similarly, on February 4, 2025, Mr. Carter also moved to dismiss Doe's complaint. *See Doe v. Combs*, No. 1:24-cv-07975-AT (S.D.N.Y.)*,* at ECF Nos. 85-86. There would also have been no need for Mr. Carter to move to dismiss the SDNY Action had the parties settled the case. Indeed, Mr. Carter's withdrawal of his Rule 11 motion without prejudice could not have induced Doe to dismiss her case with prejudice since Mr. Carter moved to dismiss Doe's complaint *after* Mr. Carter withdrew his Rule 11 motion and *before* Doe filed her notice of voluntary dismissal with prejudice.

Accordingly, the record demonstrates that the dismissal of the SDNY Action was not the product of any settlement or compromise between the parties.

### III.    Mr. Carter States A Claim For Abuse of Process

Under New York law an abuse of process claim is stated against a party who: (1) employs a regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse or justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Bd. of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Assoc., Inc.,* 38 N.Y.2d 397, 403-04 (N.Y. 1975). With respect to the second element, an allegation that process was issued "maliciously with the intent to injure and to harass plaintiff" is sufficient to satisfy this element. *Id*. As to the third element, a

plaintiff may meet this element when process is used to obtain the collateral objective of inflicting damage upon a party's business, to compel a party to comply with unreasonable demands or to exact retribution upon a party. *See e.g., Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (applying New York law); *Pagliarulo*, 30 A.D.2d at 841.

Doe contends that Mr. Carter's abuse of process claim fails because the filing of a complaint is not "process" capable of being abused and, in any event, Mr. Carter does not show how Doe abused the complaint. Doe is wrong.

New York courts hold that the use of a lawsuit for an improper purpose constitutes an abuse of process. *See, e.g.*, *Pagliarulo*, 30 A.D.2d at 841; *Levine v. Sherman*, 384 N.Y.S.2d 685, 687 (Sup. Ct. 1976) (denying motion to dismiss abuse of process claim where plaintiff sufficiently pled that defendant filed the underlying lawsuits for harassment purposes); *Cardy v. Maxwell*, 169 N.Y.S.2d 547, 549-50 (Sup. Ct. 1957) (denying motion to dismiss abuse of process claim where the complaint "contain[ed] additional allegations which [] established a perversion of the action from its lawful and proper purposes to a vehicle for attempted extortion" including "threaten[ing] plaintiff with adverse newspaper publicity unless he paid several million dollars," that "defendants caused the scandalous . . . allegations of the complaint to be given extensive and lurid publicity when plaintiff refused to comply with their demands" and "alleg[ations] that all the defendants participated in a conspiracy to force plaintiff to pay them money to escape adverse publicity rather than defend the action."). Thus, in *Pagliarulo*, which Doe's co-conspirators, the Buzbee Defendants, rely on, the court refused to dismiss an abuse of process claim based on the commencement of a prior proceeding. 30 A.D.2d at 841. Instead, the court held that plaintiff stated a claim because the complaint alleged that "prior action was commenced 'for the sole purpose of compelling these plaintiffs, through fear and duress, to comply with unreasonable and unfounded

demands made by the defendants upon the plaintiffs with respect to compliance with the award in arbitration." *Id*. Here, Mr. Carter similarly alleges that the Buzbee Defendants initiated litigation not to resolve a genuine dispute, but to compel Mr. Carter "through fear and duress, to comply with unreasonable and unfounded demands made by the defendants upon" Mr. Carter, thus satisfying the requirements for an abuse of process claim under New York law.[8]

Doe next argues that that Mr. Carter's abuse of process claim fails because she did not file the SDNY Action for an improper purpose. This argument is incorrect and misconstrues the facts pled.

Doe's plan was clear and simple. First, the Buzbee Defendants' original complaint names Sean Combs, Combs' business entities, and "Does 1-10" as defendants. Mr. Carter alleges (and the Buzbee Defendants concede) that Mr. Carter was one of the unnamed "Does," and that the complaint was intentionally vague to create leverage. It was also designed to stir up publicity and speculation by alleging vile claims of sexual assault of a minor by a celebrity known as "Celebrity A." The purpose of this tactic was to instill fear in Mr. Carter that he would be publicly named and accused of heinous acts unless he agreed to a settlement. The complaint was "the opening salvo to

---

[8] Doe's cases are distinguishable because the plaintiffs in those cases did not allege that the lawsuits were used for an improper purpose. *See, e.g., Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984) (no abuse of process claim because "[t]hey do not contend that the summons issued by defendants was improperly used after it was issued but only that defendants acted maliciously in bringing the action"); *Tray Wrap*, 2008 NYLJ LEXIS 763, at *34 (recognizing that "a cause of action for abuse of process lies not for the commencement of an action but for the perversion of the process after it is commenced"); *Tenore v. Kantrowitz, Goldhamer & Graifman, P.C.*, 76 A.D.3d 556, 557 (2nd Dep't 2010) ("a malicious motive alone does not give rise to a cause of action to recover damages for abuse of process"); *Greco v. Christoffersen*, 70 A.D.3d 769, 770 (2nd Dep't 2010) ("there is no evidence that the plaintiff commenced the instant action with an intent to do harm without excuse or justification"); *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 132 (S.D.N.Y. 2012) ("Because these assertions do not allege that Defendants improperly employed process after Plaintiffs' Indictment in September 2005, the SAC's abuse-of-process claim must be dismissed."); *Dellutri v. Elmsford*, 895 F. Supp. 2d 555, 572 (S.D.N.Y. 2012) ("Even assuming that Defendant lacked probable cause, however, does not demonstrate that Defendant sought some collateral objective"); *Manhattan Enter. Grp. LLC v. Higgins*, 816 Fed. App'x, 512, 514 (2d Cir. 2020) (mere harassment insufficient). But, unlike the plaintiffs in those cases, after filing the SDNY Action, Doe then used it in an improper attempt to extort and leverage a settlement by threatening to formally name Mr. Carter in the plaintiff SDNY Action which contained utterly false, fabricated, and horrific allegations.

their extortion scheme and used as a tool to seek collateral advantage and to gain leverage over Mr. Carter." SAC ¶ 70.

Second, after filing the original complaint, the Buzbee Defendants sent Mr. Carter an extortionate demand letter. This letter made it clear that unless Mr. Carter agreed to a confidential mediation and a substantial settlement, they would file a lawsuit against Mr. Carter and the false allegations would be made public. But Doe had *already* filed a lawsuit against Mr. Carter (albeit as one of the Doe defendants). Doe's threat was explicit: Mr. Carter could either pay "something of substance" to avoid public exposure and reputational ruin, or face the devastating consequences of being named in a lawsuit alleging sexual assault of a minor.

Third, Doe and her co-conspirators made good on their threats to publicly name Mr. Carter in the SDNY Action. With the media whipped into a frenzy, the Buzbee Defendants then paid for Doe to travel from her home in the Southern District of Alabama to the Buzbee Defendants' offices in Houston, Texas to sit for an interview with NBC News. During the NBC News Interview – which Doe attended on a voluntary basis, and which occurred in the presence of Fortney – Doe lied about Mr. Carter to a ***global television audience***. Indeed, the NBC News Interview was set up with the specific intent that the resulting broadcast reach the largest possible audience, including viewers who reside in the United States, including Alabama, and a worldwide audience. It was also set up to allow Doe (and the Buzbee Defendants) to further propagate the lies in the sham SDNY Action, as well as new lies told during the NBC News Interview, all in the hopes of bringing intense additional pressure to bear on Mr. Carter and force him into a settlement.

Accordingly, Doe did not file the SDNY Action against Mr. Carter to obtain any legitimate relief from the judicial process. Rather, Doe and her attorneys schemed and concocted a plan to knowingly file the original complaint with fabricated claims with the intent of using it as leverage

and as collateral advantage in their blackmail and extortion of Mr. Carter. Doe admitted that before

the filing of the complaint, she agreed with the Buzbee Defendants to name Mr. Carter in the action

– despite knowing that Doe had no legitimate claims against Mr. Carter – in hopes of a "payout."

ECF 32-4. Doe and her attorneys knew that the vile accusations against Mr. Carter were baseless

and false. They knew that such vile accusations were harmful to Mr. Carter's reputation and image

as a celebrity and hoped that naming Mr. Carter in the SDNY Action alongside Mr. Combs, who

faced a publicized criminal indictment for sexual allegations, would give them the leverage needed

to extort Mr. Carter. As Doe later confessed, the purpose of filing the SDNY was to use it extort

large sums of money from Mr. Carter – not to obtain any alleged relief from the judicial process.

The "consummation of such threats do not constitute a legitimate and proper use of the court" and

is sufficient to pled abuse of process. *See Cardy v. Maxwell*, 169 N.Y.S.2d 547, 550 (Sup. Ct.

1957) (denying motion to dismiss where plaintiff sufficiently alleged that defendants conspired to

file the complaint and summons for the purpose of extorting payment, and threated to give wide

publicity to the content of the complaint); *Levine*, 384 N.Y.S.2d at 687 (Sup. Ct. 1976) (denying

motion to dismiss abuse of process claim where plaintiff sufficiently pled that defendant filed the

underlying lawsuits for harassment purposes).

## IV.    The Complaint States A Claim For Civil Conspiracy

To state a claim for civil conspiracy under New York law, the plaintiff must demonstrate

the primary tort, as well as: (1) an agreement between two or more parties; (2) an overt act in

furtherance of that agreement; (3) the parties' intentional participation in the furtherance of a plan

or purpose; and (4) resulting damage or injury. *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d

659, 671 (S.D.N.Y. 2007). Doe nevertheless argues - without any legal basis - that Mr. Carter's

conspiracy claim should be dismissed for two reasons. First, she contends that the conspiracy claim

must be dismissed if Mr. Carter's underlying claims are dismissed. Second, she asserts that lawyers are immune from liability for conspiring with their law firm, other lawyers, and/or their clients.

### A.  Mr. Carter Pleads Cognizable Tort Claims

As discussed in detail above, Mr. Carter asserts viable claims against Doe for defamation, malicious prosecution and abuse of process. Mr. Carter further states claims for malicious prosecution and abuse of process against the Buzbee Defendants and the Curis Defendants. *Pasqualini*, 498 F. Supp. 2d at 671 (denying motion to dismiss civil conspiracy claim); *World Wrestling Fed'n Entm't v. Bozell*, 142 F. Supp.2d 514, 532 (S.D.N.Y. 2001) (same). Mr. Carter has stated an underlying, predicate tort, and therefore his conspiracy claim must not be dismissed on this ground.

### B.  Lawyers Are Not Absolutely Immune From Liability For Conspiring With Their Clients

Doe's argument that "an attorney cannot conspire with his client" is as wrong as it is offensive. Doe does not (and cannot) cite a single case to support this argument because no New York court has held that an attorney is absolutely immune from conspiring with their clients. This Court should not be the first.

Indeed, Doe does not even muster an argument of her own and, instead, relies exclusively on those advanced by the Buzbee Defendants. But, as their own cases make clear that "the mere fact that one is an attorney acting in a professional capacity does not make him absolutely immune from responsibility for his wrongful acts." *Dallas v. Fassnacht*, 42 N.Y.S.2d 415, 417 (Sup. Ct. N.Y. Cty 1943) ("an attorney is personally liable to a third party who sustains an injury in consequence of his wrongful act or improper exercise of authority where the attorney has been guilty of fraud or collusion, or of a malicious or tortious act"); *Vernes v. Phillips*, 266 N.Y. 298, 301 (N.Y. 1935); *Schierloh v. Kelly*, 253 A.D. 373, 374 (2d Dep't 1938). Thus, to survive a motion

to dismiss, Mr. Carter's claim "based upon an alleged conspiracy between [Doe] and her attorney[s] . . . [must] allege[] sufficient facts to show that [Doe] and her attorney[s] instituted a baseless action against him." *Dallas*, 42 N.Y.S.2d at 417 (dismissing conspiracy claim because, unlike here, "it contain[ed] no allegations of fact which [we]re sufficient to support th[at] claim"). That is the very essence of Mr. Carter's complaint: that Doe and her attorneys instituted a baseless action as part of their broader conspiracy to extort and defame Mr. Carter.

Accordingly, Mr. Carter sufficiently pleads a conspiracy claim.

### C.  New York Law Does Not Bar An "Intracorporate" Civil Conspiracy

Doe argues she is incapable of conspiring with the Buzbee Defendants and/or the Curis Defendants under the intracorporate conspiracy doctrine. ECF 43 at 47. That is incorrect.

"Under the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of [his] employment, are legally incapable of conspiring together." *Little v. City of New York,* 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (internal marks omitted). But it is not "determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together independent centers of decision making. If it does, the entities are capable of conspiring." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195-96 (2010) (examining the "now-defunct doctrine known as the "intraenterprise conspiracy doctrine" in the antitrust context). (citation omitted). The doctrine does not bar Mr. Carter's conspiracy claim.

***First***, the intraconspiracy doctrine is invalid. *Id.* [9]

---

[9] While *Am. Needle* was a Sherman Act case, "it would be logically inconsistent to hold that agents of a corporation, acting in their official capacity, together constitute only a single actor for the sake of some conspiracies but not for others. There is no distinction among the types of conspiracies covered by the aforementioned federal statutes as compared to New York state common law that would explain disparate application of the intracorporate conspiracy doctrine." *Reich v. Lopez*, 38 F. Supp. 3d 436, 463 (S.D.N.Y. 2014); *Doherty v. Am. Motors Corp.,* 728 F.2d 334, 339 (6th Cir. 1984) ("the same rule has been consistently applied in allegations of conspiracy"). It follows that, if the doctrine is no longer a viable defense to antitrust claims, it is equally unavailable to Doe here.

**Second**, the doctrine does not even apply here because the conspiracy alleged in the Second Amended Complaint is not limited to single enterprise or organization.

**Third**, assuming the alleged conspiracy was confined to the Buzbee Law Firm (and it is not), New York law provides "an exception to this doctrine [] where a plaintiff adequately alleges that each defendant possessed an independent, conspirational purpose, wholly separate and apart from the entity." ECF No. 43 at 49 (citations omitted). The SAC more than adequately alleges the Buzbee Defendants, the Curis Defendants, and Doe each had their own independent motive for conspiring to defame and extort Mr. Carter. *See, e.g.,* SAC ¶¶ 17, 162.

*Reich v. Lopez* is illustrative. 38 F. Supp. 3d 436, 468 (S.D.N.Y 2014). The court explained that, "[w]hile an employee ensuring the profitability of his company is not exceptional, if Plaintiffs are capable of showing that [an employee]'s alleged conspiratorial activities provided him disproportionately great profit as compared to [his employer]'s derived benefit (or at the expense of [the employer]), such a showing may constitute a personal stake." *Id*. Similarly, the court stated that a "conspiracy relates to [a defendant]'s attempt to harm Plaintiffs in order to, in part, protect himself from the surfacing of the bribery activity" are sufficient to overcome the intracorporate conspiracy bar because "[s]elf-protection is separate and apart from the concerns of the company." *Id*. The court therefore held that the alleged conspiracy claim was not barred by intracorporate conspiracy doctrine because the plaintiffs alleged that the co-conspirator "'profited wildly' from the ongoing illegal bribery scheme" because it "implies a 'personal stake in achieving the corporation's objective' that goes beyond 'merely carrying out the corporation's managerial policy.'").

Here, as in *Reich*, the Second Amended Complaint is replete with allegations showing that Buzbee, Fortney, and Curis each had their own personal motives for conspiring with each other,

- 42 -

their law firms, and their client, Doe. *See, e.g.,* SAC ¶ 162. For instance, as in *Reich*, the Second Amended Complaint alleges each defendant had their own individual financial motives for extorting Mr. Carter. *See, e.g., id.* at ¶17; *Reich*, 38 F. Supp. 3d at 465. Mr. Carter also alleges the Buzbee Defendants and Curis Defendants were motivated, in part, by a desire to "coverup" their extortion scheme. *See, e.g.*, *id.* at ¶¶1, 15-16. Accordingly, as in *Reich*, the intracorporate conspiracy doctrine does not bar Mr. Carter's conspiracy claim. *See Reich*, 38 F. Supp. 3d at 465.

## V.    The Recent Decision of The California Superior Court In *Carter v. Buzbee* Is Irrelevant

In 2024, Mr. Carter sued Buzbee and the Buzbee Firm for defamation, extortion, and intentional infliction of emotional distress in the California Superior Court, Los Angeles Division. On June 30, 2025, Judge Epstein of that court granted Buzbee and the Buzbee Firm's special motion to strike ("SMS") in *Carter v. The Buzbee Law Firm*, No. 24SMCV05637 (Superior Ct. L.A. County June 30, 2025). (Hahn Decl. Ex. 4) Because Judge Epstein's decision was issued after Doe filed her motion to dismiss, it was not addressed in her motion. However, Mr. Carter anticipates that she will incorrectly seek to cite the decision in support of their reply brief.

Judge Epstein's reasoning and decision do not support Doe's arguments in this case and actually underscore the strength of Mr. Carter's claims in several ways. ***First,*** the California case involved claims against Buzbee and his firm for extortion, defamation, and intentional infliction of emotional distress. This case, however, involves claims of malicious prosecution, abuse of process, and civil conspiracy against Doe, the Buzbee Defendants and the Curis Defendants.

***Second,*** Judge Epstein's decision was made under an exacting standard of California state law review that is inapplicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). California's procedural law (which does not apply here under any circumstances) required Mr. Carter to establish, before discovery, a likelihood of prevailing, including by submitting evidence the court

determines to be "reasonably possible" of being admissible at trial. *See Sweetwater Union High School Dist. v. Gilbane Building Co.*, 6 Cal. 5th 931, 947 (2019). By contrast, on a motion to dismiss, Mr. Carter's allegations are presumed true and he need only plead a plausible right to relief, which he does. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**Third**, in his decision, California State Court Judge Epstein held that although Doe's confession to investigators concerning the falsity of the SDNY Action and that Buzbee had concocted the idea to falsely accuse Mr. Carter would likely be admissible at trial, it was inadmissible at the SMS stage. Yet the allegations in Mr. Carter's complaint are deemed true for purposes of the Buzbee Defendants' motion to dismiss. *Twombly*, 550 U.S. at 555. Thus, unlike Judge Epstein at the SMS stage, this Court at the motion to dismiss stage must accept, as true, Mr. Carter's allegations that Doe admitted that Mr. Carter did not assault her and that indeed it was her attorney, Buzbee, who pushed her to propagate the false narrative of the sexual assault by Mr. Carter to leverage a maximum payday from him. *See Douglas v. Bayview Loan Servicing, LLC*, 2012 U.S. Dist. LEXIS 11943, at *8 (S.D. Ala. Jan. 13, 2012).

If anything, Judge Epstein's decision shows why Doe's motion should be denied. For instance, Judge Epstein noted that he would not have dismissed Mr. Carter's claims in the California action if his hands were not tied by specific California state court precedent on the inadmissibility of Doe's confession at the SMS stage, which are plainly inapplicable here at the motion to dismiss stage.[10] *Carter v. Buzbee*, No. 24SMCV05637, at 63 ("*but for the court's evidentiary ruling*, the court would come out the other way on this motion" (emphasis in original)). Indeed, Judge Epstein specifically noted that if Doe's confession was admissible under California law, Buzbee's conduct would expose him to liability under a malicious prosecution theory, which

---

[10] In fact, the tentative version of Judge Epstein's decision considered Doe's confession and sustained Mr. Carter's extortion claim against Buzbee. Hahn Decl. Ex. 5.

was not at issue in the case, and "would be enough to support an inference of actual malice." *Id.* Judge Epstein also held that Mr. Carter adequately showed special damages in the form of injury to his "property, business, trade, profession, or occupation." *Id*. at 63-64.

As noted, because Judge Epstein's decision in the California state court case is irrelevant to these proceedings due to the peculiarities of California state law by which Judge Epstein's analysis and decision making were cabined, it should not be considered by this Court. However, were it to be considered, it would have the opposite effect of what Doe suggests, strongly supporting denial of Doe's unsustainable motion.

### **Conclusion**

For these reasons, the Court should deny Doe's motion to dismiss in its entirety.


Dated: July 23, 2025

Respectfully submitted,

/s/ W. Patton Hahn
W. PATTON HAHN
WILLIAM G. SOMERVILLE
JADE E. SIPES

*Attorneys for Plaintiff Shawn Carter*

**OF COUNSEL:**
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
1901 Sixth Avenue North, Suite 2600
Birmingham, Alabama 35203-5202
Telephone: (205) 244-3821
wsomerville@bakerdonelson.com
phahn@bakerdonelson.com
jsipes@bakerdonelon.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2025, the foregoing has been served upon the following defendants via the Court's electronic filing system as follows:

Matthew Ryan Jackson
11 N. Water St., Suite 23200
Mobile, AL 36602
251-433-3234
matt.jackson@arlaw.com

J. Blair Newman, Jr.
11 N. Water St., Suite 13290
Mobile, AL 36602
251-433-3234
bnewman@mcdowellknight.com

Caroline T. Pryor
Thomas Oliver II
Alexander Townsley
Dennis Oscar Vann
Carr Allison
6251 Monroe Street, Suite 200
Daphne, AL 36526
cpryor@carrallison.com

/s/ *W. Patton Hahn*
OF COUNSEL